## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK

Allen HARPER, José LEON, and Ranfis
PEREZ on behalf of themselves and all
others similarly situated; and the
RELEASE AGING PEOPLE IN
PRISON CAMPAIGN ("RAPP"),

               Plaintiffs,

     v.

ANDREW CUOMO, in his official
capacity as the Governor of the State of
New York; NEW YORK STATE
DEPARTMENT OF CORRECTIONS
AND COMMUNITY SUPERVISION;
ANTHONY J. ANNUCCI, in his official
capacity as the Acting Commissioner of
the New York State Department of
Corrections and Community Supervision;
JOHN MORLEY, M.D., in his official
capacity as the Deputy Commissioner
and Chief Medical Officer of the New
York State Department of Corrections
and Community Supervision; and
JEFFREY TEDFORD, in his official
capacity as the Superintendent of
Adirondack Correctional Facility

          Defendants.

Civil Action No.  9:21-cv-19 (LEK/ML)

**CLASS ACTION COMPLAINT**
**JURY TRIAL DEMANDED**

## PRELIMINARY STATEMENT

1.     This lawsuit challenges New York's warehousing of elderly and medically

vulnerable people in a remote prison without the basic health and safety protocols necessary to

prevent the spread of COVID-19.

2.     Beginning in summer 2020, New York State officials transferred nearly 100

elderly and/or medically vulnerable people from prisons around the state to Adirondack

Correctional Facility ("Adirondack"). State officials effectively created a prison nursing home at Adirondack. Now, as the second wave of the COVID-19 crisis unfolds and plans for the distribution of a vaccine have yet to emerge, state officials persist in their failure to create a safe environment at Adirondack. State officials have refused to provide the necessary resources or adopt any of the necessary protocols at Adirondack, creating a heightened risk of spreading infection and undermining the ability to treat this particularly vulnerable group.

3.     Since COVID-19 first began to spread in the United States, medical professionals, advocates, and attorneys have warned Defendants of the danger that elderly, medically vulnerable people in New York's prisons face and demanded that Defendants modify their policies to create safe environments. Rather than heed these warnings and improve conditions where vulnerable incarcerated people were, Defendants chose to transfer many of them to Adirondack. Defendants knew that the cohort they transferred to Adirondack is at particular risk from COVID-19. Indeed, they appear to have selected them for that reason. Defendants also knew of the paucity of medical resources available at Adirondack and in the surrounding community and that Adirondack staff were not trained to deal with the clinical needs of an elderly population.

4.     Prison transfers like these have produced catastrophic COVID-19 spread throughout the country, yet Defendants have not taken the necessary steps to prevent this from happening at Adirondack. Defendants transfer men to Adirondack without screening or testing them prior to transfer. Men from different facilities are crowded together on poorly ventilated busses for the many-hours ride to Adirondack, then immediately integrated into the Adirondack population, without any screening, testing, or quarantine. Defendants have not implemented at Adirondack the most basic measures necessary to prevent COVID-19 transmission in the facility.

Defendants are not conducting meaningful testing or screening for symptoms; they have not quarantined or re-tested incarcerated people they knew to be exposed to COVID-19; they do not ensure basic hygiene within the facility; and they have forced people to congregate closely under conditions that make it almost impossible to engage in social distancing. For example, during meals, men from all units are mixed together, without masks, eating in close quarters.

5.      Defendants' handling of COVID-19 at Adirondack—particularly at this stage in the pandemic, when they have ample evidence and understanding of the risks the disease poses to elderly and infirm people in congregate settings—constitutes deliberate indifference to a grave threat to the safety of men incarcerated at Adirondack. Defendants' acts and omissions uniquely imperil this vulnerable population, violating Plaintiffs' rights under the United States Constitution and the disability rights statutes.

6.      Plaintiffs Allen Harper, José Leon, and Ranfis Perez (collectively, "Individual Plaintiffs") bring this action individually, and on behalf of all others similarly situated, and Plaintiff Release Aging People in Prison Campaign ("RAPP") brings this action on its own behalf, to challenge the acts and omissions of Governor Andrew Cuomo, the New York State Department of Corrections and Community Supervision ("DOCCS"), DOCCS's Acting Commissioner Anthony J. Annucci, DOCCS's Chief Medical Officer John Morley, M.D., and Adirondack Correctional Facility ("Adirondack") Superintendent Jeffrey Tedford. Plaintiffs assert claims under the Eighth and Fourteenth Amendments to the United States Constitution, Title II of the Americans with Disabilities Act, and Section 504 of the Rehabilitation Act of 1973.

7.      Plaintiffs seek declaratory and injunctive relief for the unconstitutional and discriminatory practices to which Adirondack residents are subject. For the General Class,

Plaintiffs seek to compel Defendants to implement necessary measures to prevent Adirondack

residents from contracting COVID-19 and suffering potentially dire complications as a result.

For the Disability Subclass, Plaintiffs seek to compel Defendants to provide reasonable

modifications for subclass members' disabilities, which render them particularly vulnerable to

suffering dire complications, up to and including death, if they contract COVID-19.

8.      Adirondack residents are at the mercy of their jailers in every respect. Their jailers

have behaved with shocking indifference toward their needs, placing them in the crosshairs of a

virus to which they are highly vulnerable. Plaintiffs seek court intervention to preserve the health

and protect the lives of Adirondack residents.

## JURISDICTION AND VENUE

9.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because

it arises under the Constitution and laws of the United States.

10.     Plaintiffs seek declaratory and injunctive relief under 28 U.S.C. §§ 1343, 2201,

and 2202.

11.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a

substantial part of the events or omissions giving rise to the claims occurred within this District.

## PARTIES

12.     **Plaintiff Allen Harper** is a 75-year-old African American man from Brooklyn

who has been incarcerated since 2002. Mr. Harper was transferred to Adirondack in or around

August of 2020 from Woodbourne Correctional Facility.

13.     Mr. Harper has a history of serious heart disease. He has had femoral popliteal

bypass surgery, has hypertension, kidney disease, valvular disease (two leaking valves in his

heart), and a prostate condition. Mr. Harper takes lisinopril and metolazone to control his

hypertension. Mr. Harper's hypertension interferes with the operation of his circulatory functions, and his valvular disease limits his ability to engage in exercise. Without medication to control his hypertension, Mr. Harper would be at serious risk of heart failure, stroke, congestive heart failure, brain hemorrhage, ischemic heart disease and worsening of his chronic kidney disease.

14.     **Plaintiff José Leon** is a 62-year-old Hispanic man from Manhattan who has been incarcerated since 1974. Mr. Leon was transferred to Adirondack in or around July 2020 from Otisville Correctional Facility.

15.     Mr. Leon has been diagnosed with hypertension, hypothyroidism, and ulcerative colitis. Mr. Leon has a BMI of 30. He has coronary artery disease and suffered a heart attack in 2019 that required a stent to open a blocked artery in his heart. Mr. Leon now takes blood thinners to prevent the stent in his heart from becoming blocked again. Mr. Leon's hypertension and coronary artery disease interfere with the functioning of his circulatory system, and without the medications he currently takes, he would be limited in his ability to engage in exercise because of the very high risk of a recurrence of a heart attack. Without adequate control of his hypertension, Mr. Leon is at increased risk of heart failure, stroke, congestive heart failure, brain hemorrhage, and ischemic heart disease.

16.     **Plaintiff Ranfis Perez** is a 60-year-old Hispanic man from Manhattan who has been incarcerated since 2001.

17.     Mr. Perez was transferred to Adirondack in or around June of 2020 from Eastern Correctional Facility. Mr. Perez has diabetes, hypertension, and high cholesterol. These diseases interfere with his circulatory and endocrine system functioning and put him at significantly increased risk for heart attack and stroke. In addition to the previously mentioned disease risks

from untreated hypertension, without medication, Mr. Perez is at risk for life-threatening conditions such as acute complications related to diabetes resulting in a risk of coma or death, as well as chronic kidney disease, blindness, and damage to the small blood vessels in his hands and feet resulting in pain, poor wound healing and increased risk for amputation. These conditions would limit Mr. Perez in the major life activities of seeing, walking, and sleeping.

18.     **Plaintiff Release Aging People in Prison Campaign ("RAPP")** is a grassroots organizing and policy organization working to end mass incarceration and promote racial justice by focusing primarily on the needs of older and aging incarcerated people in New York State.

19.     Founded in 2012, RAPP is led by formerly incarcerated people and currently has a staff of 7 full-time employees, as well as numerous individuals who either work for stipends or volunteer their time.

20.     RAPP engages in community organizing, public education, and advocacy efforts—including state legislative advocacy—to advocate for the rights of elderly people in prison and inform members of the public and the state government about the extent of the state's aging prison population and the harms this population faces. RAPP works to alleviate the effects of those harms on behalf of aging people in prison in various ways, including by advocating for systemic change and helping people secure release from prison and return to the community.

21.     As described below, Defendants' conduct has frustrated RAPP's mission by, among other things, forcing RAPP to shift its advocacy efforts away from statewide individual and legislative advocacy and toward Adirondack-specific advocacy aimed at limiting the harm posed by the Adirondack transfer plan.

22.     **Defendant Andrew Cuomo** is the Governor of the State of New York, which is a public entity covered by the ADA. He is responsible for supervising and controlling Defendant

6

DOCCS, which is a public entity covered by the ADA and a recipient of federal funds within the meaning of Section 504 of the RA.

23.     Defendant Cuomo appoints the commissioner of Defendant DOCCS, who serves at his pleasure.

24.     Defendant Cuomo has taken a prominent and hands-on role in all aspects of the State's response to COVID-19, including DOCCS's response. He has been personally involved in the acts and omissions at the heart of this case, including the failed response to COVID-19 in New York State prisons and Defendants' unsafe decision to transfer Individual Plaintiffs, and all members of the putative General Class and Subclass, to Adirondack. As various prison facilities in New York experience COVID-19 outbreaks, Defendant Cuomo has doubled down on his policy of transferring the most vulnerable incarcerated people rather than releasing them or creating adequately safe environments anywhere. For example, on October 28, 2020, Defendant Cuomo stated that the Department was considering transferring vulnerable people from Elmira, and other prisons experiencing outbreaks, to other facilities.

25.     Defendant Cuomo is sued in his official capacity. He has the authority, if enjoined to do so, to remedy this unlawful conduct.

26.     **Defendant DOCCS** is a New York State agency that enforces the laws and regulations applicable to New York State prisons.

27.     Defendant DOCCS is a public entity covered by the ADA and a recipient of federal funds within the meaning of Section 504 of the RA.

28.     Defendant DOCCS is statutorily responsible for the confinement and habilitation of individuals placed in state correctional facilities and for their programming, supervision, and conditions of confinement.

29.     Defendant DOCCS operates 52 prisons throughout New York, most of which are in poor areas of the state that lack job opportunities outside of the prison system. One of these prisons is Adirondack Correctional Facility, located at 196 Ray Brook Road, Ray Brook, New York. Defendant DOCCS has the authority, if enjoined to do so, to remedy this unlawful conduct.

30.     **Defendant Anthony J. Annucci** is the Acting Commissioner of Defendant DOCCS.

31.     Defendant Annucci is responsible for the administration and operation of DOCCS and the care and custody of people who are incarcerated in DOCCS facilities, including at Adirondack.

32.     Defendant Annucci is responsible for the administration and operation of DOCCS's planning, programs, and services for incarcerated people with disabilities.

33.     Defendant Annucci has been personally involved in the acts and omissions at the heart of this case, including Defendants' failed response to COVID-19 in New York State prisons and Defendants' unsafe decision to transfer Individual Plaintiffs and members of the putative General Class and Subclass, to Adirondack.

34.     Defendant Annucci is sued in his official capacity. He has the authority, if enjoined to do so, to remedy this unlawful conduct.

35.     **Defendant John Morley, M.D.** is the Deputy Commissioner and Chief Medical Officer of Defendant DOCCS.

36.     Defendant Morley oversees all of Defendant DOCCS's health-related programs and is responsible for the management of the Division that provides those programs. He oversees

Defendant DOCCS's provision of primary care, coordinated specialty care, and care for infectious and communicable diseases, including COVID-19.

37.     Defendant Morley was instrumental in designing Defendant DOCCS's pandemic plan and "reopening plan." He was a key player in Defendant DOCCS's decision to transfer Individual Plaintiffs, and members of the putative General Class and Subclass, to Adirondack and has overseen these transfers.

38.     Defendant Morley is responsible for overseeing all aspects of medical care and COVID-19 prevention at Adirondack.

39.     Defendant Morley is sued in his official capacity. He has the authority, if enjoined to do so, to remedy Defendants' unlawful conduct with respect to testing, screening, and access to medical care.

40.     **Defendant Jeffrey Tedford** is the Superintendent of Adirondack Correctional Facility.

41.     Subject to the direction of Defendant Annucci, Defendant Tedford is the Chief Administrative Officer of Adirondack. Defendant Tedford is legally responsible, under the laws of the State of New York, for the management and supervision of the facility and for directing the work and defining the responsibilities of all the employees of the facility.

42.     As the Superintendent of Adirondack, Defendant Tedford is the legal custodian of Individual Plaintiffs and members of the putative plaintiff General Class and Subclass.

43.     Defendant Tedford is sued in his official capacity. He has the authority, if enjoined to do so, to remedy Defendants' unlawful conduct concerning testing, quarantining, and screening people incarcerated at Adirondack, as well as Defendants' unlawful conduct

9

concerning provision of soap and other hygiene necessities, as well as social distancing in all areas of the prison, including housing units, dining spaces, and bathrooms.

## CLASS ALLEGATIONS

44.     Plaintiffs properly maintain this action as a class action pursuant to Rules 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure on behalf of the Individual Plaintiffs and similarly situated individuals in a putative General Class and a putative Disability Subclass.

45.     The putative General Class consists of all persons who are incarcerated or who will be incarcerated at Adirondack Correctional Facility during the pendency of Defendant Cuomo's declaration of a COVID-19 emergency for the State of New York.

46.     Everyone in the General Class is currently age 60 or over, and most, if not all, also have underlying medical conditions that put them at particular risk of serious harm or death from COVID-19.

47.     According to the Centers for Disease Control ("CDC"), medical conditions that exacerbate the risk of death or serious illness from COVID-19 include, but are not limited to: chronic lung disease or moderate to severe asthma (including chronic obstructive pulmonary disease, ("COPD") *e.g.* emphysema and chronic bronchitis); idiopathic pulmonary fibrosis and cystic fibrosis); serious heart conditions (including heart failure, coronary artery disease, congenital heart disease, cardiomyopathies and pulmonary hypertension); people who are immunocompromised (including by cancer treatment, smoking, bone marrow or organ transplantation, immune deficiencies, poorly controlled HIV or AIDS, and prolonged use of corticosteroids and other immune weakening medications); people with severe obesity (body mass index ("BMI") of 40 or higher); people with diabetes; people with chronic kidney disease

undergoing dialysis; people with chronic liver disease, including cirrhosis; and people with hemoglobin disorders, including sickle cell disease and thalassemia.

48.     All Individual Plaintiffs are members of the General Class, and all are at least 60 years old—Mr. Harper is 75, Mr. Leon is 62, and Mr. Perez is 60. Additionally, each Individual Plaintiff has underlying medical conditions that put him at increased risk of death or serious complications from COVID-19. Mr. Harper has at least two underlying medical conditions— high blood pressure and serious cardiac problems—that put him at increased risk of death or serious complications from COVID-19. Mr. Leon has a history of serious heart illness, including a heart attack last year for which he was hospitalized for six days, and he currently has the serious heart illness of hypertension. Mr. Perez has diabetes, which is recognized by the CDC as a condition that greatly increases the risk for COVID-19 complications.

49.     The putative Disability Subclass consists of members of the General Class who have or are perceived to have diabetes and/or heart disease, physical impairments that limit one or more of their major life activities and that place members of the Disability Subclass at increased risk of contracting, becoming severely ill from, and/or dying from COVID-19.

50.     Diabetes limits endocrine system functioning, and so is a qualifying disability within the meaning of the ADA. *See, e.g.*, 42 U.S.C. 12102(2)(B) ("disability" is "a physical or mental impairment that substantially limits one or more major life activities," and "a major life activity . . . includes the operation of a major bodily function, including . . . endocrine . . . functions.").

51.     Serious heart disease, including hypertension, is likewise a disability within the meaning of the ADA, in that it interferes with "the operation of . . . circulatory . . . functions" under 42 U.S.C. § 12102(2)(B).

52.     Similarly, kidney disease is a disability within the meaning of the ADA, as it interferes with both circulatory and endocrine functions under 42 U.S.C. § 12102(2)(B).

53.     All Individual Plaintiffs are also members of the Disability Subclass. Mr. Perez has both diabetes and hypertension. These diseases interfere with his circulatory and endocrine system functioning and put him at significantly increased risk for heart attack and stroke. In addition to the previously mentioned disease risks from untreated hypertension, without medication, Mr. Perez is at risk for life-threatening conditions such as acute complications related to diabetes resulting in a risk of coma or death, as well as chronic kidney disease, blindness, and damage to the small blood vessels in his hands and feet resulting in pain, poor wound healing and increased risk for amputation. These conditions would limit Mr. Perez in the major life activities of seeing, walking, and sleeping.

54.     Mr. Harper is also a member of this subclass. Mr. Harper's hypertension interferes with the operation of his circulatory functions, and his valvular disease limits his ability to engage in exercise. Without medication to control his hypertension, Mr. Harper would be at serious risk of heart failure, stroke, congestive heart failure, brain hemorrhage, ischemic heart disease and worsening of his chronic kidney disease. Mr. Harper's chronic kidney disease also interferes with his endocrine system functioning.

55.     Mr. Leon is also a member of this subclass. Mr. Leon's hypertension and coronary artery disease interfere with the functioning of his circulatory system, and without the medications he currently takes, he would be limited in his ability to engage in exercise because of the very high risk of a recurrence of a heart attack. Without adequate control of his hypertension, Mr. Leon is at increased risk of heart failure, stroke, congestive heart failure, brain hemorrhage, and ischemic heart disease.

56.    A class action is the only practicable means by which the Individual Plaintiffs and the putative class members may challenge Defendants' acts and omissions that place putative class members at risk of contracting and succumbing to COVID-19.

57.    <u>Numerosity</u>: The Class and Subclass are so numerous that joinder of all members is impractical. About 96 people are incarcerated at Adirondack. All people incarcerated in Adirondack are within the General Class. At least 30 people incarcerated at Adirondack are also members of the disability subclass. Disposition of this matter as a class action will avoid a proliferation of lawsuits and will provide to the Parties and the Court the substantial benefits and efficiencies of a counseled, coordinated presentation of the dispute.

a.    The compositions of the General Class and Disability Subclass are necessarily fluid as Defendants transfer individuals to and from Adirondack at their discretion, and new class members enter each class upon transfer to Adirondack. It therefore would be impracticable to join each class member to this lawsuit.

b.    Among other relief, Individual Plaintiffs seek prospective injunctive relief on behalf of future, unknown General Class and Disability Subclass members, further making joinder impracticable.

58.    <u>Commonality</u>: Individual Plaintiffs raise questions of law and fact that are common to all class members and to the subclass members. Common questions raised as to the General Class include: (a) whether COVID-19 presents a heightened risk of harm to class members incarcerated in Adirondack; (b) whether Defendants have taken the necessary steps to respond to this heightened risk or have violated and continue to violate the Eighth Amendment by failing to take the necessary steps to protect class members from the risk posed by the conditions of confinement at Adirondack, in light of what they know about the risks posed by

COVID-19; and (c) whether Individual Plaintiffs are entitled to declaratory and injunctive relief to vindicate their constitutional rights.

59.     Common questions raised as to the Disability Subclass include, but are not limited to: (a) whether Defendants fail to accommodate the needs of people with the disabilities of heart disease, diabetes, and kidney disease, which render them susceptible to contracting, becoming severely ill from, and/or dying from COVID-19; (b) whether Defendants' failure to accommodate these disabilities violates Title II of the ADA and Section 504 of the RA; and (c) whether Individual Plaintiffs are entitled to declaratory and injunctive relief to vindicate their statutory rights.

60.     Typicality: The claims of the Individual Plaintiffs are typical of those of the General Class. Defendants have placed the Individual Plaintiffs at the same significant risk of harm as experienced by all class members through failing to take steps to address the shared risk of contracting, and being rendered seriously ill or injured by, COVID-19 at Adirondack. Individual Plaintiffs, like all Adirondack residents, face an unnecessarily heightened risk of contracting the virus because of Defendants' conduct. All Individual Plaintiffs are at least 60 years old and have serious underlying medical conditions that put them at heightened risk of death or serious injury if they contract COVID-19.

61.     The claims of the Individual Plaintiffs are also typical of those of the Disability Subclass. Like other members of the Disability Subclass, Mr. Perez has diabetes, a condition that makes him a qualified individual with a disability under the ADA. Like other members of the disability subclass, Mr. Leon has pulmonary hypertension, a serious heart condition that makes him a qualified individual with a disability. Mr. Harper also has pulmonary hypertension, and he also has kidney disease, making him a qualified individual with a disability.

62.    <u>Adequacy</u>: The Proposed Class satisfies the adequacy requirements of Fed. R. Civ. P. 23(a)(4), because the class representatives will fairly and adequately represent the interests of the Proposed Class and Disability Subclass.

a.    The Individual Plaintiffs seek the same declaratory and injunctive relief as the other members of the Proposed Class and Subclass: a declaratory judgment that the policies at issue here violate the Eighth Amendment, the ADA, and Section 504 of the RA, and preliminary and permanent injunctions enjoining Defendants such that they will come into compliance with those laws. Such relief will benefit all current and future class members who are and may be imprisoned at Adirondack while COVID-19 remains a serious threat to class members' health. In asserting their own rights, the Individual Plaintiffs will represent the rights of all members of the Proposed Class and Subclass fairly and adequately. The class representatives have no interests that are antagonistic to each other's interests or to the interests of other members of the Proposed Class and Subclass.

b.    Plaintiffs are represented by attorneys employed by Relman Colfax PLLC and the Prisoners' Rights Project of The Legal Aid Society. Undersigned counsel has ample experience litigating complex lawsuits, including federal class actions and civil rights lawsuits involving the rights of incarcerated people.

63.    Defendants have acted and refused to act on grounds generally applicable to all proposed class and subclass members. Declaratory and injunctive relief is appropriate respecting the class and subclass. Individual Plaintiffs therefore seek class certification under Fed. R. Civ. P. 23(b)(2).

64.    In the alternative, the requirements of Fed. R. Civ. P. 23(b)(1) are satisfied because prosecuting separate actions would create a risk of inconsistent or varying adjudications

with respect to individual Class members that would establish incompatible standards for the party opposing the proposed Class.

## FACTUAL BACKGROUND

## <u>The COVID-19 Pandemic</u>

65.     COVID-19 is a potentially deadly infectious respiratory disease that is caused by a novel coronavirus (SARS-CoV-2).[1]

66.     The United States is the worldwide COVID-19 epicenter, and the number of new cases continues to rise daily.[2] Since the onset of the pandemic, the United States has reported over 21.4 million confirmed cases of COVID-19, resulting in more than 361,000 deaths nationwide.[3]

67.     New York was one of the first states hit by COVID-19. Recognizing the severity of the pandemic, Defendant Cuomo declared a State of Emergency on March 7, 2020, which allowed the state to expedite the provision of medical supplies and testing kits.[4] By March 20, Defendant Cuomo closed all schools and non-essential business, required non-essential workers to work from home, and ordered all individuals over the age of 70 to shelter in place.[5]

---

[1] Pritish K. Tosh, M.D., *Coronavirus: What Is It and How Can I Protect Myself?*, MAYO CLINIC (Dec. 22, 2020), https://www.mayoclinic.org/diseases-conditions/coronavirus/expert-answers/novel-coronavirus/faq-20478727.
[2] *WHO Coronavirus Disease (COVID-19) Dashboard: United States of America*, WORLD HEALTH ORG. (Jan. 7, 2021), https://covid19.who.int/.
[3] *Coronavirus in the U.S.: Latest Map and Case Count*, N.Y. TIMES (Jan. 7, 2021), https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html.
[4] *At Novel Coronavirus Briefing, Governor Cuomo Declares State of Emergency to Contain Spread of Virus*, N.Y. STATE (Mar. 7, 2020), https://www.governor ny.gov/news/novel-coronavirus-briefing-governor-cuomo-declares-state-emergency-contain-spread-virus.
[5] Ben Axelson, *Coronavirus Timeline in New York: Here's How Gov. Cuomo Has Responded to COVID-19 Pandemic Since January*, SYRACUSE.COM (Apr. 15, 2020), https://www.syracuse.com/coronavirus/2020/04/coronavirus-timeline-in-ny-heres-how-gov-cuomo-has-responded-to-covid-19-pandemic-since-january.html.

68.     Since March 2020, the State has maintained that New Yorkers must "do what we know works - wear a mask, avoid gatherings and socially distance."[6] Even with these precautions in place, New York is experiencing a dangerous second spike.[7]

69.     COVID-19 can cause extreme pain, akin to "an anvil sitting on [a patient's] chest."[8] Approximately 20% of COVID-19 patients will develop severe symptoms that require hospitalization.[9] Of those who recover, many suffer permanent damage to their lungs, heart, and brain, resulting in long-term breathing problems and an increased risk of heart failure and stroke. Moreover, COVID-19 frequently causes blood clots, which can cause long-lasting problems in the liver and kidneys.[10]

70.     COVID-19 is highly contagious. Current research suggests that the novel coronavirus spreads easily from person to person, most often between people who are in close contact with one another (*i.e.* within six feet of each other) and through respiratory droplets that are produced when an infected person talks, sings, sneezes, or coughs.[11] Research has shown that an aggregate of 15 minutes of contact with an infected individual creates a significant risk of transmission.[12] The virus may also be spread through contaminated surfaces.[13]

---

[6] *Governor Cuomo Updates New Yorkers on State's Progress During COVID-19 Pandemic*, N.Y. STATE (Jan. 6, 2021), https://www.governor.ny.gov/news/governor-cuomo-updates-new-yorkers-states-progress-during-covid-19-pandemic-97.
[7] *N.Y. Flirts With Covid Record After Months of Controlling Cases*, BLOOMBERG (Dec. 10, 2020), https://www.bloomberg.com/news/articles/2020-12-10/n-y-flirts-with-covid-record-after-months-of-controlling-cases.
[8] *'An Anvil Sitting on My Chest': What It's Like to Have Covid-19*, N.Y. TIMES (May 7, 2020), https://www.nytimes.com/article/coronavirus-symptoms html.
[9] *Knowing the Risks of COVID-19*, WORLD HEALTH ORG. (Mar. 8, 2020), https://www.who.int/indonesia/news/detail/08-03-2020-knowing-the-risk-for-covid-19.
[10] *COVID-19 (coronavirus): Long-Term Effects*, MAYO CLINIC (Nov. 17, 2020), https://www.mayoclinic.org/diseases-conditions/coronavirus/in-depth/coronavirus-long-term-effects/art-20490351.
[11] CTRS. FOR DISEASE CONTROL AND PREVENTION, HOW TO PROTECT YOURSELF & OTHERS (Nov. 27, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention html.
[12] *COVID-19 in a Correctional Facility Employee Following Multiple Brief Exposures to Persons with COVID-19 — Vermont, July–August 2020*, Centers for Disease Control and Prevention, (Oct. 21, 2020), https://www.cdc.gov/mmwr/volumes/69/wr/mm6943e1 htm?s_cid=mm6943e1_w.
[13] Neeltje van Doremalen et al., *Aerosol and Surface Stability of SARS-CoV-2 as Compared with SARS-CoV-1*, 16 N. ENGL J MED.

71.     There is also evidence that COVID-19 spreads through aerosol transmission, such that there is a greater risk of COVID-19 transmission indoors, especially if spaces are poorly ventilated.[14] The CDC has advised that where "people with COVID-19 seem to have infected others who were more than 6 feet away," the "transmissions occurred within enclosed spaces that had inadequate ventilation."[15]

72.     Dr. Anthony Fauci, the Director of the National Institute of Allergy and Infectious Diseases at the National Institute of Health, stated that it has become "much clearer" that individuals are at greater risk of becoming infected when in indoor spaces with less air circulation and "any degree of aerosolization."[16] Dr. Joseph Allen, director of Harvard University's Healthy Buildings program, which studies how buildings impact public health, has cautioned, "[a]irborne transmission is happening in normal situations—it doesn't just have to be a choir practice or while someone is exercising," and that "[w]e've seen this in a restaurant, on a school bus, at a camp."[17] Scientists have also detected the virus traveling through air conditioning and ductwork.[18]

---

382  (April 16, 2020), https://www.ncbi nlm.nih.gov/pmc/articles/PMC7121658/pdf/NEJMc2004973.pdf; *see also*, NATL. INST. OF HEALTH, STUDY SUGGESTS NEW CORONAVIRUS MAY REMAIN ON SURFACES FOR DAYS (Mar. 24, 2020), https://www nih.gov/news-events/nih-research-matters/study-suggests-new-coronavirus-may-remain-surfaces-days; CTRS. FOR DISEASE CONTROL AND PREVENTION, PUBLIC HEALTH GUIDANCE FOR COMMUNITY-RELATED EXPOSURE, (Dec. 3, 2020), https://www.cdc.gov/coronavirus/2019-ncov/php/public-health-recommendations.html.

[14] CTRS. FOR DISEASE CONTROL AND PREVENTION, DECIDING TO GO OUT  (Oct. 28, 2020), https://www.cdc.gov/coronavirus/2019-ncov/daily-life-coping/deciding-to-go-out html.

[15] CTRS. FOR DISEASE CONTROL AND PREVENTION, HOW COVID-19 SPREADS (last accessed Jan. 7, 2021), https://tools.cdc.gov/api/v2/resources/media/407478/content html.

[16] Noah Higgins-Dunn, *Fauci Says He Thinks There is "a Degree" of Airborne Spread of the Coronavirus*, CNBC (Aug. 4, 2020, 12:11 PM), https://www.cnbc.com/2020/08/03/fauci-says-theres-a-degree-the-coronavirus-is-spreading-through-air-particles.html.

[17] *CDC Acknowledges COVID-19 Can Spread via Tiny Air Particles,* WALL ST. J. (Oct. 5, 2020), https://www.wsj.com/articles/cdc-updates-covid-19-guidelines-acknowledging-virus-can-spread-via-tiny-air-particles-11601921416.

[18] Jianyun Lu et al., *COVID-19 Outbreak Associated with Air Conditioning in Restaurant, Guangzhou, China, 2020*, *in* 26(7) EMERGING INFECTIOUS DISEASES 1628 (July 2020), https://wwwnc.cdc.gov/eid/article/26/7/20-0764_article; Joseph Allen, Opinion, *We Cannot Keep Ignoring the Possibility of Airborne Transmission. Here's How to Address It.*, WASH. POST (May 26, 2020, 1:55 PM), https://www.washingtonpost.com/opinions/2020/05/26/key-stopping-covid-19-addressing-airborne-transmission/.

73.     Eating meals in close proximity has been identified as significantly increasing the risk of COVID-19 transmission. A September study by the CDC found that adults who tested positive for COVID-19 were twice as likely to have dined at a restaurant in the last two weeks.[19] In discussing the results, the study noted that "[m]asks cannot be effectively worn while eating and drinking" and that "[e]xposures and activities where mask use and social distancing are difficult to maintain, including going to locations that offer on-site eating and drinking, might be important risk factors for SARS-CoV-2 infection."[20]

74.     Infected individuals can transmit the virus to others even when asymptomatic; recent research has also shown that up to half of COVID-19 transmissions come from people who show no symptoms.[21] Moreover, emerging research shows that people infected with COVID-19 tend to be *most* contagious before they begin to show symptoms.[22]

75.     Everyone is at risk of contracting COVID-19 if they are exposed to the virus, but people with comorbid health conditions have a significantly higher risk of developing a serious illness—meaning they may require hospitalization, intensive care, or a ventilator to help them breathe—or of dying from COVID-19.[23] In fact, adults with comorbid conditions are 6 times more likely to be hospitalized for COVID-19 and 12 times more likely to die.[24] In New York

---

[19] Kiva A. Fisher et al., *Community and Close Contact Exposures Associated with COVID-19 Among Symptomatic Adults ≥18 Years in 11 Outpatient Health Care Facilities — United States, July 2020*, 69 MORBIDITY AND MORTALITY WEEKLY REPORT 1258, 1259 (2020), https://www.cdc.gov/mmwr/volumes/69/wr/pdfs/mm6936a5-H.pdf.

[20] *Id.* at 1259, 1261.

[21] Moghadas et al., *The Implications of Silent Transmission for the Control of COVID-19 Outbreaks*, PROCEEDINGS OF THE NATIONAL ACADEMY OF SCIENCES (July 28, 2020), https://www.pnas.org/content/117/30/17513.

[22] Xi He et al., *Temporal Dynamics in Viral Shedding and Transmissibility of COVID-19*, NATURE MEDICINE (April 15, 2020), https://www.nature.com/articles/s41591-020-0869-5.

[23] Conditions that the CDC has recognized as leading to this heightened risk include cancer, chronic kidney disease, COPD, Down Syndrome, obesity, severe obesity, serious heart conditions, immunocompromised state from solid organ transplant, sickle cell disease, type 2 diabetes, pregnancy, or a history of smoking. *See People with Certain Medical Conditions,* CTRS. FOR DISEASE CONTROL & PREVENTION (Dec. 29, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions html.

[24] Lena H. Sun, *Patients With Underlying Conditions Were 12 Times as Likely to Die of COVID-19 as Otherwise Healthy People, CDC Finds*, WASH. POST (June 15, 2020, 8:10 PM),

State, 90 percent of individuals who have died from COVID-19 had comorbidities, with over half of those who died suffering from hypertension and nearly 35 percent of them diabetic.[25]

76.     Advanced age also increases one's risk for severe illness and death from COVID-19. Adults over 65 are 5 times more likely to be hospitalized for COVID-19 and 90 times more likely to die when compared to adults under 30.[26] In New York State, over eighty-five percent of COVID-19-related deaths have been individuals over the age of 60.[27]

77.     People in prison disproportionately suffer from chronic and noncommunicable diseases like hypertension, diabetes, and asthma, as well as communicable diseases like hepatitis, HIV, and tuberculosis.[28] Moreover, on average, an incarcerated person's physiological age is estimated to be 10 to 15 years older than his or her chronological age, reflecting the toll that incarceration takes on people's health and their bodies' functioning.[29]

78.     Race also affects the chances of severe illness or death from COVID-19. The CDC has estimated that non-Hispanic Black or African American individuals are 3.7 times and 2.8 times as likely to be hospitalized and to die from COVID-19, respectively, as compared to white, non-Hispanic persons. Hispanic or Latino individuals are 4.1 times more likely to hospitalized, and 2.8 times more likely to die.[30]

---

https://www.washingtonpost.com/health/2020/06/15/patients-with-underlying-conditions-were-12-times-more-likely-die-covid-19-than-otherwise-healthy-people-cdc-finds/.

[25] N.Y. STATE DEP'T OF HEALTH, *COVID-19 Tracker: Fatalities*, https://covid19tracker health ny.gov/views/NYS-COVID19-Tracker/NYSDOHCOVID-19Tracker-Fatalities?%3Aembed=yes&%3Atoolbar=no&%3Atabs=n (last visited Jan. 7, 2021).

[26] CTRS. FOR DISEASE CONTROL AND PREVENTION, OLDER ADULTS (Dec. 13, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults html.

[27] N.Y. STATE DEP'T OF HEALTH, *supra* note 25.

[28] The American Academy of Family Physicians, *Incarceration and Health: A Family Medicine Perspective (Position Paper)*, https://www.aafp.org/about/policies/all/incarceration html (last visited Jan. 7, 2021).

[29] Brie Williams et al., *Aging in Correctional Custody: Setting a Policy Agenda for Older Prisoner Health Care*, 102 AM. J. PUB. HEALTH 1475, 1477 (2012), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3464842/pdf/AJPH.2012.300704.pdf.

[30] CTRS. FOR DISEASE CONTROL AND PREVENTION, COVID-19 HOSPITALIZATION AND DEATH BY RACE/ETHNICITY, (Nov. 30, 2020), https://www.cdc.gov/coronavirus/2019-ncov/covid-data/investigations-discovery/hospitalization-death-by-race-ethnicity.html.

79.     Men also face a greater risk of severe illness and death from COVID-19 infection.[31] The CDC has officially added gender to its list of potential risk factors for severe COVID-19 illness.[32]  In New York State, men account for over 56 percent of COVID-19 deaths.[33]

80.     COVID-19 therefore poses a substantial risk of serious medical harm to Individual Plaintiffs and members of the putative General Class and Disability Subclass, obligating Defendants to take necessary steps to prevent Plaintiffs from contracting it and to ensure they are properly cared for if they do contract it.

### The Public Health Emergency Created by COVID-19 in Prisons

81.     The risks associated with COVID-19 are significantly elevated in prison.

82.     Without measures to prevent its introduction, COVID-19 can enter prisons easily through daily staff movements, visitors, transfers of incarcerated people from other prisons, and outside contact through court hearings and off-site medical appointments.[34]

83.     Both intra and inter-state transfers have resulted in deadly COVID-19 outbreaks in the recipient facilities.[35] Kinross Correctional Facility, located on Michigan's remote Upper

---

[31] Richard V. Reeves & Tiffany N. Ford, *COVID-19 Much More Fatal for Men, Especially Taking Age Into Account*, BROOKINGS INSTITUTE (May 15, 2020), https://www.brookings.edu/blog/up-front/2020/05/15/covid-19-much-more-fatal-for-men-especially-taking-age-into-account/. *See also* Maggie Koerth, *Why Are More Men Than Women Dying of COVID-19?*, FIVETHIRTYEIGHT (April 30, 2020, 5:58 AM), https://fivethirtyeight.com/features/why-are-more-men-than-women-dying-of-covid-19/ (reporting on research showing that, out of 35 countries reporting COVID deaths broken down by sex, men with confirmed COVID-19 infections were more likely to die than women with confirmed infections)..

[32] CTRS. FOR DISEASE CONTROL AND PREVENTION, ASSESSING RISK FACTORS FOR SEVERE COVID-19 ILLNESS, (Nov. 30, 2020), https://www.cdc.gov/coronavirus/2019-ncov/covid-data/investigations-discovery/assessing-risk-factors.html.

[33] N.Y. State Dep't of Health, *supra* note 25.

[34] CTRS. FOR DISEASE CONTROL AND PREVENTION, INTERIM GUIDANCE ON MANAGEMENT OF CORONAVIRUS DISEASE 2019 (COVID-19) IN CORRECTIONAL AND DETENTION FACILITIES (Dec. 31, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html#correctional-facilities. .

[35] Cary Aspinwall & Ed White, *Moving People – And Coronavirus – From Prison to Prison*, THE MARSHALL PROJECT (Dec. 21, 2020), https://www.themarshallproject.org/2020/12/21/moving-people-and-coronavirus-from-prison-to-prison.

Peninsula, experienced a severe COVID-19 outbreak following an October 28, 2020 transfer of nine incarcerated people to Kinross Correctional Facility from Marquette Branch Prison, where there were 350 active COVID-19 infections. As of December 21, 2020, more than 1,100 incarcerated people had been infected at Kinross, and at least seven had died.[36]

84.     Kinross's crisis reflects a nationwide trend. Oklahoma's prisons experienced a similar transfer-induced spike: transfers of more than 4,500 prisoners between July and September resulted in an estimated 6,600 prisoners testing positive and 37 deaths.[37] Just this past October, a federal Bureau of Prisons transfer of 150 inmates from an Ohio facility to Fort Dix, New Jersey resulted in over 228 COVID-19 cases – the second highest number in the federal prison system.[38]

85.     Once COVID-19 is introduced into a prison, it can spread rapidly in this necessarily congregate environment. The attack rate, or the proportion of those exposed to COVID-19 who ultimately become sick, is as high as 80% in prisons, compared to 20-30% in the rest of the United States.[39]

86.     Because of the ease with which COVID-19 spreads in prison, as well as the stubborn refusal of many authorities to modify entrenched practices to combat it, the positive rate is 4 times higher in prison than in the community. [40] The Federal Bureau of Prisons has reported that, out of the nearly 97,000 federal inmates who have been tested, over 40,000 have

---

[36] *Id*.

[37] Cary Aspinwall & Ed White, *supra* note 35.

[38] Samantha Melamed, *COVID-19 outbreak infecting hundreds at Fort Dix is 'escalating crisis,' N.J. senators warn*, THE PHILADELPHIA INQUIRER (Nov. 10, 2020), https://www.inquirer.com/news/fci-fort-dix-coronavirus-covid-outbreak-transfers-elkton-cory-booker-bob-menendez-20201110 html.

[39] Henry Njuguna, M.D. et al., *Serial Laboratory Testing for SARS-CoV-2 Infection Among Incarcerated and Detained Persons in a Correctional and Detention Facility*, 69 MORBIDITY AND MORTALITY WEEKLY REPORT 836, 837 (2020), https://www.cdc.gov/mmwr/volumes/69/wr/pdfs/mm6926e2-H.pdf.

[40] *1 in 5 Prisoners in the U.S. Has Had COVID*-19, The Marshall Project, (Dec. 18. 2020), available at https://www.themarshallproject.org/2020/12/18/1-in-5-prisoners-in-the-u-s-has-had-covid-19

ever tested positive.[41] Thus, federal prisons have an approximate 41% positive test rate, which is over 8 times higher than what the World Health Organization considers to be safe.[42]

87.     New York prisons' experience with the virus this fall shows how rapidly the contagion spreads in carceral settings once it has been allowed to enter, if—as here—state authorities refuse to take steps to stop it. On September 28, 2020, Elmira Correctional Facility ("Elmira") and Greene Correctional Facility ("Greene") each reported one COVID-19 case. By December 2, 2020, roughly 605 and 162 incarcerated individuals at Elmira and Greene, respectively, were reported to have tested positive for the virus. Greene's case count, which was only two at the beginning of the October, jumped by over 90 cases in the first two weeks of the month. During a two-week period in October, Elmira Correctional Facility went from 20 reported cases to 590 cases.

88.     Over the past month, a rapid acceleration of positive cases has become evident throughout the DOCCS system: the Department had 2000 total reported cases on December 12, 2020 and reported more than 3,000 cases less than three weeks later, on December 31, 2020.[43]

---

[41] *COVID-19 Inmate Test Information*, FEDERAL BUREAU OF PRISONS, https://www.bop.gov/coronavirus/ (last visited Jan. 7, 2021).

[42] David Dowdy & Gypsyamber D'souza, *Covid-19 Testing: Understanding the "Percent Positive,"* JOHNS HOPKINS BLOOMBERG SCH. OF PUB. HEALTH (Aug. 10, 2020), https://www.jhsph.edu/covid-19/articles/covid-19-testing-understanding-the-percent-positive.html.

[43] *NY Suspends Visitation at State Prisons Amid Outbreaks*, U.S. NEWS AND WORLD REP. (Dec. 30, 2020), https://www.usnews.com/news/best-states/new-york/articles/2020-12-30/ny-suspends-visitation-at-state-prisons-amid-outbreaks. These statistics are almost certainly underreporting the true number of COVID-19 cases that have emerged in DOCCS facilities, as DOCCS did not test the majority of incarcerated individuals for the majority of the pandemic. *See Testimony of Anthony J. Annucci, Acting Commissioner NYS Department of Corrections and Community Supervision*, Before the NYS Senate Standing Committee on Crime Victims, Crime and Corrections and NYS Senate Standing Committee on Health: COVID-19 Impact on Prisons and Jails (Sept. 22, 2020) *https://doccs.ny.gov/system/files/documents/2020/09/9.22.20-doccs-covid-19-impact-prison-and-jail-verbal-testimony.pdf* (noting approximately 13,000 COVID tests given to incarcerated population of 36,704 to date). DOCCS does not even consistently test incarcerated individuals for COVID-19 when it knows they have been *exposed* to COVID-19, even when those individuals specifically request to be tested due to their known exposure. As an example, when Fishkill Correctional Facility experienced a large COVID-19 outbreak earlier this year, and five incarcerated individuals had already died from the virus, DOCCS had tested had "less than 20% of [Fishkill's] incarcerated population . . . with just over one-third coming back positive." Gabe Stern, *Report details inconsistent*

89.     Not only does COVID-19 spread faster in prisons, but it is also more deadly. Experts have found that the adjusted death rate in prison is 3 times higher than the rate in the rest of the United States.[44]

90.     Beyond the "normal" risk of COVID-19 transmission in a prison setting, the men at Adirondack Correctional Facility, all of whom are at least 60 years old and have underlying health conditions—and who have been transferred to Adirondack precisely for that reason—are at an even higher risk of death or serious injury from COVID-19.

91.     Out of recognition of the serious threat COVID-19 poses to the prison population, the CDC has issued guidance to prisons on how to prevent the spread of COVID-19. The CDC recommends that facilities:

a.      Ensure incarcerated people and staff have an adequate supply of personal protective equipment, personal hygiene supplies, and cleaning supplies, including but not limited to soap, alcohol-based hand sanitizer, facemasks, gloves, and disinfectant;

b.      Create a contingency plan in case there is a shortage of personal protective equipment;

c.      Provide soap and hand sanitizer free of charge to allow for frequent use;

d.      Adhere to all CDC guidelines for cleaning, and disinfect frequently touched surfaces several times per day;

e.      Educate incarcerated people and staff about how to stop the spread of COVID-19;

---

procedures in NY prison during COVID-19 outbreak, THE DAILY ORANGE (Sept. 8, 2020), available at http://dailyorange.com/2020/09/report-details-inconsistent-procedures-ny-prison-covid-19-outbreak/.
[44] Brendan Saloner, Ph.D., et al., COVID-19 Cases and Deaths in Federal and State Prisons, JAMA NETWORK (July 8, 2020), https://jamanetwork.com/journals/jama/fullarticle/2768249.
This rate is adjusted to determine the death rate if "the age and sex distributions of the U.S. and prison populations were equal" in order to account for the demographic differences between the prison population and the greater U.S. population.

f.      Ensure that people socially distance by staying six feet apart from one another at

all times.[45]

As described further below, Adirondack has not adhered to this guidance or taken any

other steps to prevent or limit the introduction of COVID-19.

### Defendants' Response to COVID-19 in Prisons

92.    The most obvious measure to arrest the spread of COVID-19 in New York's

prisons would be to release a significant number of people incarcerated there, but, as described

below, Defendants have refused to do so. Because of this refusal, vulnerable people remain

incarcerated in life-threatening conditions, yet Defendants have failed to take the necessary steps

to ameliorate the risk the virus poses within prisons.

93.    Early in the pandemic, Defendant Cuomo announced that, to combat COVID-19

in its prisons, DOCCS would release approximately 1,100 people arrested for technical parole

violations.[46] Then, on April 15, 2020, Defendant Cuomo announced his plan to release

vulnerable incarcerated people who had less than 90 days remaining on their sentences and were

not convicted of a violent felony or sex offense.[47] On April 30, 2020, Defendant Cuomo's office

announced a similar initiative for pregnant and postpartum people in custody.[48]

94.    These limited COVID-19 release programs have failed to reduce New York's

prison population sufficiently to reduce the threat posed by COVID-19. The Cuomo

administration reported that, as of November 23, 2020 only 3,147 incarcerated individuals had

---

[45] Ctrs. for Disease Ctrl. & Prevention, *supra* note 34.
[46] Denis Slattery, *New York to release 1,100 inmates being held on parole violations*, N.Y. DAILY NEWS (Mar. 27, 2020), https://www nydailynews.com/coronavirus/ny-coronavirus-new-york-inmates-released-parole-violations-20200327-jyrdhpxzdbbtvcb6ei7fy7ebwq-story html.
[47] Ryan Tarinelli, *Certain NY Prisoners Will See Release Amid Pandemic, Top Cuomo Aide Says*, N.Y.L.J. (Apr. 15, 2020), https://www.law.com/newyorklawjournal/2020/04/15/certain-ny-prisoners-will-see-release-amid-pandemic-top-cuomo-aide-says/.
[48] Nick Reisman, *New York Moves to Release Pregnant Inmates*, SPECTRUM NEWS (Apr. 30, 2020), *https://spectrumlocalnews.com/nys/central-ny/ny-state-of-politics/2020/04/30/new-york-pregnant-inmate-release*.

been released, roughly seven percent of the pre-release population.[49] Defendant Cuomo has

granted just 10 commutations since the start of the pandemic, lagging far behind the governors of

other states.[50]

95.     Defendants have been on notice of the risks of people remaining incarcerated, as

medical experts across the country and several doctors in New York's correctional institutions

have warned about the risks.[51]

96.     Dr. Robert Cohen, former Rikers Island medical director, warned, "[t]he most

important thing we can do right now is discharge all of the people who are old and have serious

medical issues;" "[i]t's to everybody's advantage to get them out," because "those people are

likely to die from a coronavirus infection."[52] Dr. Ross MacDonald, Rikers Island Chief

Physician, warned, "A storm is coming . . . We have told you who is at risk. Please let as many

out as you possibly can."[53]

97.     Dr. Mary Bassett, the former New York City Health Commissioner, urged

Defendant Cuomo to "grant compassionate release to elderly inmates, as well as those with

---

[49] Reuven Blau, 'Hundreds' of Prisoners Approved for Early Release Stuck Behind Bars as COVID Spikes, THE CITY, (Nov. 24, 2020), https://www.thecity.nyc/2020/11/24/21717723/prisoners-approved-for-early-release-stuck-behind-bars-covid.

[50] Victoria Law, *While COVID-19 Spreads In NY Prisons, Loved Ones On The Outside Plead With Cuomo For Clemency*, GOTHAMIST (Nov. 23, 2020), https://gothamist.com/news/while-covid-19-spreads-ny-prisons-loved-ones-outside-plead-cuomo-clemency (reporting three commutations from the start of the pandemic to date as of Nov. 23, 2020); NEW YORK STATE, GOVERNOR CUOMO GRANTS CLEMENCY TO 21 INDIVIDUALS (Dec. 24, 2020), https://www.governor.ny.gov/news/governor-cuomo-grants-clemency-21-individuals (reporting clemencies granted to an additional 21 individuals, among these 7 commutations).  In April, Oklahoma Governor Kevin Stitt commuted the sentences of 450 incarcerated individuals; California Governor Gavin Newsom issued 55 commutations between March and November, *Id.*

[51] *See, e.g.,* Declarations of Dr. Jonathan Louis Golob and Dr. Marc Stern, *Dawson v. Asher,* 2:20-cv-00409-JLRMAT (W.D.Wash. Mar. 16, 2020), ECF Nos. 5 & 6; Declaration of Dr. Robert L. Cohen, *Sanchez et al. vs. Dallas County Sheriff et al.,* 3:20-cv-00832-E-BH (N.D. Tex. 2020), ECF No. 39.

[52] Jan Ransom & Alan Feuer, *'A Storm Is Coming': Fears of an Inmate Epidemic as the Virus Spreads in the Jail*, N.Y. TIMES (Apr. 23, 2020), https://www.nytimes.com/2020/03/20/nyregion/nyc-coronavirus-rikers-island.html; Zach Williams, *Rising Calls to Free Incarcerated New Yorkers*, CITY & STATE N.Y. (Mar. 20, 2020), https://www.cityandstateny.com/articles/policy/criminal-justice/rising-calls-free-incarcerated-new-yorkers html..

[53] @RossMacDonaldMD, TWITTER (Mar. 18, 2020, 9:51 PM), https://twitter.com/RossMacDonaldMD/status/1240455802193883137.

health conditions that put them at higher risk," noting that "[g]iven the conditions in which incarcerated people live . . . this population is especially vulnerable to the virus, and largely unable to prevent its spread," which will cause "people in prison who become infected [to] die unnecessarily."[54]

98.    Despite these warnings, New York has actually slowed its pace of releasing long-time incarcerated people because of COVID-19, rather than accelerating it. For example, in March, DOCCS published a memo stating that all merit time reviews and initial and Limited Credit Time Allowance parole interviews would be postponed two months to June and July 2020.

### Transfers to Adirondack Correctional Facility

99.    Instead of releasing elderly, medically-vulnerable people, Defendants announced that they would "transfer to Adirondack, incarcerated individuals age 65 and older," who qualified according to the medical and security requirements Defendants established.[55]

100.    Adirondack is a 500-bed men's prison run by DOCCS in Ray Brook, New York. In 2018, it was converted to a facility intended to house young people, age 16 to 18. As of April 2020, only 13 people, all teenagers, remained incarcerated at Adirondack.[56]

101.    Beginning in April of 2020, Defendants transferred these 13 young people out of Adirondack, and in May, it began implementing their plan of moving elderly men who had been incarcerated in other facilities around the state into Adirondack. Adirondack now holds

---

[54] Mary Bassett, Eric Gonzalez, & Darren Walker, *Andrew Cuomo, Stop a Coronavirus Disaster: Release People from Prison*, N.Y. TIMES (Mar. 30, 2020), https://www.nytimes.com/2020/03/30/opinion/nyc-prison-release-covid.html.
[55] N.Y. STATE DEP'T OF CORR. & CMTY. SUPERVISION, DOCCS RE-OPENING PLAN FACT SHEET, (May 29, 2020), https://doccs ny.gov/system/files/documents/2020/06/web-page-doccs-re-opening-fact-sheet-5-29-20-final.pdf.
[56] Aaron Cerbone, *Adirondack prison swings from juniors to seniors*, ADIRONDACK DAILY ENTER. (Jun. 26, 2020), https://www.adirondackdailyenterprise.com/news/local-news/2020/06/adirondack-prison-swings-from-juniors-to-seniors/.

approximately 96 men. Half the men at Adirondack are between 60 and 65 years old. The other

half are over 65 years old.

102.     DOCCS's stated criteria for transfer to Adirondack are that a person be over

sixty-five years old, have an underlying health condition, and be eligible for placement in a

medium-security prison based on low institutional and public risk scores.

103.     Thus, by design, incarcerated people at Adirondack are old, infirm, and

unthreatening. These are precisely the people that DOCCS should prioritize releasing in

light of the COVID-19 crisis. Instead, Defendants transported them to a distant and

unsuitable place, where, removed from public view, they face a constitutionally

unacceptable risk of harm. Defendants have failed to implement the most basic

procedures necessary to protect any population during the COVID-19 pandemic, let alone

a population of elderly and high-risk people in prison.

104.     For example, the CDC recommends that "Facilities in communities with moderate

to substantial levels of community transmission" consider:

- Testing at intake before putting transferees into the general population at the facility;

- Housing people individually while test results are pending; and

- Implementing a routine 14-day quarantine for people entering a facility.

These recommendations are "particularly" urged where incoming people "will transition to a

congregate setting with persons at increased risk for severe illness from COVID-19."[57]

105.     Defendants have not done any of these things at Adirondack, nor have they taken

any other measures to prevent new transfers from introducing COVID-19 in the facility. In

---

[57] *See* CTRS. FOR DISEASE CONTROL AND PREVENTION, INTERIM CONSIDERATIONS FOR SARS-COV-2 TESTING IN CORRECTIONAL AND DETENTION FACILITIES, *supra* note 34.

handling transfers, Defendants do not test people before transferring them to Adirondack from prisons around the state, nor do they quarantine people upon arrival.

106.    This failure to test for COVID-19 before transfer—an ongoing practice of Defendants—creates a high risk that those coming in from other prisons are bringing COVID-19 with them. Of the 96 people currently incarcerated in Adirondack, a large number were transferred from facilities with extremely high COVID-19 incidence and mortality rates. For example, Mr. Leon was transferred from Otisville Correctional Facility, where almost 10% of the population – 54 out of 584 people – have so far tested positive for COVID-19. A number of people were transferred to Adirondack from Fishkill Correctional Facility ("Fishkill"), the DOCCS facility that, for most of the pandemic, had the highest COVID-19 incidence rate and still has the highest mortality rate – COVID-19 deaths at Fishkill account for nearly one-third of all deaths from COVID-19 in DOCCS facilities. Experiences around the country and widely-known information about the nature of COVID-19 make it clear that this approach—which Defendants have given no indication of stopping—creates a grave risk of outbreak.

107.    Moreover, as Defendants knew, social distancing is not possible on the hours-long transfer bus trips, and these buses transport people mixed in from different facilities around the state to bring them to Adirondack and to other prisons on the way. At least one bus has had a passenger coughing and exhibiting flu-like symptoms during the several hours in which he was in close contact with other passengers. Defendants responded only by returning that person to Fishkill (because he was determined to be too sick to be transported) and proceeding with the plan to transport the other passengers to Adirondack. Not only were the people on the bus with the coughing person not tested upon arrival at Adirondack, they were immediately introduced into the general population.

108.     Unsurprisingly, after these transfers, two of the people bused to Adirondack fell ill with COVID-19.

109.     Defendants also do not test transferees upon their arrival at Adirondack, nor do they quarantine them, in violation of obvious COVID-19 danger this practice poses. As a result, Defendants cannot and do not detect new infections and they allow newcomers to expose others at Adirondack to the virus.

**Dangerous Conditions at Adirondack Correctional Facility**

110.     Adirondack now exclusively houses some of the people most vulnerable to COVID-19 in the state, who by virtue of age, underlying medical condition, race, and gender have a heightened risk of serious complications from COVID-19. In spite of this, Defendants have made no efforts to make Adirondack a suitable facility to house this vulnerable population during a pandemic. To the contrary, Defendants' policies and practices at Adirondack make social distancing and other safeguards impossible.

111.     Adirondack consists of several housing units, each with approximately 22-24 rooms. Of these, 16 rooms have doors on them, and 6-8 have no doors. Adirondack houses people in cells both with and without doors. Plaintiff Harper, for example, lives in a room with no door. In these conditions, COVID-19—which is an airborne pathogen—spreads rapidly. Defendants have also placed ten men in Plaintiff Leon's housing unit in rooms without doors, increasing the likelihood of transmission of COVID-19 within the housing unit.

112.     Within the housing units, the indoor recreation areas consist of TV rooms with a few benches for seating. The benches are short and are placed close to each other, such that people cannot maintain six feet of distance from each other while watching

television, even if they sit on opposite ends of the benches. Sitting at any distance apart is often

not possible, as these rooms are regularly packed with people.

113.    Each housing unit has one bathroom that is shared by everyone in the unit. Men

are required to shave communally during a single period in the evenings, such that they must

stand directly next to each other while engaging in an activity that necessarily precludes mask-

wearing.

114.    Adirondack also requires residents to go to a communal mess hall to eat. While

other DOCCS facilities allow people to eat in their cells, Adirondack mandates that people eat in

the mess hall together. At least three housing units go to the mess hall per shift, so upward of 45

people from different housing units eat together in close quarters. People line up to wait for food

in lines where it is not possible to stand six feet apart from each other, and then they eat at tables

sitting across from and within six feet of each other.

115.    Adirondack provides limited options for avoiding this unsafe environment. The

only food people can take out of the mess hall at Adirondack are slices of bread, which people

must pick up themselves. Incarcerated people who have diabetes or otherwise cannot subsist on

bread are given nothing that they could eat in their cells. Otherwise, people can purchase food

from the commissary or have family members pay to send them food that they can eat in their

cells – choices that are financially infeasible or nutritionally inadequate for most people on a

regular basis.

116.    Plaintiff Leon, for example, is unable to socially distance in the mess hall, and so

in order to eat meals that he does not pay for separately, he must face exposure to residents of

three housing units in a circumstance in which social distancing and mask wearing is not

possible.

31

117.    Many incarcerated people have been given only a few paper face masks, which are designed to be disposable but which they must wash with soap and water to reuse. Staff at Adirondack often do not wear masks or wear their masks below their chins, exposing their noses and mouths, and Defendants have not taken actions to prevent this. Staff regularly do not wear masks inside of the housing units, both when interacting with other staff members and with people who are incarcerated. Furthermore, staff are often assigned to work on different units, so they regularly commingle with people from multiple housing units.

118.    Defendants also do not provide soap for handwashing at sinks and give members of the putative General Class only two bars of soap every two weeks, which they are to use for all their needs, including hand-washing in the bathroom, where no other soap is provided. People regularly run out of soap, as one bar per week is insufficient, and if they need more soap, they are required to buy more from the commissary.

119.    DOCCS reports that two people at Adirondack have tested positive for COVID-19, but this number is unreliable, as COVID-19 testing at Adirondack is sporadic and haphazard at best. Defendants do not test people incarcerated at Adirondack on a routine basis, not even in response to observed need, known interactions with COVID-19 patients, or before or after hospital trips. Defendants also do not conduct any regular temperature or symptom screening of the population.

120.    Defendants appear to have recently – as of the end of December – begun conducting random tests of two people per housing unit every two weeks. It is not clear whether this testing is enshrined in a policy, whether Defendants are implementing it in

every housing unit, or how long it will continue, but regardless of the answers to any of those questions, this modest testing is completely inadequate to identify the presence or scope of COVID-19 within Adirondack, particularly in light of the above-referenced conditions that Defendants have created at Adirondack. The widely-understood nature of the asymptomatic spread of COVID-19 requires regular and universally-available testing to understand whether COVID-19 is present in the facility, not just whether one person chosen at random has COVID-19 on a given day.

121.    On September 30 and October 1, 2020, DOCCS conducted what appears to be its only round of facility-wide COVID-19 testing at Adirondack since at least mid-summer. One incarcerated person tested positive for COVID-19 at that time. On October 2, the person who tested positive was moved into quarantine, but no one else from his communal housing unit was quarantined or separated in any way. Instead, people who had been living with him before he tested positive continued to mingle with each other and the prison-wide population, eating meals with people from around the prison in the mess hall and working wherever they were assigned throughout the prison. Moreover, no one in the housing unit of the infected person was tested or screened after the positive result to ascertain whether they had contracted COVID-19 from their daily contact with him.

122.    In the week before this individual tested positive, he had participated in a hearing for a grievance with Plaintiff Perez. Another incarcerated person was also in the meeting, along with three staff members. The grievance hearing was held in a room with no windows, with everyone sitting around a table less than six feet apart for approximately one hour.

123.    After learning that someone who had been in the grievance hearing had tested positive, Defendants sent the staff members home for two weeks, but they did not quarantine

Plaintiff Perez or the other incarcerated person. Instead, they sent them back to their housing units, potentially exposing everyone in those units. Defendants did not test or screen Plaintiff Perez or the other incarcerated person after their exposure. This incident illustrates that even under circumstances where Defendants understood that quarantining was necessary and appropriate, and where they instituted such quarantines to protect staff members, they refused to do the same to protect class members.

124.    Moreover, by failing to re-test residents, Defendants failed to learn the scope of the possible infection within Adirondack, a crucial step for containing any outbreak.

125.    Compounding the harm caused by the lack of adequate quarantine and testing procedures, Adirondack lacks adequate medical resources to care for the medically vulnerable people that Defendants have moved there.

126.    Adirondack has two negative-pressure isolation rooms, which are rooms with sufficient air turnover to reduce the likelihood of airborne virus spread. Adirondack has two additional rooms that could possibly be converted to isolation rooms. These four rooms are insufficient for quarantining the population in the event of a COVID-19 outbreak.

127.    Adirondack's entire medical staff consists of only two nurses. People seeking medical care at Adirondack are told to put in a request to go to sick call, which is available once per day, at 6:15 a.m., on weekdays only.

128.    The medical facilities and preventive procedures within Adirondack are insufficient to meet the routine needs of the facility's elderly and infirm population; they are not close to sufficient to prevent or respond to a COVID-19 outbreak.

129.    Defendants have also administered medical care ineffectively in light of the demands that the risks of COVID-19 pose. Plaintiff Leon has been denied necessary medical care because of Defendants' lack of adequate testing at Adirondack. Plaintiff Leon has colitis, a serious medical condition that requires monitoring through annual colonoscopies. On October 6, 2020, he was admitted to a hospital for preparation for a colonoscopy, but he did not have a colonoscopy because he had not had a sufficiently recent COVID-19 test.

<u>**The Lack of Medical Resources for a COVID-19 Outbreak in<br>the Community of Ray Brook**</u>

130.    The danger of a COVID-19 outbreak in Adirondack is compounded by the lack of medical resources in Ray Brook, New York, where the facility is located, and it poses a danger to the community outside the prison.

131.    As described above, it appears that the closest hospital with the capacity to accept people from prison is Albany Medical Center, two and a half hours from Adirondack. Even if staff were able to send incarcerated people from Adirondack to a local hospital that lacked the normally-required security features for some reason, there are only two local options: Adirondack Medical Center, which has 8 intensive care unit beds, or Elizabethtown Community Hospital, which has only 25 inpatient beds total.

132.    The medical system that exists in the community was established to serve the regular needs of the population there, not the needs of the population during a pandemic. It certainly cannot mitigate the heightened risk of community spread from Defendants' addition of 100 elderly, medically needy adults.

133.    Defendants' indifference to containing COVID-19 within Adirondack's walls creates a heightened risk of spread throughout the Ray Brook community generally, should COVID-19 enter the facility, as part of the danger of a COVID-19 outbreak within a prison is the

possibility that it will spread to the surrounding community through staff or other civilians who regularly enter and exit the prison. Nearly 30% of residents in Ray Brook are 60 years old or older, and in the event of an outbreak, they would be endangered, because the local medical system would be easily overwhelmed. [58]

134.    The likelihood of an unmanageable outbreak within Adirondack is also compounded by its proximity to FCI-Ray Brook, a federal prison less than one mile away where forty-three people have currently tested positive for COVID-19.[59] As discussed, the risk of COVID-19 spread within prisons is significantly higher than in the community at large and Ray Brook, NY, has two prisons in close proximity, with staff members almost certainly intermingling and interacting in local grocery stores and other community spaces, introducing a heightened risk of inter-prison COVID-19 spread.

## Through Transfers to and Conditions at Adirondack, Defendants Have Violated the Eighth Amendment Rights of Plaintiffs and Putative Class Members

135.    The Eighth Amendment to the United States Constitution prohibits the infliction of "cruel and unusual punishment." U.S. Const. amend. VIII. This prohibition applies to "the treatment a prisoner receives in prison and the conditions under which he is confined." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (quoting *Helling v. McKinney*, 509 U.S. 25, 31 (1993)). Prison officials have a duty to take necessary measures to guarantee the safety of incarcerated people, ensure that incarcerated people receive adequate medical care, and protect incarcerated people from infectious diseases.

*Defendants Have Been Deliberately Indifferent Because They Are Aware of the Risk of Serious Harm that COVID-19 Poses to Elderly and Medically Vulnerable Incarcerated People, Yet*

---

[58] U.S. CENSUS BUREAU, ACS DEMOGRAPHIC AND HOUSING ESTIMATES, 2018: ACS 5-YEAR ESTIMATES DATA PROFILES (last accessed Jan. 7, 2021), *available at* https://data.census.gov/cedsci/table?g=0500000US36031&tid=ACSDP5Y2018.DP05&hidePreview=false.
[59] FEDERAL BUREAU OF PRISONS, *supra* note 45.

*Refuse to Take Necessary Steps to Respond to the Risk at Adirondack*

136.    Defendants are aware of the serious risk COVID-19 poses to medically vulnerable and elderly incarcerated people, and specifically to Plaintiffs and putative class members. Despite this knowledge, Defendants have refused to take necessary measures to respond to this risk at Adirondack, and indeed, have acted in ways that have increased the risk. Defendants have refused to implement testing, contact tracing, quarantine, distancing, and isolation protocols, even when faced with cases of COVID-19 within Adirondack. Defendants have also ignored Plaintiffs' repeated requests for cleaning supplies, hygiene supplies and other important COVID-19 mitigation measures. These actions and failures to act amount to deliberate indifference in response to the risk of COVID-19 at Adirondack.

<u>Defendants Are and Have Been Aware of the Risk Created by Transferring Medically Vulnerable and Elderly People to Adirondack and Confining them in the Conditions that Exist at Adirondack</u>

137.    For well over eight months, as described above, Defendants have been warned of and have been aware of the extraordinarily high risk COVID-19 poses to incarcerated people who are elderly and/or have preexisting serious medical conditions. Since Summer 2020, Defendants have been warned of and have been aware of the risks posed by their decision to transfer these men to Adirondack and confine them in the conditions that have existed at Adirondack since these transfers began.

138.    Outside of the prison setting, Defendant Cuomo has acted aggressively in combatting and responding to COVID-19, imposing formal restrictions on much of society and urging residents to take a host of voluntary steps to contain the virus's spread. Yet Defendants have refused to show the same urgency when it comes to protecting elderly and medically vulnerable incarcerated people, who are at their mercy with no ability to protect themselves.

139.    Plaintiff RAPP has contacted Defendants Cuomo, Annucci, Morley, and Tedford repeatedly to inform them of the extent and severity of the risk of concentrating medically vulnerable and elderly men at Adirondack, and the Legal Aid Society and hundreds of other organizations have made similar appeals to Defendants.

140.    Organizations, including Plaintiff RAPP, have alerted Defendants specifically to the risk posed by transferring older, medically-vulnerable people to Adirondack and have identified the lack of COVID-related safety measures at Adirondack. On June 25, 2020, for example, RAPP organized a sign-on letter joined by dozens of interested organizations in which it notified Defendant Cuomo and others about the specific risk posed by the Adirondack plan and Defendants' failures to adopt adequate testing and other measures to protect the elderly men being transferred to the facility. The letter notified Defendant Cuomo that "these transfers fundamentally represent a public health crisis that amounts to a ticking time bomb" and asked for the release of the men at Adirondack or other action that would ensure their safe return to the community. On other occasions, RAPP and other organizations have asked Defendant DOCCS to mitigate the dangerous COVID-19-related conditions at the facility by engaging in proper testing, quarantining, and isolation practices; providing incarcerated people with sufficient cleaning and hygiene supplies; ceasing transfers to the facility; and releasing people from the facility.

141.    This Court and other courts in the Second Circuit have put Defendants on notice by repeatedly recognizing that the presence of COVID-19 in a prison creates a serious, life-threatening medical risk. *See, e.g., United States v. Rountree*, No. 1:12-CR-0308 (LEK), 2020 WL 2610923, at *5 (N.D.N.Y. May 18, 2020) (prisons are "powder kegs for infection" and have allowed "the COVID-19 virus to spread with uncommon and frightening speed.") (quoting

*United States v. Skelos*, No. 15-CR-317, 2020 WL 1847558, at *1 (S.D.N.Y. Apr. 12, 2020));

*Coronel v. Decker*, 449 F. Supp. 3d 274, 283 (S.D.N.Y. 2020) (collecting cases); *Martinez-*

*Brooks v. Easter*, No. 3:20-CV-00569 (MPS), 2020 WL 2405350, at *28 (D. Conn. May 12,

2020) (holding that petitioners established likelihood of success in habeas petition alleging that

respondents "failed to (1) adequately screen inmates for COVID-19 symptoms, (2) test

symptomatic inmates, (3) isolate infected patients, (4) quarantine patients thought to have been

exposed, (5) implement adequate social distancing, (6) observe proper sanitation measures, (7)

provide staff and inmates with adequate personal protective equipment, soap, and sanitizers, and

(8) provide adequate medical care to inmates with COVID-19 as well as other medical

conditions."); *Valenzuela Arias v. Decker*, No. 20 CIV. 2802 (AT), 2020 WL 1847986, at *7

(S.D.N.Y. Apr. 10, 2020) (finding deliberate indifference where jail officials simply monitored

for signs of infection, as monitoring was "too little, too late" and jail conditions "plainly d[id] not

allow for the social distancing measures recommended by the CDC."). Defendants know through

ample public information and have acknowledged as much that this already-heightened risk in

prison is even more acute for elderly people and people with underlying medical conditions.

142.    Through lawsuits challenging COVID-19 conditions in New York State prisons,

Defendants have been provided with expert testimony detailing the scope and severity of the risk

Adirondack.

143.    On several occasions, Defendants have publicly acknowledged the scope and

severity of the unique risk COVID-19 poses to elderly and medically vulnerable incarcerated

people. Defendant Cuomo has publicly acknowledged the risk COVID-19 poses to incarcerated

people on at least 18 separate occasions during his COVID-19 press conferences. On May 23,

Defendant Cuomo acknowledged that the State chose to test incarcerated elders—albeit a very

small percentage of them—"because COVID affects older people more."[60]

144.    As the Superintendent of Adirondack, Defendant Tedford has reviewed and

responded to multiple inmate grievance appeals and complaints detailing dangerous COVID-19-

related conditions at the prison. Upon information and belief, several class members have written

to Defendant Tedford about COVID-19-related conditions at Adirondack. Additionally, each

individual plaintiff appealed COVID-19-related grievance responses to Defendant Tedford.

These appeals detailed the lack of cleaning and hygiene supplies, insufficient quarantining and

isolation practices, and noncompliance with social distancing practices at Adirondack. Defendant

Tedford responded to these complaints with vague indications that he was acting to address

them, but no such action has taken place.

145.    In their capacity as DOCCS Central Office staff members, Defendants Annucci

and Morley are personally involved in the activities of the Central Office Review Committee

("CORC"), which reviews grievances filed by incarcerated people. Defendant Morley sits on

CORC, and CORC acts at the direction of Defendant Annucci. Each Individual Plaintiff

appealed Defendant Tedford's appeal response to CORC because the responses did not

adequately address the concerns raised. With their CORC appeal papers, each Individual Plaintiff

detailed dangerous COVID-19-related conditions at Adirondack, including lack of cleaning and

hygiene supplies, insufficient quarantining and isolation practices, and noncompliance with

social distancing practices.

---

[60] N.Y. State, *Governor Cuomo Announces Eighth Region on TRACK TO Hit Benchmark to Begin Reopening Tuesday May 26th*, YOUTUBE (May 23, 2020), https://www.youtube.com/watch?v=4NAycLIsyHU.

146.    Upon information and belief, Defendants Annucci and Morley have also received scores of letters from medical experts and advocates detailing dangerous COVID-related conditions at Adirondack and explaining the serious risk COVID-19 poses to elderly and medically vulnerable incarcerated people throughout the state prison system. Defendant Annucci has publicly claimed that he is acting to address complaints such as these, yet he has failed to back up those words with actions.

147.    Defendants Annucci and Morley have also repeatedly acknowledged that elderly and medically vulnerable incarcerated people are at heightened risk of contracting COVID-19. Defendant Annucci has repeatedly acknowledged the specific risk COVID-19 poses to elderly incarcerated people with serious pre-existing medical conditions, including on September 22, 2020 in testimony before the New York State Senate Standing Committees on Health and Crime Victims, Crime, and Corrections. Defendant Annucci stated that he was taking action to address these risks.

148.    As the Superintendent of Adirondack, Defendant Tedford has also been notified of COVID-related concerns in Adirondack, as he has reviewed multiple inmate grievance appeals detailing dangerous COVID-related conditions at the prison.[61]

---

[61] Defendant Tedford has failed to respond meaningfully to the primary concerns raised in those grievances. Plaintiffs have appealed grievance responses concerning lack of cleaning and hygiene supplies, insufficient quarantining and isolation practices, and noncompliance with social distancing practices. His responses to Plaintiffs' concerns have been marginal and have not addressed the most dangerous conditions. Defendant Tedford has overseen the installation of additional hand sanitizer dispensers, and in some housing units, Defendant Tedford has overseen provision of more soap. However, in spite of complaints from people who are incarcerated and from advocacy groups and legal services organizations, Defendant Tedford has made no changes to Adirondack's dangerous approach to testing and quarantining related to transfers or to testing and quarantining within the prison, even in the face of known COVID-19 exposure, nor has he changed Adirondack's policies and practices regarding social distancing throughout the facility, including at mealtimes and in bathrooms. These changes are within Defendants' power to make.

149.    Defendants have been repeatedly put on notice of the circumstances that all class members face. For example, in their CORC appeals, each Individual Plaintiff alerted Defendants Annucci and Morley to their medical needs, age, and need for protection from COVID-19. In their appeals, each Individual Plaintiff explained that their age rendered them susceptible to serious complications from COVID-19. They also stated that their medical conditions constitute co-morbidities as defined by the CDC and rendered them susceptible to serious complications from COVID-19.

150.    Defendant Tedford is Plaintiffs' jailer. Each Individual Plaintiff has written to Defendant Tedford to alert him to their medical needs, age, and need for protection from COVID-19. In these communications, each Individual Plaintiff explained that their age rendered them susceptible to serious complications from COVID-19. Each Individual Plaintiff also stated that their medical conditions constitute co-morbidities as defined by the CDC and rendered them susceptible to serious complications from COVID-19.

Despite their Awareness, Defendants Have Failed to Take Necessary Steps to Respond to the Risk by Mitigating the Spread of COVID-19 at Adirondack and Protecting the Men Incarcerated There

151.    Defendants have failed to take necessary steps to improve conditions at Adirondack and limit the spread of COVID-19 to the residents there.

152.    Defendants have given no indication that they intend to stop transferring men to Adirondack from other facilities throughout the state, and when transferring people, they do not test them prior to transfer or after transfer, nor do they quarantine people upon arrival. This is true even when Defendants are transferring men to Adirondack from facilities that have had COVID-19 cases and deaths.

153.    Defendants' refusal to implement these basic COVID-19 prevention measures constitutes a frightening lack of concern for the potential spread of COVID-19 amongst this extremely vulnerable population. It also stands in direct contrast to CDC guidelines, which advise that after a person travels and is potentially exposed to COVID-19, that person should quarantine for 14 days. Specifically, the CDC states:

> You may have been exposed to COVID-19 on your travels . . . You may feel well well and not have any symptoms, but you can be contagious without symptoms and spread the virus to others. You and your travel companions . . . pose a risk to your . . . community for 14 days after you were exposed to the virus.[62]

154.    The CDC recommends that, in congregate living conditions "such as in correctional and detention facilities" which "have potential for rapid and widespread transmission of" COVID-19, administrators should employ either a system of contact tracing or "a broader testing strategy, beyond testing only close contacts within the facility, to reduce chances of a large outbreak."[63] But Defendants have employed neither at Adirondack, nor have they employed alternative testing and quarantining protocols directed toward preventing the spread of the virus.

155.    Defendants have the resources to screen and test all men incarcerated at Adirondack on a routine basis. They also have the resources to implement a contact tracing system consistent with public health guidance. They simply have chosen not to do so.

156.    Even though Adirondack is an environment ripe for widespread transmission, and even though COVID-19 has already entered Adirondack, Defendants do not have a "broader testing strategy." Defendants instead test incarcerated people infrequently and haphazardly, with

---

[62] CTRS. FOR DISEASE CONTROL AND PREVENTION, AFTER YOU TRAVEL INTERNATIONALLY (Dec. 9, 2020), https://www.cdc.gov/coronavirus/2019-ncov/travelers/after-travel-precautions html.
[63] CTRS. FOR DISEASE CONTROL AND PREVENTION, INTERIM CONSIDERATIONS FOR SARS-CoV-2 TESTING IN CORRECTIONAL AND DETENTION FACILITIES, *supra* note 34.

no discernible pattern and seemingly without any connection to conditions or developments at the prison.

157.    Each time a person has tested positive at Adirondack, Defendants have failed to quarantine the incarcerated men who were in contact with the patient.

158.    Defendants have also refused to implement a contact tracing system at Adirondack. They have no functional system for determining who may have been exposed to COVID-19, let alone tracking those with whom such people subsequently interact. When incarcerated men test positive for COVID-19 at Adirondack, Defendants do not quarantine exposed residents, re-test exposed individuals, or otherwise try to prevent exposed individuals from spreading COVID-19 throughout the prison.

159.    Defendants have failed to implement necessary quarantine and isolation practices at Adirondack. Defendants maintain only two negative pressure isolation rooms at Adirondack – a facility that houses nearly 100 medically vulnerable men. Defendants have refused to take steps to bolster Adirondack's capacity to respond to an outbreak by adding quarantining and isolation space or otherwise reconfiguring the facility to prepare for the potential spread of the pathogen. Knowing full well that there is a significant risk of a widespread outbreak at Adirondack, Defendants have chosen not to prepare for it.

160.    Defendants have failed to implement a social distancing protocol at Adirondack, and Defendants' practices at Adirondack do not allow for social distancing. Defendants continually require men at Adirondack to congregate in bathrooms, recreation yards, and mess halls. Defendants force incarcerated people to eat meals in crowded mess halls, work in close quarters, and allow for unchecked congregating in recreation rooms and housing units.

161.    Defendants have also refused to provide Plaintiffs the basic guidance, hygiene supplies, and cleaning supplies required to protect them from COVID-19 transmission. In addition to the lack of soap, described above, for months, Defendants refused to provide adequate access to hand sanitizer or switch out masks when necessary.

162.    These failures individually put members of the General Class at grave risk of COVID-19, and collectively, these failures compound to create a constitutionally unacceptable level of risk of death or serious injury to members of the putative General Class and Disability Subclass.

163.    In sum, Defendants have wholesale disregarded the CDC and other public health guidelines at Adirondack. In doing so, they have not explained why they have rejected this guidance or explained what alternative guidance they are following or measures that they are adopting, and their practices have subjected people in their custody to an unreasonable and unnecessary risk of serious harm or death. They know full well the consequences of ignoring public health guidance: by failing to follow infectious disease control practices, Defendants have caused severe outbreaks of COVID-19 at other facilities. Defendants' refusal to implement these guidelines at Adirondack, where the incarcerated population is uniquely vulnerable, constitutes deliberate indifference to a known risk, particularly as the pandemic rages on and as outbreaks at Elmira, Greene, and other facilities are directly attributable to Defendants' inaction.

<u>**Defendants Have Violated the Rights of the
Disability Subclass Under the ADA and RA**</u>

*DOCCS Has Discriminated Against People with Disabilities in
Transferring them to Adirondack*

164.    As described above, all Individual Plaintiffs are members of the putative Disability Subclass.

165.     Other members of the Disability Subclass also have diabetes and serious heart disease, conditions that limit the functioning of the endocrine system, the circulatory system, and other bodily functions. Additionally, their disabilities substantially limit them, or would limit them absent medication and other mitigating measures, in major life activities such as seeing, sleeping, walking, and engaging in physically-exerting activity.

166.     As described above, both the transfer process and the living conditions at Adirondack subject people to unacceptable risks of contracting and suffering serious illness or death from COVID-19. These risks are particularly great for members of the Disability Subclass.

167.     Defendants have specifically chosen Individual Plaintiffs and other class members to be subjected to the heightened risks of transfer to and incarceration at Adirondack because they are elderly and have underlying medical conditions that Defendants perceive as disabling and that, for Disability Subclass members, also constitute disabilities. They have thus intentionally discriminated against Individual Plaintiffs and other subclass members in a way that adversely affects them based on having or being perceived to have a disability within the meaning of 42 U.S.C. § 12102(2).

168.     The transfers themselves, and then warehousing men in a facility with inadequate medical facilities and social distancing measures, do not protect people incarcerated at Adirondack, but rather endanger them. Furthermore, the limited capacity of local medical resources and the long distance to the closest major hospital make it especially likely that, should a COVID-19 outbreak occur, Defendants will be unable to adequately respond and treat infected people. Accordingly, there is no rational relationship between this disparate treatment and any legitimate purpose.

169.     By selecting this group of men for transfer to Adirondack, where they face a heightened risk of contracting, becoming seriously ill from, and potentially dying from COVID-19, Defendants have discriminated against the Disability Subclass on the basis of their actual or perceived disabilities.

*DOCCS Has Failed to Make Reasonable Modifications to Prevent Heightened Exposure to the Risks of COVID-19 for People with Disabilities*

170.     Members of the Disability Subclass require reasonable modifications to reside at Adirondack safely, because they are subjected to heightened risk of contracting COVID-19 and of suffering serious complications if they do by virtue of their disabilities. They have requested these reasonable modifications through Adirondack's grievance process.

171.     Without the ability to live in a prison setting unencumbered by a heightened risk of contracting COVID-19 and becoming seriously ill or dying as a result, members of the Disability Subclass cannot have effective access to Adirondack's programs, services, and activities.

172.     In order for this subclass not to be subjected to a heightened risk in their daily activities, members of the Disability Subclass require reasonable modifications, including testing people for COVID-19 prior to transferring them to Adirondack; quarantining them when they arrive at Adirondack; quarantining people who have been exposed to someone with an active case of COVID-19; and testing people who have been exposed to COVID-19 after a reasonable period post-exposure to determine whether they have contracted COVID-19. These modifications, too, would not involve unreasonable cost or fundamental alteration.

173.     Needed reasonable modifications also include the ability to sleep in cells with doors; social distancing in recreation areas, in the law library, in housing units, and at mealtimes; the ability to eat meals from the mess hall in their rooms; keeping staff and units separated from

47

one another to contain any outbreak; and for all incarcerated people and staff to wear masks at all times. All these modifications could be made with very little cost or burden—indeed, these precautions are being taken at other prisons and jails around the country—such that they would not fundamentally alter Defendants' programs.

174.    Defendants have failed to make those reasonable modifications. As a result, people with disabilities in Adirondack are at a heightened risk of contracting COVID-19 and becoming seriously ill or dying.

175.    Adirondack, which only recently began housing adults, also lacks programming, such as college courses, that other prisons in the DOCCS system provide. Members of the subclass were moved to Adirondack on the basis of their actual or perceived disabilities, so they have also been deprived access to that programming on the basis of disability.

176.    To the extent programming is provided, members of this Subclass are forced to choose between not participating in the programming currently offered at Adirondack and participating at the risk of contracting a potentially fatal virus. In order to avoid this discriminatory choice, members of this Subclass require reasonable modifications including requiring social distancing during activities; requiring that all staff wear masks during activities; and conducting activities outdoors.

177.    In the alternative, or to the extent these modifications are not possible, members of this Subclass require the reasonable modification of release to home confinement. One of the criteria by which residents of Adirondack have been chosen for transfer there is posing relatively low security risk. If Defendants are unwilling or unable to ensure Disability Subclass members' general safety and safe ability to access services, release to home confinement is necessary to ensure they do not face discriminatory conditions based on their disabilities.

48

## Defendants Have Frustrated Plaintiff RAPP's Mission and Forced it to Divert Resources

178.    Plaintiff RAPP is an organization that advocates on behalf of the increasing number of older prisoners. Much of its work includes securing the release, safe return, and reintegration of older and aging people from prison.

179.    In early 2020, Plaintiff RAPP was focused primarily on attempting to reform the New York State prison system. It worked to educate and mobilize members of the community and the state legislature to support two pending parole reform bills that it hoped would lead to the release of countless older people whose continued incarceration actively harmed the community while helping no one. It hoped that, after working to secure passage of those bills, it could spend the rest of 2020 ensuring that reforms were implemented in a manner consistent with the promise of those bills.

180.    Soon after COVID-19 entered the United States, however, much of New York State shut down and the legislature did not vote on the parole bills in 2020. RAPP recognized that COVID-19—and the Defendants' failure to take adequate steps to address the virus in state prisons—posed a serious threat to the aging incarcerated populations that RAPP serves and thus needed to temporarily shift its focus away from its broader legislative and systemic reform efforts and toward providing direct assistance to individuals seeking release from prison via individual petitions for clemency and medical parole. It focused on that activity from March through May.

181.    In late May, however, RAPP learned of Defendants' decision to concentrate elderly and medically-vulnerable incarcerated people at Adirondack and, recognizing the threat the plan posed to the lives of the population it serves, diverted efforts away from helping people statewide with individual release petitions and toward opposing the Adirondack Plan.

49

182.     As part of its advocacy in response to the Adirondack transfers, RAPP determined

that the interests of Adirondack residents converged with the interests of incarcerated elderly

people being transferred to Adirondack—all stood to be harmed by a potential COVID-19

outbreak at the prison. It therefore sought to organize both local residents and family members of

the men who would be imprisoned at Adirondack in opposition to the plan.

183.     While community organizing and education are part of RAPP's core mission, it

had never engaged in any significant advocacy efforts in or around Adirondack. The

organization's director and associate director therefore spent considerable time away from New

York City to instead be in Adirondack, where they convened a working group focused

exclusively on the Adirondack prison plan. That group, which remains in effect as of the filing of

this Complaint and includes criminal-justice-focused non-profits and local groups, investigated

conditions on the ground, analyzed data relating to the Adirondack transfers, and developed a

plan to oppose the Adirondack transfers.

184.     RAPP and its partners worked to educate the public and public officials about the

dangers posed by the Adirondack plan by, among other things, holding a rally at the facility,

increasing press coverage of the plan, organizing a sign-on letter in opposition to the plan, and

hosting a virtual press conference with members of the New York State Senate and State

Assembly Health Committees. RAPP dedicated a significant amount of man hours to preparing

and training people for these efforts and appearances and it also trained local actors so that they

might continue advocacy efforts on their own.

185.     Since learning of Defendants' Adirondack plan, RAPP has spent and continues to

spend a significant number of hours per week to mitigate the potential harm faced by people

incarcerated at Adirondack. It regularly fields calls from family members of men incarcerated at

Adirondack who are concerned about the lack of adequate safeguards and the facility, providing support, advice, and/or assistance for those who want to advocate on behalf of their family members.

186.    The continued incarceration in unusually dangerous circumstances of elderly people in Adirondack also directly frustrates RAPP's mission of advocating for the rights of elderly prisoners. Defendants' decision to concentrate this elderly prison population under circumstances that pose a significant risk to their long-term health, if not their lives, harms the community on whose behalf it is RAPP's mission to advocate and impedes RAPP's ability to advance this community's rights.

187.    Because of the need to remedy Defendants' unlawful actions with respect to Adirondack, RAPP has had to forego activities that were planned to be at the core of accomplishing its mission during this time. If it did not have to address the allegations described in this complaint, RAPP would have been able to devote far more time to continuing to help individuals statewide seek release from incarceration and advocating for systemic change rather than having to focus on seeking to minimize the harm of a plan that it felt should never have been adopted in the first place.

## CAUSES OF ACTION

## Count I – Violation of the Eighth Amendment

## (42 U.S.C. § 1983)

(All Plaintiffs Against Defendants Cuomo, Annucci, Morley, and Tedford)

188.     Plaintiffs incorporate by reference each and every allegation contained in the foregoing paragraphs as if specifically alleged herein.

189.     Defendants have exhibited deliberate indifference to the serious medical needs of Individual Plaintiffs and the putative General Class and Disability Subclass by failing to implement measures to prevent the spread of COVID-19, thus depriving Individual Plaintiffs and members of the General Class and Disability Subclass of their rights, privileges, and immunities in violation of 42 U.S.C. § 1983 and their rights guaranteed by the Eighth and Fourteenth Amendments to the United States Constitution.

190.     Defendants have actual knowledge of the serious medical needs of Individual Plaintiffs and the putative General Class and Disability Subclass and the attendant serious risk that contracting COVID-19 will mean dying or suffering serious complications. Defendants have documented their knowledge of these risks and have repeatedly acknowledged the risk publicly.

191.     Defendants have acted under color of law to willfully and knowingly refuse to implement adequate COVID-19 prevention and mitigation measures at Adirondack despite their knowledge of the risk. They have done so through the actions alleged above, including by refusing to test people prior to their transfer to Adirondack; refusing to test people after their transfer to Adirondack; refusing to quarantine people after their transfer to Adirondack; refusing to promulgate or implement adequate quarantining and isolation protocols; refusing to promulgate or implement adequate testing protocols; refusing to promulgate or implement

adequate contact tracing protocols; refusing to promulgate or implement adequate social

distancing protocols; refusing to promulgate or implement adequate cleaning protocols; and

refusing to promulgate or implement adequate hygiene protocols. These actions, individually and

in combination, have created a serious risk that Individual Plaintiffs and members of the putative

General Class and Disability Subclass will contract COVID-19 and suffer death or serious injury

as a result.

192.    As a direct and proximate result of Defendants' deliberate indifference to

plaintiffs' known and serious medical needs, Plaintiffs have sustained the injuries herein alleged

and will continue to sustain such injuries if Defendants' conduct is not enjoined.

### Count II – Violation of Title II of the Americans with Disabilities Act

### 42 U.S.C. § 12101, *et seq.*

(Individual Plaintiffs, on behalf of themselves and members of the Disability Subclass, and
RAPP, Against All Defendants)

193.    Plaintiffs incorporate by reference each and every allegation contained in the

foregoing paragraphs as if specifically alleged herein.

194.    Title II of the ADA states, in pertinent part:

> [N]o qualified individual with a disability shall, by reason of such disability, be
> excluded from participation in or be denied the benefits of the services, programs,
> or activities of a public entity. 42 U.S.C. § 12132.

A "public entity" includes state and local governments, their agencies, and their instrumentalities.

42 U.S.C. § 12131(1).

195.    Disability discrimination under Title II includes the refusal to make reasonable

modifications to policies, practices, and procedures where necessary to ensure that persons with

disabilities do not experience discrimination. 28 C.F.R. § 35.130(b)(7).

196.    Defendants DOCCS was at all times relevant to this action, and currently is a "public entity" within the meaning of Title II of the ADA.

197.    Defendants Cuomo, Annucci, Morley, and Tedford are responsible for the operation of public entities covered by Title II of the ADA. 42 U.S.C. §§ 12131(1)(A) and (B).

198.    Defendants provided and provide "services, programs and activities" including educational programs, services, and activities in DOCCS facilities.

199.    The term "disability" includes physical and mental impairments that substantially limit one or more major life activities. 42 U.S.C. § 12102(2). A "'qualified individual with a disability' means an individual with a disability who, with or without reasonable modifications to rules, policies, or practices . . . meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2).

200.    Individual Plaintiffs and members of the Disability Subclass were, at all times relevant to this action, and are currently "qualified individuals with disabilities" within the meaning of Title II of the ADA. *See* 42 U.S.C. § 12102. They all have diabetes and heart disease, which substantially limit major life activities, and they are all incarcerated in Adirondack facilities and, thus, qualified—with or without reasonable modification—to participate in the programs, services, and activities of DOCCS facilities.

201.    Defendants have violated the rights of Individual Plaintiffs and members of the Disability Subclass secured by Title II of the ADA and its implementing regulations. *See* 42 U.S.C. § 12134; 28 C.F.R. § 35.101 *et seq.*

202.    Defendants have denied Individual Plaintiffs and members of the Disability Subclass reasonable modifications necessary to avoid discriminating against them on the basis of their disabilities. As described above, Defendants transferred people to Adirondack on the basis of

54

perceived disability, and when members of the Disability Subclass arrived, they were denied the reasonable modifications they require to be able to safely participate in Adirondack's programs, services, and activities.

203.    Defendants have failed to make reasonable modifications to their policies, practices, and procedures even though these modifications are necessary to avoid discriminating against Individual Plaintiffs and members of the Disability Subclass, in violation of 28 C.F.R. § 35.130(b)(7).

204.    Specifically, as described above, Defendants have refused to test people for COVID-19 prior to transferring them to Adirondack, have refused to alter their transfer practices to reduce the risk of contracting COVID-19 en route to Adirondack, have refused to quarantine people when they arrive at Adirondack, have refused to test people for COVID-19 at a reasonable date after their arrival, and have refused to quarantine or conduct appropriate testing for people who have been exposed to infected individuals.

205.    Moreover, Defendants have refused to ensure that everyone incarcerated at Adirondack has a door on his cell, have refused to allow for social distancing in housing units, recreation areas, the law library, or at mealtimes, and have refused to allow people to eat meals in their cells. As a result, Individual Plaintiffs and members of the Disability Subclass are deprived of the ability to partake in these and other basic activities and services safely.

206.    Defendants could modify their practices to make their services safely accessible to people with disabilities without fundamentally altering the services they provide.

207.    Because Defendants' discriminatory and wrongful conduct is ongoing, declaratory and injunctive relief are appropriate remedies. Further, as a direct result of Defendants' actions,

Individual Plaintiffs and members of the Disability Subclass are suffering irreparable harm, the danger of a life-threatening illness. Therefore, speedy and immediate relief is appropriate.

208. Title II of the ADA also states, in pertinent part, "no qualified individual with a disability shall, by reason of such disability, be . . . subjected to discrimination by any such entity." 42 U.S.C. § 12132. A "public entity" includes state and local governments, their agencies, and their instrumentalities. 42 U.S.C. § 12131(1).

209. As described above, Individual Plaintiffs and members of the Disability Subclass were singled out among all people incarcerated at DOCCS facilities for transfer to Adirondack because they were perceived to have disabilities within the meaning of the ADA. DOCCS has advanced no explanation for these transfers, and since these transfers made people more vulnerable, there is no rational relationship between the transfers and any legitimate government purpose.

210. Pursuant to 42 U.S.C. § 12133, Plaintiffs are entitled to declaratory and injunctive relief.

**Count III – Violation of Section 504 of the Rehabilitation Act**

**29 U.S.C. § 794**

(Individual Plaintiffs, on behalf of themselves and the Disability Subclass, and RAPP Against Defendants DOCCS and Adirondack)

211. Plaintiffs incorporate by reference each and every allegation contained in the foregoing paragraphs as if specifically alleged herein.

212. Section 504 of the Rehabilitation Act provides, in pertinent part:

> No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance[.]

29 U.S.C. § 794(a).

213.    Defendants DOCCS was at all times relevant to this action and is currently a recipient of federal financial assistance within the meaning of Section 504.

214.    Individual Plaintiffs and members of the Disability Subclass were at all times relevant to this action, and are currently "otherwise qualified individuals with disabilities" within the meaning of Section 504. They all have impairments that substantially limit a major life activity, and they were and/or are all incarcerated in DOCCS facilities and qualified—with or without reasonable modification—to participate in the programs and activities at DOCCS facilities.

215.    Defendants have violated the rights of Individual Plaintiffs and members of the Disability Subclass secured by Section 504 and its implementing regulations by discriminating against them on the basis of their disabilities or perceived disabilities and by denying them the reasonable accommodations they need to participate in the programs, services, and activities of Adirondack without being subjected to a heightened risk of contracting COVID-19 and of that illness resulting in serious injury or death.

216.    Pursuant to 29 U.S.C. § 794(a), Plaintiffs are entitled to declaratory and injunctive relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that the Court grant them the following relief:

(1)    Certify the proposed General Class and Disability Subclass;

(2)    Enter a declaratory judgment that the foregoing acts violated Plaintiffs' rights under the Eighth Amendment, the ADA, and the RA;

(3)    Enter a preliminary injunction and/or permanent injunction directing Defendants to take all necessary steps to stop violating Plaintiffs' rights, including but not limited to:

A.  Cease all transfers of people from other prisons to Adirondack until
    Defendants can demonstrate that transfers can be done in a manner that meets
    constitutional and statutory standards for ensuring adequate safety of members
    of the General Class and Disability Subclass;

B.  Ensure that everyone incarcerated at Adirondack is housed in conditions that
    ensure constitutionally and statutorily adequate safety from the risk of
    contracting COVID-19;

C.  Ensure that conditions for eating, visitation, recreation, and programming at
    Adirondack meet constitutional and statutory safety standards;

D.  Conduct COVID-19 testing, screening, and quarantining in a manner
    sufficient to meet constitutional and statutory safety standards;

E.  Appoint an independent monitor with medical expertise to ensure compliance
    with these conditions, and provide the monitor with unfettered access to
    medical units, confidential communication with detained individuals in and
    out of quarantine, and surveillance video of public areas of the facilities;

(4)   Retain jurisdiction over this case until Defendants have fully complied with the
orders of this Court, and there is a reasonable assurance that they will continue to comply in the
future, absent continuing jurisdiction;

(5)   Award any and all costs and/or fees incurred in this action that are available under
law; and

(6)   Order such relief as this Court deems just and equitable.

**DEMAND FOR JURY TRIAL**

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury on all issues triable as of right.

Dated: January 8, 2021                     /s/ Rebecca Livengood_____
                                          Sasha Samberg-Champion (Bar Roll #702397)
                                          Jia Cobb (Bar Roll #520798)
                                          Gabriel Diaz*
                                          Rebecca Livengood (Bar Roll #702388)
                                          RELMAN COLFAX PLLC
                                          1225 19th St. NW, Suite 600
                                          Washington, D.C. 20036
                                          T: (202) 728-1888
                                          F: (202) 728-0848


                                           /s/ Stefen R. Short_____
                                          Stefen R. Short (Bar Roll # 519275)
                                          Sophia Gebreselassie*
                                          David Billingsley*
                                          THE LEGAL AID SOCIETY
                                          PRISONERS' RIGHTS PROJECT
                                          199 Water Street, 6th Floor
                                          New York, N.Y. 10038
                                          T: (212) 577-3530
                                          F: (202) 728-0848

                                          *Attorneys for Plaintiffs*

                                          *Pro Hac Vice Applications to Be Submitted*