**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK**

Allen HARPER, José LEON, and Ranfis
PEREZ on behalf of themselves and all
others similarly situated; and the
RELEASE AGING PEOPLE IN
PRISON CAMPAIGN ("RAPP"),

                    Plaintiffs,

      v.

ANDREW CUOMO, in his official
capacity as the Governor of the State of
New York; NEW YORK STATE
DEPARTMENT OF CORRECTIONS
AND COMMUNITY SUPERVISION;
ANTHONY J. ANNUCCI, in his official
capacity as the Acting Commissioner of
the New York State Department of
Corrections and Community Supervision;
JOHN MORLEY, M.D., in his official
capacity as the Deputy Commissioner
and Chief Medical Officer of the New
York State Department of Corrections
and Community Supervision; and
JEFFREY TEDFORD, in his official
capacity as the Superintendent of
Adirondack Correctional Facility

                 Defendants.

Civil Action No. 9:21-cv-19 (LEK/ML)

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' REQUEST FOR
PRELIMINARY INJUNCTION**

## <u>TABLE OF CONTENTS</u>

**TABLE OF AUTHORITIES** ................................................................................ iv

**INTRODUCTION** ............................................................................................ 1

**FACTUAL BACKGROUND** ............................................................................ 2

**ARGUMENT** .................................................................................................. 10

    A.  STANDARD OF REVIEW AND RELIEF SOUGHT ................................ 10

    B.  PLAINTIFFS WILL SUFFER IRREPERABLE HARM IN THE FORM OF EXTREME AND VERY SERIOUS DAMAGE, INCLUDING THE POSSIBILITY OF LONG-TERM INJURY AND DEATH, IN THE ABSENCE OF A PRELIMINARY INJUNCTION ............................................................ 11

    C.  LIKELIHOOD OF SUCCESS ON THE MERITS ................................... 15

        1.  Plaintiffs are Likely to Succeed on the Merits of Their ADA and RA Claims ....................................................................................................... 15

            a. Individual Plaintiffs and Members of the Disability Subclass are Qualified Individuals with Disabilities ................................. 16

            b. Defendant DOCCS is an Entity Subject to the ADA and RA ........... 17

            c. Individual Plaintiffs and Members of the Disability Subclass Were Denied the Opportunity to Benefit from Defendants' Services, Programs, or Activities ....................................................... 18

            d. Defendants Cannot Demonstrate That the Relief Plaintiffs Seek Would Impose an Undue Hardship ...................................... 20

        2.  Plaintiffs are Likely to Succeed on the Merits of their Eighth Amendment Claim ................................................................................................. 21

            a. Defendants Have Exposed Individual Plaintiffs and Members of the General Class to a Substantial Risk of Serious Harm ........................ 22

            b. Defendants Have Acted with Deliberate Indifference in Exposing Plaintiffs to a Serious Risk of Harm ................................... 23

    D.  THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST SUPPORT A
        PRELIMINARY INJUNCTION ................................................................................. 29

    E.  THE REMEDY PLAINTIFFS SEEK IS APPROPRIATE ......................................... 31

**CONCLUSION** ...................................................................................................................... 33

## **TABLE OF AUTHORITIES**

<u>Cases</u>                                                                                          <u>Pages</u>

*ACLU v. Clapper*, 804 F.3d 617 (2d Cir. 2015) ......................................................... 10

*Banks v. Booth*, 468 F. Supp. 3d 101 (D.D.C. 2020)............................................... 29, 30

*Basank v. Decker*, 449 F. Supp. 3d 205 (S.D.N.Y. 2020) ....................................... 12, 13

*Connecticut Dep't of Envtl. Prot. v. OSHA*, 356 F.3d 226 (2d. Cir. 2004) ................. 12

*Coronel v. Decker*, 449 F. Supp. 3d 274 (S.D.N.Y. 2020) ...................................... 29, 30

*DeShaney v. Winnebago Co. Dep't of Soc. Serv.*, 489 U.S. 189 (1989)...................................... 21

*Disabled in Action v. Bd. Of Elections in City of New York*, 752 F.3d 189 (2d Cir. 2014)......... 19

*Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110 (2d Cir. 2009) .............................. 10

*Farmer v. Brennan*, 511 U.S. 825 (1994) ........................................................ 21, 22, 23

*Fulton v. Goord*, 591 F.3d 37 (2d Cir. 2009)........................................................ 17

*Gogos v. AMS Mech. Sys., Inc.*, 737 F.3d 1170 (7th Cir. 2013) .................................... 17

*Helling v. McKinney*, 509 U.S. 25 (1993)........................................................ 10, 21, 22

*Hope v. Pelzer*, 536 U.S. 730 (2002) ................................................................ 24

*Hutto v. Finley*, 437 U.S. 678 (1978)................................................................ 22

*Innovative Health Systems, Inc. v. City of White Plains*, 117 F.3d 37 (2d Cir. 1997)................ 12

*Jolly v. Coughlin*, 76 F.3d 468 (2d. Cir. 1996) ...................................................... 10

*Martinez v. Cuomo*, 459 F. Supp. 3d 517 (S.D.N.Y. 2020).......................................... 18

*Martinez-Brooks v. Easter*, 459 F. Supp. 3d 411 (D. Conn. 2020)...................................... *passim*

*Mays v. Dart*, 453 F. Supp. 3d 1074 (N.D. Ill. 2020) .............................................. 13, 22

*Mays v. Dart*, 974 F.3d 810 (7th Cir. 2020) ...................................................... 25, 26

*Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206 (1998).................................................... 15, 18

*Shapiro v. Cadman Towers, Inc.,* 51 F.3d 328 (2d Cir. 1995) ....................................................... 12

*Tom Doherty Ass'ts, Inc. v. Saban Entertainment, Inc.*, 60 F.3d 27 (2d Cir. 1995) ..................... 11

*United States v. Georgia*, 546 U.S. 151 (2006) ........................................................................... 19

*Winter v. NRDC*, 555 U.S. 7 (2008) ............................................................................................. 10

*Wright v. New York State Dep't of Corr.*, 831 F.3d 64 (2d Cir. 2016) ................................. *passim*

<u>Statutes</u>                                                                                                                        <u>Pages</u>

42 U.S.C. § 12102 ......................................................................................................................... 16

28 C.F.R. § 35 ......................................................................................................................... 18, 20

29 C.F.R. § 1630.2 ........................................................................................................................ 17

Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132 ....................................... 16, 20

Title V of the Rehabilitation Act, 29 U.S.C. § 794 ...................................................................... 16

<u>Other Authorities</u>                                                                                                             <u>Pages</u>

Adam Federman, *Small Adirondack Hospital Preps For COVID-19 In The Rural North
    Country's 'Calm Before The Storm'*, Adirondack Explorer (Mar. 25, 2020),
    https://www.adirondackexplorer.org/stories/small-adirondack-hospital-preps-for-covid-
    19-in-the-rural-north-countrys-calm-before-the-storm ...................................................... 14

Brandy Henry, *Social Distancing and Incarceration: Policy and Management Strategies to
    Reduce COVID-19 Transmission and Promote Health Equity Through Decarceration*,
    47 Health Education and Behavior 536-539 (May 2020) ...................................... 5, 13, 32

Brendan Saloner, Ph.D., et al., *COVID-19 Cases and Deaths in Federal and State Prisons*,
    JAMA Network (July 8, 2020),
    https://jamanetwork.com/journals/jama/fullarticle/2768249 ............................................. 5

Ctrs. for Disease Control and Prevention, Assessing Risk Factors for Severe COVID-
    19 Illness, (Nov. 30, 2020), https://www.cdc.gov/coronavirus/2019-ncov/covid-
    data/investigations-discovery/assessing-risk-factors.html ................................................. 4

Ctrs. for Disease Control & Prevention, COVID-19 Hospitalization and Death by
    Race/Ethnicity (Nov. 30, 2020), https://www.cdc.gov/coronavirus/2019-ncov/covid-
    data/investigations-discovery/ hospitalization-death-by-race-ethnicity.html .................... 4

Ctrs. for Disease Control & Prevention, Evidence used to update the list of
   underlying medical conditions that increase a person's risk of severe illness from
   COVID-19 (Nov. 2, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-
   precautions/evidence-table.html ....................................................................................... 12

Ctrs. for Disease Control and Prevention, Interim Considerations for SARS-CoV-2
   Testing in Correctional and Detention Facilities (Dec. 3, 2020),
   https://www.cdc.gov/coronavirus/2019-ncov/community/correction-
   detention/testing.html.......................................................................................................... 7

Ctrs. for Disease Control and Prevention, Older Adults (Dec. 13, 2020),
   https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/
   older-adults.html .................................................................................................................. 3

Ctrs. for Disease Control & Prevention, Past Seasons Estimated Influenza
   Disease Burden, https://www.cdc.gov/flu/about/burden/past seasons.html ...................... 2

Ctrs. for Disease Control & Prevention, People with Certain Medical Conditions
   (Dec. 29, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-
   precautions/people-with-medical-conditions.html ........................................................... 12

Ctrs. for Disease Control & Prevention, Scientific Brief: Community Use of Cloth
   Masks to Control the Spread of SARS-CoV-2 (Nov. 20, 2020),
   https://www.cdc.gov/coronavirus/2019-ncov/more/masking-
   science-sars-cov2.html ................................................................................................ 3, 14

Ctrs. for Disease Control and Prevention, Weekly Updates by Select Demographic
   and Geographic Characteristics (Jan. 6, 2021),
   https://www.cdc.gov/nchs/nvss/vsrr/covid_weekly/index.htm .................................. 3, 12

Daniel P. Oran, AM & Eric J. Topol, M.D., *Prevalence of Asymptomatic
   SARS-CoV-2 Infection*, 173 Annals of Internal Medicine 362, (2020),
   https://www.acpjournals.org/doi/10.7326/M20-3012 ....................................................... 2

Elizabethtown Community Hospital, *Inpatient Care*, https://www.ech.org/Departments-and-
   Programs/Inpatient-Care-Department .............................................................................. 15

Halley Bondy, *39% of Covid-19 deaths have occurred in nursing homes – many could have been
   prevented: report*, NBC News Know Your Value (Dec. 8, 2020 1:29 PM),
   https://www.nbcnews.com/know-your-value/feature/39-covid-19-deaths-have-occurred-
   nursing-homes-many-could-ncna1250374 ........................................................................ 4

Henry Njuguna, M.D. et al., *Serial Laboratory Testing for SARS-CoV-2 Infection Among*

*Incarcerated and Detained Persons in a Correctional and Detention Facility*, 69
   Morbidity and Mortality Weekly Report 836, 837 (2020),
   https://www.cdc.gov/mmwr/volumes/69/wr/pdfs/mm6926e2-H.pdf ............................... 5

Jan Ransom & Alan Feuer, *'We're Left for Dead': Fears of Virus Catastrophe at Rikers Jail*,
   N.Y. Times (Mar. 30, 2020),
   https://www.nytimes.com/2020/03/30/nyregion/coronavirus-rikers-nyc-jail.html ........... 5

Jordan Allen et al*., Coronavirus in the U.S.: Latest Map and Case Count*, N.Y. Times
   (Jan. 8, 2021), https://www.nytimes.com/interactive/2020/us/
   coronavirus-us-cases.html ................................................................................................. 2

Maggie Koerth, *Why Are More Men Than Women Dying of COVID-19?*, FiveThirtyEight
   (April 30, 2020, 5:58 AM), https://fivethirtyeight.com/features/why-are-more-men-than-
   women-dying-of-covid-19/ ............................................................................................... 4

Mayo Clinic Staff, *COVID-19 (coronavirus): Long-Term Effects*, Mayo Clinic
   (Nov. 17, 2020), https://www.mayoclinic.org/diseases-conditions/coronavirus/in-depth/
   coronavirus-long-term-effects/art-20490351 ............................................................. 2, 11

N.Y. State, *Governor Cuomo Announces Eighth Region on TRACK TO Hit Benchmark to Begin
   Reopening Tuesday May 26th*, Youtube (May 23, 2020),
   https://www.youtube.com/watch?v=4NAycLIsyHU ...................................................... 24

N.Y. State Dep't of Corr. & Cmty. Supervision, DOCCS COVID-19 Report,
   https://doccs.ny.gov/doccs-covid-19-report ................................................................... 24

N.Y. State Dep't of Corr. & Cmty. Supervision, DOCCS Re-Opening Plan Fact Sheet,
   (May 29, 2020), https://doccs.ny.gov/system/files/documents/2020/06/web-page-doccs-
   re-opening-fact-sheet-5-29-20-final.pdf .......................................................................... 5

RAPP, June 25, 2020 RAPP Adirondack Letter, http://rappcampaign.com/wp-
   content/uploads/Adirondack-Sign-on-Letter_June-2020-new.pdf .................................. 24

RAPP, "Re: Releasing New Yorkers from Prison is the Only Way to Save Lives in the Wake of
   COVID-19," http://rappcampaign.com/wp-content/uploads/Legis-
   letter-Cuomo.pdf ....................................................................................................... 6, 23

Richard V. Reeves & Tiffany N. Ford, *COVID-19 Much More Fatal for Men, Especially Taking
   Age Into Account*, Brookings Institute (May 15, 2020),
   https://www.brookings.edu/blog/up-front/2020/05/15/covid-19-much-more-fatal-for-
   men-especially-taking-age-into-account/ .......................................................................... 4

Shan Li, *Covid-19 Surge Strikes Two New York Prisons*, Wall St. J. (Oct. 21, 2020),

https://www.wsj.com/articles/covid-19-surge-strikes-two-new-york-prisons-
11603315628 ................................................................................................... 6

Sharon H. Bergquist et al., *Non-hospitalized Adults with COVID-19 Differ Noticeably from
Hospitalized Adults in Their Demographic, Clinical, and Social Characteristics*, SN
Comprehensive Clinical Medicine (2020),
https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7426161/ .......................................... 2, 3

The Marshall Project, *A State by State Look at Coronavirus in Prisons*, The Marshall Project,
https://www.themarshallproject.org/2020/05/01/a-state-by-state-look-at-coronavirus-in-
prisons ..................................................................................................... 13

Timothy Williams, Benjamin Weiser and William K. Rashbaum, *'Jails Are Petri Dishes':
Inmates Freed as the Virus Spreads Behind Bars*, N.Y. Times (Mar. 30, 2020),
https://www.nytimes.com/2020/03/30/us/coronavirus-prisons-jails.html ...................... 32

U.S. Equal Employment Opportunity Commission, *Diabetes in the Workplace and the ADA,*
(May 15, 2013), https://www.eeoc.gov/laws/guidance/diabetes-workplace-and-ada ..... 17

Xi He et al., *Temporal Dynamics in Viral Shedding and Transmissibility of COVID-19*, Nature
Medicine (April 15, 2020), https://www.nature.com/articles/s41591-020-0869-5 ........... 3

Zak Cheney-Rice, *We're Going to All Start Dropping': Rikers Inmates on Life as Prisoners of
COVID-19*, N.Y. Mag. Intelligencer (Apr. 1, 2020),
https://nymag.com/intelligencer/2020/04/rikers-inmates-on-life-as-prisoners-of-the-
coronavirus.html ........................................................................................... 5

I.      **Introduction**

Defendants have transferred the most vulnerable people in their prison system, elderly people with underlying health conditions, to the remote Adirondack Correctional Facility ("Adirondack") during the most deadly pandemic in generations. In doing so, they have failed to conduct basic testing, screening, quarantining, and social distancing practices that would protect this population from death or serious injury resulting from COVID-19. These actions have created the conditions for a deadly outbreak. Plaintiffs bring this case, and seek a preliminary injunction from the Court, in order to prevent such an outbreak and mitigate the risk facing people incarcerated at Adirondack.

Specifically, Plaintiffs Allen Harper, Jose Leon, and Ranfis Perez ("Individual Plaintiffs"), on behalf of themselves and members of a General Class and Disability Subclass, along with the Release Aging People in Prison Campaign ("RAPP"), seek declaratory and injunctive relief under Title II of the Americans with Disabilities Act ("ADA"), Section 504 of the Rehabilitation Act of 1973 ("RA"), and the Eighth Amendment to the United States Constitution to remedy Defendants' ongoing violations of their statutory and constitutional rights. Defendants Governor Andrew Cuomo, the New York State Department of Corrections and Community Supervision ("DOCCS"), DOCCS's Acting Commissioner Anthony J. Annucci, DOCCS's Chief Medical Officer John Morley, M.D., and Adirondack Correctional Facility ("Adirondack") Superintendent Jeffrey Tedford (collectively, "Defendants") have discriminated against and failed to provide reasonable modifications to Individual Plaintiffs and the members of the Disability Subclass, and have violated the Eighth Amendment rights of all members of the General Class.

Although all of Plaintiffs' claims merit urgent consideration and require relief, Plaintiffs

1

seek through their Preliminary Injunction narrower relief aimed at immediately preventing COVID-19 from entering the facility and identifying and containing it if it does enter. To that end, Plaintiffs ask that the Court order Defendants to implement appropriate screening, testing, quarantining, and contact tracing protocols for all staff and residents of Adirondack, and that Defendants be enjoined from transferring anyone into the facility until they are able to do so in a way that does not create an unnecessary and unreasonable risk of introducing COVID-19 to Adirondack, pursuant to the conditions described below.

## II.    Factual Background

COVID-19 is an acute respiratory illness caused by a highly contagious, novel virus to which humans have no pre-existing immunity. Ex. 14, Shaman Decl. at ¶ 9. COVID-19 can be fatal, and many of those who survive COVID-19 suffer debilitating long-term damage to the heart, lungs, brain, and vascular system.[1] As of Jan. 6, 2021, COVID-19 has infected an estimated 21.2 million people in the United States,[2] and almost 360,000 people in the United States have died from COVID-19 or related complications. COVID-19 is thus about 14 times more deadly than seasonal influenza.[3]

The virus spreads quickly in part because it can spread from asymptomatic carriers. Ex. 14, Shaman Decl. at ¶ 9. People who spread COVID-19 often show only mild symptoms or no symptoms at all.[4] The virus is most contagious 2-3 days before any symptoms arise, and even

---

[1] Mayo Clinic Staff, *COVID-19 (coronavirus): Long-Term Effects*, MAYO CLINIC (Nov. 17, 2020), https://www.mayoclinic.org/diseases-conditions/coronavirus/in-depth/coronavirus-long-term-effects/art-20490351.
[2] Jordan Allen et al., *Coronavirus in the U.S.: Latest Map and Case Count*, N.Y. Times (Jan. 8, 2021), https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html.
[3] From the 2010-11 to 2019-20 flu seasons, there were an estimated 296,300,000 symptomatic influenza cases, and 359,000 estimated deaths, for a fatality rate of 0.12%. CTRS. FOR DISEASE CONTROL & PREVENTION, PAST SEASONS ESTIMATED INFLUENZA DISEASE BURDEN, https://www.cdc.gov/flu/about/burden/past-seasons.html.
[4] Daniel P. Oran, AM & Eric J. Topol, M.D., *Prevalence of Asymptomatic SARS-CoV-2 Infection*, 173 Annals of Internal Medicine 362, (2020), https://www.acpjournals.org/doi/10.7326/M20-3012 (finding that 40-45% of people had no symptoms); Sharon H. Bergquist et al., *Non-hospitalized Adults with COVID-19 Differ Noticeably from*

2

those without symptoms may be contagious for more than two weeks after infection.[5] Because of these factors, asymptomatic transmissions are thought to account for more than half of all infections, and there is no way to know who is infected or contagious without testing.[6]

While everyone is at risk of contracting COVID-19, several factors can exacerbate the risk that death or serious injury will result from the virus. For example, the risk of death or serious injury resulting from COVID-19 is especially grave for older people. As of January 6, 2021, people at least 65 years old constituted 4 out of 5 U.S. COVID-19 related deaths,[7] and people at least 55 years old constituted 92% of deaths.[8]

Several medical conditions also exacerbate the risk. One study found that 70% of those hospitalized from COVID-19 had at least one underlying condition that increased their risk.[9] The Centers for Disease Control and Prevention ("CDC") recognizes that such medical conditions include heart conditions (including heart failure, coronary artery disease, congenital heart disease, cardiomyopathies and pulmonary hypertension); diabetes; and some forms of chronic kidney disease.[10]

Race and gender also affect susceptibility to death or serious injury from COVID-19. The CDC has estimated that non-Hispanic Black or African American individuals are 3.7 times and 2.8 times as likely to be hospitalized and to die from COVID-19, respectively, as compared to

---

*Hospitalized Adults in Their Demographic, Clinical, and Social Characteristics*, SN COMPREHENSIVE CLINICAL MEDICINE (2020), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7426161/, (finding that 52% of people reported no symptoms or only mild ones).
[5] Xi He et al., *Temporal Dynamics in Viral Shedding and Transmissibility of COVID-19*, NATURE MEDICINE (April 15, 2020), https://www.nature.com/articles/s41591-020-0869-5.
[6] CTRS. FOR DISEASE CONTROL & PREVENTION, SCIENTIFIC BRIEF: COMMUNITY USE OF CLOTH MASKS TO CONTROL THE SPREAD OF SARS-CoV-2 (Nov. 20, 2020), https://www.cdc.gov/coronavirus/2019-ncov/more/masking-science-sars-cov2.html.
[7] CTRS. FOR DISEASE CONTROL AND PREVENTION, WEEKLY UPDATES BY SELECT DEMOGRAPHIC AND GEOGRAPHIC CHARACTERISTICS (Jan. 6, 2021), https://www.cdc.gov/nchs/nvss/vsrr/covid_weekly/index htm.
[8] *Id.*
[9] Sharon H. Bergquist, et al., *supra* note 4.
[10] CTRS. FOR DISEASE CONTROL AND PREVENTION, OLDER ADULTS (Dec. 13, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults html

white, non-Hispanic persons. Hispanic or Latino individuals are 4.1 times more likely to be hospitalized, and 2.8 times more likely to die.[11] Men also face a greater risk of severe illness and death from COVID-19 infection,[12] so much so that the CDC has added gender to its list of potential risk factors for severe COVID-19 illness.[13]

Congregate living spaces are ripe for the spread of COVID-19. The virus spreads through droplets expelled into the air from a person's respiratory system while breathing, coughing, talking, speaking, singing, or eating, which may then infect others. Ex. 14, Shaman Decl. at ¶ 11. In situations where people spend a significant period of time physically close to one another, particularly in indoor settings with poor ventilation, transmission of the virus becomes much more likely. Ex. 14, Shaman Decl. at ¶¶ 11-12. In part because of their congregate nature, for example, nursing homes are particularly dangerous environments for the spread of COVID-19. By December 2020, 39% of COVID-19 deaths had occurred in nursing homes.[14]

Likewise, incarcerated people are at exceptionally high risk of infection and serious illness or death from COVID-19. When people are incarcerated, they have little to no agency over their environment and have extremely limited privacy, so they have little ability to socially

---

[11] CTRS. FOR DISEASE CONTROL & PREVENTION, COVID-19 HOSPITALIZATION AND DEATH BY RACE/ETHNICITY, CENTERS FOR DISEASE CONTROL, (Nov. 30, 2020), https://www.cdc.gov/coronavirus/2019-ncov/covid-data/investigations-discovery/hospitalization-death-by-race-ethnicity.html.
[12] Richard V. Reeves & Tiffany N. Ford, *COVID-19 Much More Fatal for Men, Especially Taking Age Into Account*, Brookings Institute (May 15, 2020), https://www.brookings.edu/blog/up-front/2020/05/15/covid-19-much-more-fatal-for-men-especially-taking-age-into-account/. *See* Maggie Koerth, *Why Are More Men Than Women Dying of COVID-19?*, FIVETHIRTYEIGHT (April 30, 2020, 5:58 AM), https://fivethirtyeight.com/features/why-are-more-men-than-women-dying-of-covid-19/ (reporting on research showing that, out of 35 countries reporting COVID-19 deaths broken down by sex, men with confirmed COVID-19 infections were more likely to die than women with confirmed infections).
[13] CTRS. FOR DISEASE CONTROL AND PREVENTION, ASSESSING RISK FACTORS FOR SEVERE COVID-19 ILLNESS, (Nov. 30, 2020), https://www.cdc.gov/coronavirus/2019-ncov/covid-data/investigations-discovery/assessing-risk-factors.html.
[14] Halley Bondy, *39% of Covid-19 deaths have occurred in nursing homes – many could have been prevented: report*, NBC NEWS KNOW YOUR VALUE (Dec. 8, 2020 1:29 PM), *https://*www.nbcnews.com/know-your-value/feature/39-covid-19-deaths-have-occurred-nursing-homes-many-could-ncna1250374.

distance absent policies and procedures enabling them to do so. [15] *See, e.g.*, Ex. 1, Harper Decl. at ¶¶ 12-14, 10; Ex. 2, Leon Decl. at ¶¶ 14-17; Ex. 3, Perez Decl. at ¶¶ 10-12. Frequently, including at Adirondack, incarcerated people are required to sleep in rooms without doors; to share sinks, toilets, showers and phones; and to sit next to and across from each other at mealtimes.[16] For these reasons, without measures to ameliorate its spread, COVID-19 spreads twice as fast in a prison setting as it does in the general community, and the infected fall ill two to four times more often.[17]

Defendants have compounded these risks by making Adirondack into a prison nursing home. They have brought in exclusively elderly and vulnerable prisoners, many with serious underlying medical conditions. In May of 2020, Defendants announced that they would convert Adirondack, formerly a youth facility, into a prison for "incarcerated individuals age 65 or older" who met certain medical and mental health requirements.[18] Since that time, approximately 96 men, all of whom are over the age of 60, and half of whom are over 65, have been brought in from all over the state. All have health conditions that may place them at risk for serious illness from COVID-19. *See*, *e.g.*, Ex. 1, Harper Decl. at ¶¶ 4, 10; Ex. 20, Harper Med. Records; Ex. 2, Leon Decl. at ¶¶ 4, 10; Ex. 17, Leon Med. Records; Ex. 3, Perez Decl. at ¶ 4; Ex. 19, Perez Med. Records.

---

[15] Brandy Henry, *Social Distancing and Incarceration: Policy and Management Strategies to Reduce COVID-19 Transmission and Promote Health Equity Through Decarceration*, 47 HEALTH EDUCATION AND BEHAVIOR 536-539 (May 2020).

[16] Jan Ransom & Alan Feuer, *'We're Left for Dead': Fears of Virus Catastrophe at Rikers Jail*, N.Y. TIMES (Mar. 30, 2020), https://www nytimes.com/2020/03/30/nyregion/coronavirus-rikers-nyc-jail.html; Zak Cheney-Rice, *We're Going to All Start Dropping': Rikers Inmates on Life as Prisoners of COVID-19*, N.Y. MAG. INTELLIGENCER (Apr. 1, 2020), https://nymag.com/intelligencer/2020/04/rikers-inmates-on-life-as-prisoners-of-the-coronavirus.html.

[17] Henry Njuguna, M.D. et al., *Serial Laboratory Testing for SARS-CoV-2 Infection Among Incarcerated and Detained Persons in a Correctional and Detention Facility*, 69 MORBIDITY AND MORTALITY WEEKLY REPORT 836, 837 (2020), https://www.cdc.gov/mmwr/volumes/69/wr/pdfs/mm6926e2-H.pdf; Brendan Saloner, Ph.D., et al., *COVID-19 Cases and Deaths in Federal and State Prisons*, JAMA NETWORK (July 8, 2020), https://jamanetwork.com/journals/jama/fullarticle/2768249.

[18] N.Y. STATE DEP'T OF CORR. & CMTY. SUPERVISION, DOCCS RE-OPENING PLAN FACT SHEET, (May 29, 2020), https://doccs ny.gov/system/files/documents/2020/06/web-page-doccs-re-opening-fact-sheet-5-29-20-final.pdf

Defendants have been on notice of all these risks in the prison system for months, as there have been over 3400 COVID-19 cases and 27 deaths among incarcerated people in DOCCS facilities. *See* Ex. 21, DOCCS COVID-19 Data Compilation. A similar number of staff members have been infected, though with fewer deaths. In addition to numerous warnings from state and local health officials, New York state prisons have suffered several recent outbreaks since the start of the pandemic that illustrate how rapidly the disease spreads.[19] At Woodburne Correctional Facility, there were no active COVID-19 cases reported on December 1, 2020, yet now there have been 219 cases, including two deaths.[20] Greene Correctional Facility reported two COVID-19 cases on October 1, 2020; two weeks later, there were over 90 cases.[21] Similarly, Elmira reported only one case on September 28, 2020.[22] By October 28, 2020, the number had skyrocketed to 590.[23]

Moreover, Plaintiff RAPP has contacted Defendants Cuomo, Annucci, Morley, and Tedford repeatedly to inform them of the extent and severity of the risk of concentrating medically vulnerable and elderly people in prison, generally, and at Adirondack, specifically.[24] Plaintiff RAPP and other advocacy groups have alerted Defendants specifically to the risk posed by transferring elderly and medically vulnerable people to Adirondack and have identified the inadequacy of COVID-19-related measures at Adirondack.[25] They have asked Defendants to mitigate the dangerous COVID-19-related conditions at the facility by engaging in proper

---

[19] *See, e.g.*, Shan Li, *Covid-19 Surge Strikes Two New York Prisons*, WALL ST. J. (Oct. 21, 2020), *https*://www.wsj.com/articles/covid-19-surge-strikes-two-new-york-prisons-11603315628.
[20] *Compare* Ex. 21, DOCCS COVID-19 Data Compilation at 5 (Dec. 1, 2020), *with* Ex. 21, DOCCS COVID-19 Data Compilation at 8 (Dec. 22, 2020).
[21] *Compare* Ex. 21, DOCCS COVID-19 Data Compilation at 2 (Oct. 1, 2020), *with* Ex. 21, DOCCS COVID-19 Data Compilation at 4 (Oct. 28, 2020).
[22] Ex. 21, DOCCS COVID-19 Data Compilation at 1 (Sep. 28, 2020).
[23] Ex. 21, DOCCS COVID-19 Data Compilation at 4 (Oct. 28, 2020).
[24] *See, e.g.*, "Re: Releasing New Yorkers from Prison is the Only Way to Save Lives in the Wake of COVID-19," http://rappcampaign.com/wp-content/uploads/Legis-letter-Cuomo.pdf. (hereinafter "RAPP Advocacy Letter").
[25] *Id.*

testing, quarantining, and isolation practices; providing incarcerated people with sufficient cleaning and hygiene supplies; ceasing transfers to the facility, and releasing people from the facility.[26]  RAPP has also convened a local working group and organized numerous local volunteers to educate the public and to advocate that public officials take steps to mitigate the risks COVID-19 poses at Adirondack.

Despite these warnings, Defendants have done little to protect from COVID-19 the elderly and infirm people who are, by design, concentrated at Adirondack. The CDC recommends that facilities like Adirondack conduct testing at intake before putting transferees into the general population at the facility; house people individually while test results are pending; and implement a routine 14-day quarantine for people entering a facility.[27] These recommendations are "particularly" important when incoming people "will transition to a congregate setting with persons at increased risk for severe illness from COVID-19."[28]

DOCCS has done none of this at Adirondack, disregarding CDC and other public health guidelines without adopting any alternative guidance to prevent the entry of COVID-19 to the facility or limiting its spread among the population. It does not test people before transferring them to Adirondack from prisons around the state, nor does it separate or quarantine people upon arrival or while test results are pending. *See, e.g.*, Ex. 19, Perez Med. Records at 1 (no COVID-19 test prior to June 29, 2020, when Mr. Perez was tested at Adirondack); Ex. 17, Leon Med. Records at 1 (last test at Otisville pre-transfer was June 4, 2020; first test at Adirondack was June 28 with result received on July 3), 4 (transfer paperwork dated June 18). The hours-long bus

---

[26] *Id.*
[27] CTRS. FOR DISEASE CONTROL AND PREVENTION, INTERIM CONSIDERATIONS FOR SARS-CoV-2 TESTING IN CORRECTIONAL AND DETENTION FACILITIES (Dec. 3, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/testing.html.
[28] *Id.*

rides on which incarcerated people are transferred include people from numerous facilities around the state. *See, e.g.*, Ex. 1, Harper Decl. at ¶ 5; Ex. 4, Spadaro Decl. at ¶ 5. They are transported in rows immediately in front of and behind each other, a practice that precludes social distancing. Ex. 1, Harper Decl. at ¶ 5.

Once at Adirondack, people are often housed in cells without doors. Ex. 1, Harper Decl. at ¶ 12. They congregate in recreation areas where they are required to sit on small benches, such that sitting any distance apart is impossible. Ex. 3, Perez Decl. at ¶ 12. Multiple housing units eat in a communal mess hall, where 45-50 people at a time wait in line for food and sit across from or next to each other, well within six feet. Ex. 1, Harper Decl. at ¶ 14. Other than food they buy from the commissary, the only food people are allowed to eat in their cells are slices of bread. Ex. 4, Spadaro Decl. at ¶ 25. Many people are therefore forced to eat their meals in the mess hall three times a day, potentially exposing themselves to COVID-19 infection. *See* Ex. 8, Leon Supp. Decl. at ¶¶ 10-11.

Defendants do not conduct any regular temperature or symptom screening of incarcerated people, *see* Ex. 8, Leon Supp. Decl. at ¶ 4, and testing is haphazard. Several Plaintiffs have stated that over the course of several months, they have been tested once at Adirondack. Ex. 1, Harper Decl. at ¶ 8; Ex. 2, Leon Decl. at ¶ 8; Ex. 3, Perez Decl. at ¶ 6. Defendants' responses to positive testing have also been inadequate. In those cases where a person has tested positive, Defendants have failed to quarantine and test people who have been in close contact with the person, allowing other potentially infected people to continue commingling with the rest of the population. For example, on September 30 and October 1, 2020, DOCCS conducted what appears to be its only round of facility-wide COVID-19 testing at Adirondack since at least mid-summer. Ex. 3, Perez Decl. at ¶ 6; Ex. 12, Applegate Decl. at ¶ 7. One incarcerated person tested

positive for COVID-19 at that time. On October 2, the person who tested positive was moved into quarantine, but no one else from his communal housing unit was quarantined or separated in any way. Instead, people who had been living with him before he tested positive continued to mingle with each other and the prison-wide population, eating meals with people from around the prison in the mess hall and working wherever they were assigned throughout the prison. Indeed, in the week before this individual tested positive, he had participated in a grievance hearing with Plaintiff Perez. Another incarcerated person was also in the meeting, along with three staff members. The grievance hearing was held in a room with no windows, with everyone sitting around a table less than six feet apart for approximately one hour. After learning that someone who had been in the grievance hearing had tested positive, Defendants sent the staff members home for two weeks, but they did not quarantine Plaintiff Perez or the other incarcerated person. Instead, they sent them back to their housing units, conducting no follow-up testing or screening and potentially exposing everyone in those units. This incident illustrates that even under circumstances where Defendants understood that quarantining was necessary and appropriate, and where they instituted such quarantines to protect staff members, they refused to do the same to protect class members. Moreover, by failing to re-test residents, Defendants failed to learn the scope of the possible infection within Adirondack, a crucial step for containing any outbreak.

Simply put, Adirondack is a disaster waiting to happen. Plaintiffs ask that this Court grant a preliminary injunction to require Defendants to conduct regular asymptomatic testing of all incarcerated people and staff at Adirondack, isolate those people known to have been exposed, and halt transfers until an appropriate testing regimen can be instated.

**III.     Argument**

Plaintiffs bring claims under the ADA, RA, and Eighth Amendment. For the reasons discussed herein, Plaintiffs meet the standards for a preliminary injunction with respect to each claim.

A.  Standard of Review and Relief Sought

A party seeking a preliminary injunction or temporary restraining order must show (1) "a likelihood of success on the merits," (2) "a likelihood of irreparable harm in the absence of preliminary relief," and (3) "that the balance of equities tips in the party's favor, and that an injunction is in the public interest." *ACLU v. Clapper*, 804 F.3d 617, 622 (2d Cir. 2015) (citing *Winter v. NRDC*, 555 U.S. 7, 20 (2008)). *See also Jolly v. Coughlin*, 76 F.3d 468, 473 (2d. Cir. 1996) (quotation marks omitted).

"A showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (quotation marks omitted). The irreparable harm must be "neither remote nor speculative, but actual and imminent, and one that cannot be remedied if the court waits until the end of trial to resolve the harm." *Martinez-Brooks v. Easter*, 459 F. Supp. 3d 411, 447 (D. Conn. 2020) (quoting *Faively Transport*, 559 F.3d at 118). The fact that the harm has not yet come to pass is irrelevant to the irreparable harm analysis, as "a remedy for unsafe conditions need not await a tragic event." *Helling v. McKinney*, 509 U.S. 25, 33 (1993).

In assessing preliminary injunction requests, courts distinguish between injunctions that impose mandatory relief, "commanding some positive act," and injunctions that impose prohibitory relief, enjoining a defendant from engaging in some conduct. Courts apply a heightened standard for mandatory relief, requiring, in addition to the preliminary injunction criteria outlined above, that movants seeking mandatory relief make "a clear showing that the

10

moving party is entitled to the relief requested," or that "extreme or very serious damage will result from a denial of preliminary relief." *Tom Doherty Ass'ts, Inc. v. Saban Entertainment, Inc.*, 60 F.3d 27, 34 (2d Cir. 1995).

Here, Plaintiffs seek both prohibitory and mandatory relief. Plaintiffs seek prohibitory relief in the form of halting transfers until Defendants can demonstrate that they are conducting them in a manner that does not create an unconstitutional risk to safety. For this relief, the prohibitory preliminary injunction standard applies. Plaintiffs also seek mandatory relief in the form of testing of asymptomatic officers and incarcerated people and quarantining and retesting of people who have come into contact with individuals known to be infected. For this relief, the mandatory standard applies. Plaintiffs meet the applicable standard for all relief they seek.

B. Plaintiffs Will Suffer Irreparable Harm in the Form of Extreme and Very Serious Damage, Including the Possibility of Long-Term Injury and Death, in the Absence of a Preliminary Injunction.

The irreparable harm Plaintiffs face is the danger of death or serious long-term injury that would result from an outbreak of COVID-19 within Adirondack, given Defendants' refusal to put in place policies that would prevent it. COVID-19 can be fatal, and many of those who survive suffer debilitating long-term damage to the heart, lungs, brain, and vascular system.[29] Moreover, Adirondack is populated exclusively with people who are at the gravest risk for serious harm from COVID-19 – older men, many of whom have chronic conditions rendering them especially susceptible to severe or fatal illness.[30] As of December 12, 2020, the CDC records that men over the age of 55—the entire Adirondack population—have accounted for half

---

[29] MAYO CLINIC, *supra* note 1.

[30] Additionally, a constitutional violation constitutes irreparable harm. "In the Second Circuit, it is well-settled that an alleged constitutional violation constitutes irreparable harm." *Martinez-Brooks*, 459 F. Supp. 3d at 411 (quoting *Basank, 449 F. Supp. 3d at 213*, and citing *Connecticut Dep't of Envtl. Prot. v. OSHA*, 356 F.3d 226 (2d. Cir. 2004)). The unreasonably high risk of a COVID-19 outbreak among highly vulnerable incarcerated people constitutes irreparable harm because it violates the right to be from cruel and unusual punishment. *Martinez-Brooks*, 459 F. Supp. 3d at 411.

of all COVID-19-related deaths in the United States.[31] People over the age of 50 are *at least* 4 times more likely to need hospitalization due to COVID-19 than the population at large, and at least 30 times more likely to die. Chronic conditions such as diabetes, kidney disease, obesity, and heart conditions—which afflict members of the Plaintiff classes—further exacerbate risk.[32]

A substantial risk of death or serious illness constitutes irreparable harm, as courts in the Second Circuit consistently recognize. *See, e.g.*, *Martinez-Brooks*, 459 F. Supp. 3d at 447–48 (irreparable harm where plaintiffs face "[a] substantial risk of serious illness or death")[33] citing *Innovative Health Systems, Inc. v. City of White Plains*, 117 F.3d 37, 43–44 (2d Cir. 1997) (irreparable harm where the closure of a treatment program would pose risk of serious harm to plaintiffs, including "death, illness or disability"); *Shapiro v. Cadman Towers, Inc.,* 51 F.3d 328, 332–33 (2d Cir. 1995) (affirming District Court's irreparable harm finding based on substantial "risk of injury [and] infection" to plaintiff).

Indeed, courts around the country have recognized that the specific risk of death or injury COVID-19 poses to incarcerated people, and particularly to the medically vulnerable, satisfies the irreparable harm requirement. *See, e.g.*, *Martinez-Brooks*, 459 F. Supp. 3d at 448 (irreparable harm where class of people incarcerated at FCI Danbury, in particular the medically vulnerable subclass, faced "grave risk" of death from COVID-19); *Mays v. Dart*, 453 F. Supp. 3d 1074, 1098 (N.D. Ill. 2020) (irreparable harm where incarcerated plaintiffs were at risk of "severe

---

[31] Men aged 55 and over account for 135,391 out of 276,061 (49%) of all U.S. COVID-19 related deaths. CTRS. FOR DISEASE CONTROL AND PREVENTION, *supra* note 7.
[32] CTRS. FOR DISEASE CONTROL & PREVENTION, PEOPLE WITH CERTAIN MEDICAL CONDITIONS (Dec. 29, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions html; CTRS. FOR DISEASE CONTROL & PREVENTION, EVIDENCE USED TO UPDATE THE LIST OF UNDERLYING MEDICAL CONDITIONS THAT INCREASE A PERSON'S RISK OF SEVERE ILLNESS FROM COVID-19 (Nov. 2, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/evidence-table.html.
[33] Although *Martinez-Brooks* involved a petition for a temporary restraining order rather than a preliminary injunction, "It is well established that in this Circuit the standard for an entry of a TRO is the same as for a preliminary injunction." *Andino v. Fischer*, 555 F. Supp. 2d 418, 419 (S.D.N.Y. 2008) (collecting cases).

health consequences, including death" and "permanent lung damage" from COVID-19), *aff'd in relevant part*, 974 F.3d 810 (7th Cir. 2020); *Basank v. Decker*, 449 F. Supp. 3d 205, 210–13 (S.D.N.Y. 2020) (irreparable harm because "[t]he nature of detention facilities makes exposure and spread of the virus particularly harmful"). Indeed, in *Martinez-Brooks*, the Court found that the threat of COVID-19 in prison "easily satisfy[ied] the irreparable harm prerequisite" under the heightened standard applied to mandatory injunctions. *See Martinez-Brooks*, 459 F. Supp. 3d at 438 (mandatory standard applied to plaintiffs' claims), 448 (plaintiffs satisfied that standard).

The risk of irreparable harm is imminent. The United States is experiencing its greatest surge of COVID-19 infections yet. Ex. 14, Shaman Decl. at ¶¶ 26-28; 32. The country's correctional systems have not been spared. During the week of December 15, 2020, new cases among incarcerated people across the country, at well over 25,000, broke the record that been set the previous week.[34] New York State prisons are also experiencing their most severe surge yet. Since December 2, the total number of positive COVID-19 cases has increased by 89 percent, and the number of COVID-related deaths has risen 50 percent.[35] Defendants have failed to respond to this increase by implementing necessary policies to contain the spread.

Prisons by their very nature are "epicenters of infectious diseases," if measures are not taken to combat virus spread.[36] Asymptomatic carriers—or people without symptoms—have long been known to spread COVID-19. Experts estimate that asymptomatic transmissions account for more than 50% of all transmissions.[37] Without proactive and consistent testing of

---

[34] *A State by State Look at Coronavirus in Prisons*, THE MARSHALL PROJECT, https://www.themarshallproject.org/2020/05/01/a-state-by-state-look-at-coronavirus-in-prisons (last visited Jan. 8, 2021).
[35] *Compare* Ex. 21, DOCCS COVID-19 Data Compilation at 10 (January 6, 2021) (reporting 3,459 total positive cases and 27 deaths) *with* Ex. 21, DOCCS COVID-19 Data Compilation at 6 (December 2, 2020) (reporting 1,826 total positive cases and 18 deaths).
[36] Brandy Henry, *supra* note 15.
[37] CTRS. FOR DISEASE CONTROL & PREVENTION, *supra* note 6.

13

asymptomatic staff, residents, and people transferred into Adirondack, every person at the facility could seed an outbreak.

In view of this, Defendants' failure to conduct a meaningful testing and quarantining regimen creates an imminent risk of irreparable harm. Defendants' failure to test transferees creates an imminent risk of COVID-19 entering the prison, and their failure to test people incarcerated at Adirondack prevents Defendants from knowing the extent of the presence of COVID-19 within the facility. Moreover, in light of this failure, Defendants' refusal to quarantine or screen people who have been exposed to COVID-19 creates an imminent risk of spread within the prison.

The threat of death or serious injury from this imminent risk is particularly acute because if an outbreak does occur, it will overwhelm the local health care infrastructure. Adirondack is poorly equipped to deal with health crises. Adirondack's medical staff consists of only two nurses. Incarcerated people may visit the infirmary once a day, at 6:15 AM, on weekdays only. Adirondack has at most four rooms with appropriate ventilation to isolate infectious patients. The closest hospital that appears equipped to handle incarcerated patients—Albany Medical Center— is over two hours away. The two nearby hospitals, where people incarcerated at Adirondack may not even be eligible to receive care, are Adirondack Medical Center, which has only eight intensive care beds,[38] and Elizabethtown Community Hospital, in Vermont, which has only 25 inpatient beds total.[39] Neither Adirondack Correctional Facility nor the surrounding communities are equipped to handle a major outbreak of COVID-19 at the prison.

---

[38] Adam Federman, *Small Adirondack Hospital Preps For COVID-19 In The Rural North Country's 'Calm Before The Storm'*, ADIRONDACK EXPLORER (Mar. 25, 2020), https://www.adirondackexplorer.org/stories/small-adirondack-hospital-preps-for-covid-19-in-the-rural-north-countrys-calm-before-the-storm.

[39] Elizabethtown Community Hospital, *Inpatient Care*, https://www.ech.org/Departments-and-Programs/Inpatient-Care-Department (last visited Jan. 8, 2021).

Defendants' failure to implement necessary testing and quarantine policies thus creates

an imminent, grave, and unnecessarily high risk of death or serious injury among the Adirondack

population. To address the risk and ensure it does not materialize, Plaintiffs ask that the Court

issue a preliminary injunction requiring Defendants to take the necessary testing and

quarantining measures to protect people at Adirondack. Without this relief, there is a serious risk

that Adirondack, like many New York State prisons, will be overrun by the virus.

C.   Likelihood of Success on the Merits

Plaintiffs seek relief under the ADA, RA, and Eighth Amendment. While Plaintiffs meet

the preliminary injunction standard for all claims, as discussed below, success on any individual

claim would be sufficient to warrant the relief Plaintiffs seek.

**1.   Plaintiffs are Likely to Succeed on the Merits of Their ADA and RA Claims.**

Defendants have discriminated against members of the Disability Subclass and have

failed to provide them with reasonable modifications that would allow them to access programs

and services at Adirondack safely.

The ADA prohibits public entities, including prisons and prison systems, from

discriminating on the basis of disability. *See, e.g.*, *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206,

201 (1998). Under Title II of the ADA, "no qualified individual with a disability shall, by reason

of such disability, be excluded from participation in or be denied the benefits of the services,

programs, or activities of a public entity, or be subjected to discrimination by any such entity."

42 U.S.C. § 12132. The RA similarly provides that "[n]o otherwise qualified individual with a

disability . . . shall, solely by reason of her or his disability, be excluded from the participation in,

be denied the benefits of, or be subjected to discrimination under any program or activity

receiving Federal financial assistance." 29 U.S.C. § 794(a). Courts construe the ADA and RA to

have comparable requirements. *See, e.g.*, *Wright v. New York State Dep't of Corr.*, 831 F.3d 64, 72 (2d Cir. 2016).

In order to make a *prima facie* case of an ADA or RA violation, a plaintiff must show "1) that he is a qualified individual with a disability; 2) [Defendant] is an entity subject to the [ADA or RA]; and 3) he was denied the opportunity to benefit from [Defendant's] services, programs, or activities or [Defendant] otherwise discriminated against him by reason of his disability." *Wright*, 831 F.3d at 72. Once a plaintiff makes a *prima facie* showing under the ADA or RA, the burden shifts to the defendant, who must prove that the modification plaintiffs seek would "impose undue hardship on the operation of its services, programs, or activities." *Wright*, 831 F.3d at 76 (quotation marks and alterations omitted).

> a. *Individual Plaintiffs and Members of the Disability Subclass are Qualified Individuals with Disabilities.*

Plaintiffs in the Disability Subclass are qualified individuals with disabilities within the meaning of the ADA. They have impairments that, with or without medication, 42 U.S.C. § 12102(4)(E)(i)(I), substantially limit "major life activities," 42 U.S.C. § 12102(2), including their ability to walk and their ability to operate "major bodily function[s], including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions." *Id.* Individual Plaintiffs in the Disability Subclass have substantial physical impairments that constitute disabilities under the ADA. Plaintiff Perez has diabetes, which interferes with his endocrine functioning, and as a consequence of which, without medication, he would be limited in his ability to sleep, see, walk around, and engage in otherwise routine daily activities. *See, e.g.*, Ex. 19, Perez Med. Records at 1; 29 C.F.R. § 1630.2(j)(3)(iii); U.S. Equal Employment Opportunity Commission, *Diabetes in the Workplace and the ADA* ("As a result of changes made by the ADAAA, individuals who

have diabetes should easily be found to have a disability within the meaning of the first part of

the ADA's definition of disability within the meaning of the first part of the ADA's definition of

disability because they are substantially limited in the major life activity of endocrine function.")

Similarly, Plaintiffs Harper and Leon suffer from hypertension and a history of heart disease.

Without medication, their blood pressure would rise and they would be at serious risk for stroke

or heart attack. *See, e.g.*, Ex. 20, Harper Med. Records at 10, 14, 15, 34; Ex. 17, Leon Med.

Records at 3, 6, 7; *Gogos v. AMS Mech. Sys., Inc.*, 737 F.3d 1170, 1173 (7th Cir. 2013)

("[Plaintiff]'s alleged chronic blood-pressure condition—for which he has taken medication for

more than eight years—could also qualify as a disability . . . '[S]omeone who began taking

medication for hypertension before experiencing substantial limitations related to the impairment

would still be an individual with a disability if, without the medication, he or she would now be

substantially limited in functions of the cardiovascular or circulatory system.'") (quoting 29

C.F.R. Pt. 1630, App. at Section 1630.2(j)(1)(vi)).

>   b.  *Defendant DOCCS is an Entity Subject to the ADA and RA.*

Defendant DOCCS is a public entity and recipient of federal funds, and thus it is subject

to the ADA and RA. *See, e.g.*, *Wright*, 831 F.3d at 72. ("DOCCS is an entity that is subject to the

[ADA and RA].");  *Fulton v. Goord*, 591 F.3d 37, 43 (2d Cir. 2009) (same).

>   c.  *Individual Plaintiffs and Members of the Disability Subclass Were Denied the*
>       *Opportunity to Benefit from Defendants' Services, Programs, or Activities.*

Defendants denied Plaintiffs the opportunity to benefit from their services, programs or

activities by reason of Plaintiffs' disabilities. "[S]ervices, programs, [and] activities" under the

ADA include "recreational activities, medical services, and educational and vocational

programs." *Wright*, 831 F.3d at 72 (quoting *Yeskey*, 524 U.S. at 210) (quotation marks omitted).

The law in the Second Circuit is consistent with Department of Justice regulations, which

17

provide that the ADA encompasses "anything a public agency does." 28 C.F.R. Pt. 35, App. B. Under Title II of the ADA, public entities must "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7)(i). *See also, e.g.*, *Martinez v. Cuomo*, 459 F. Supp. 3d 517, 523 (S.D.N.Y. 2020) (RA, like ADA, requires reasonable modifications providing meaningful access to services).

Members of the Disability Subclass are particularly vulnerable to complications from COVID-19 as compared to the prison population at large by virtue of their disabilities. *See* Ex. 16, Fenig Decl. at ¶¶ 53-65. They require reasonable modifications to safely access Adirondack's services, programs, and activities. Defendants have failed to provide reasonable modifications to them by failing to effectively provide basic protections from the uncontrolled spread of COVID-19, thereby increasing the likelihood that members of the disability subclass will contract COVID-19 and suffer serious complications as a result. Such reasonable modifications include measures to prevent the unnecessary spread of COVID-19 within Adirondack, including testing asymptomatic people, testing and quarantining people known to have come into contact with COVID-19-positive individuals, testing people before transferring them to Adirondack, and quarantining and testing people after they arrive at Adirondack. Necessary reasonable modifications also include allowing adequate distancing at mealtimes, including by allowing people to eat in their rooms, along with allowing adequate distancing in bathrooms and recreation areas. Reasonable modifications also require ensuring that people have doors on their bedrooms to limit airborne spread. Defendants have failed to make these reasonable

modifications despite being warned by experts around the country and from advocates within New York that this conduct puts people in its care at a grave risk of serious illness or death.

Defendants have thus failed to provide effective access, because Plaintiffs in the Disability Subclass cannot safely access any of the prison's services. They cannot safely use the day rooms for recreation, safely shave in the bathrooms, or safely eat in the mess hall because they cannot partake in any of these services without risking unmasked exposure to people housed throughout the prison. Defendants' failure to provide a safe environment thus deters Plaintiffs from using basic prison services. *See, e.g.*, *Disabled in Action v. Bd. Of Elections in City of New York*, 752 F.3d 189, 200 (2d Cir. 2014) ("deterrence constitutes an injury under the ADA"). Indeed, Plaintiffs in the Disability Subclass sometimes abstain from eating in the mess hall altogether. They are instead forced to pay for food to eat in their rooms, the only alternative. As the Supreme Court has explained, the "deliberate refusal of prison officials to accommodate [an incarcerated person's] disability-related needs in such fundamentals as mobility, hygiene, medical care, and virtually all other prison programs" could "quite plausib[ly]" constitute a violation of Title II. *See United States v. Georgia*, 546 U.S. 151, 157 (2006). Moreover, "[a] reasonable accommodation must provide effective access to prison activities and programs." *Wright*, 831 F.3d at 73.

Not only have Defendants discriminated against Plaintiffs in the Disability Subclass by failing to provide them reasonable modifications as described above, they have also discriminated against them by transferring them to Adirondack. As Defendants' public statements made clear, Plaintiffs would not have been transferred to Adirondack unless they had or were perceived to have a disability. Yet after transferring members of the Disability Subclass, Defendants have chosen not to make the reasonable modifications necessary to allow them to

19

safely access the prison's programs and services. Plaintiffs were thus denied access to programming in contravention of the ADA and RA. *See, e.g.*, 42 U.S.C. § 12132; 28 C.F.R. § 35.130(b)(1).

The reasonable modifications that members of the Disability Subclass seek are readily available to Defendants. According to Mr. Schwartz, it is within Defendants' capacity to conduct pre-transfer testing, post-transfer testing and quarantining, regular facility-wide testing, and testing and quarantining for individuals known to have been exposed to someone with COVID-19 that Disability Subclass Plaintiffs seek. *See, e.g.*, Ex. 15, Schwartz Decl. at ¶ 24. These measures would dramatically reduce the likelihood of members of the Disability Subclass contracting and suffering serious complications from COVID-19. *See, e.g.*, Ex. 16, Fenig Decl. at ¶¶ 30-41.

        d.   *Defendants Cannot Demonstrate That the Relief Plaintiffs Seek Would Impose an Undue Hardship.*

Because Plaintiffs in the Disability Subclass have made a *prima facie* case that Defendants have failed to make reasonable accommodations for their needs, the burden shifts to Defendants to demonstrate that the accommodation they seek would "impose undue hardship on the operation of its services, programs, or activities." *Wright*, 831 F.3d at 76 (quotation marks and alterations omitted). Defendants cannot meet this burden. As prison expertise confirms, DOCCS can provide these modifications without imposing an undue hardship or "fundamentally altering" the nature of Defendants' services. Ex. 15, Schwartz Decl. at ¶¶ 24, 34, 36-37, 41.

Accordingly, Plaintiffs in the Disability Subclass are likely to prevail on their claim that Defendants have failed to provide them with reasonable modifications and have discriminated against them on the bases of their disabilities in violation of the ADA and RA.

2.     **Plaintiffs are Likely to Succeed on the Merits of their Eighth Amendment Claim.**

"[W]hen the State . . . so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—*e.g.*, . . . medical care, and reasonable safety—it transgresses the . . . Eighth Amendment." *Helling*, 509 U.S. at 32 (citing *DeShaney v. Winnebago Co. Dep't of Soc. Serv.*, 489 U.S. 189, 200 (1989)) (quotation marks omitted). A prisoner's Eighth Amendment right to humane conditions of confinement is violated when, under an objective analysis, he is incarcerated "under conditions posing a substantial risk of serious harm" and, when, under a subjective analysis, prison officials have acted with "deliberate indifference to inmate health or safety." *See Martinez-Brooks*, 459 F. Supp. 3d at 439 (quoting *Farmer v. Brennan*, 511 U.S. 825, 832–833 (1994)).

Both prongs of the Eight Amendment test are satisfied in this case. In the middle of the COVID-19 pandemic, Defendants have concentrated medically vulnerable, elderly, and disabled men under conditions that objectively pose a substantial risk of allowing the airborne and rapidly transmissible COVID-19 virus to enter Adirondack and spread uncontrollably. Defendants know full well that every person incarcerated at Adirondack is uniquely vulnerable to death or serious complications from COVID-19 and that combatting the virus's spread requires measures that they have refused to take at Adirondack.

a.     *Defendants Have Exposed Individual Plaintiffs and Members of the General Class to a Substantial Risk of Serious Harm.*

The first prong of the Eighth Amendment analysis is satisfied when someone is imprisoned under conditions that expose them to a substantial risk of serious damage to their health. *See Farmer*, 511 U.S. at 843. It is not constitutionally significant that the risk has not materialized; officials violate the Eighth Amendment when they subject incarcerated people to

21

risks that are "very likely to cause serious illness and needless suffering the next week or month or year." *Helling*, 509 U.S. at 33. Plaintiffs readily satisfy this standard, as there is a serious risk that they will be infected with COVID-19 and suffer serious health consequences—or die—as a result.

Indeed, courts have found that the possibility of the spread of communicable disease in prisons—even diseases far less serious than COVID-19—meets the objective-risk standard of the Eighth Amendment. *See*, *e.g.*, *Helling*, 509 U.S. at 33 (where "inmates in punitive isolation were crowded into cells," and "some of them had infectious maladies such as hepatitis and venereal disease . . . the Eighth Amendment required a remedy.") (citing *Hutto v. Finley*, 437 U.S. 678, 682 (1978); *Martinez-Brooks*, 459 F. Supp. 3d at 439 ("Courts have long recognized that prison officials have an Eighth Amendment duty to protect inmates from exposure to communicable disease."). Unsurprisingly, courts have found that the risk of potential spread of COVID-19, specifically, satisfies the Eighth Amendment's objective prong. *See*, *e.g.*, *Martinez-Brooks*, 459 F. Supp. 3d at 439 (finding that the risk of COVID-19 in prison "easily satisfie[s]" objective prong); *Mays*, 453 F. Supp. 3d at 1091 (finding that the risk of COVID-19 in jail satisfies analogous objective prong of the Fourteenth Amendment for pre-trial detainees).

The danger of the spread of COVID-19 is so significant that the country has effectively shut down much of the economy to avoid it, and many states, including in New York, continue to impose even more serious restrictions as winter begins. The risk in this case—both because of the elevated likelihood of spread within a prison and the particular vulnerability of Adirondack's population—is even higher than that which exists in virtually every other prison and certainly outside prisons. There can simply be no doubt that the potential spread of the virus at Adirondack poses a "serious risk to the health or safety" of the people imprisoned therein, such

that the Eighth Amendment requires a response from Defendants to try to mitigate that risk.

> **b.  *Defendants Have Acted with Deliberate Indifference in Exposing Plaintiffs to a Serious Risk of Harm.***

The second, subjective, prong of the Eighth Amendment analysis requires that Defendants have acted with "deliberate indifference" to the risk of serious harm—in other words, that officials know "that inmates face a substantial risk of serious harm and disregard[] that risk by failing to take reasonable measures to abate it." *Martinez-Brooks*, 459 F. Supp. 3d at 440 (citing *Farmer*, 511 U.S. at 847). Here, Defendants both knew of the substantial risk and disregarded that risk by failing to take any necessary measures to limit it.

Defendants are aware of the substantial risk that the spread of COVID-19 poses to the elderly and medically vulnerable population at Adirondack. COVID-19 has spurred lockdowns, quarantines, and social distancing measures over the past year—indeed, Defendant Cuomo has mandated many of these measures. Defendants were also aware of the specific risk that COVID-19 poses to elderly and medically vulnerable prisoners. From the early days of the pandemic, health officials and advocates warned Defendants about the high likelihood of COVID-19 spread in prison settings[40] and, on June 25, 2020, Plaintiff RAPP and dozens of other concerned organizations warned Defendant Cuomo that the plan to transfer elderly and infirm men to Adirondack "fundamentally represent[ed] a public health crisis that amounts to a ticking time bomb."[41] Defendants' experience at other prisons has borne out that risk. As of December 22, 2020, New York state prisons have confirmed 2,479 and 2,627 COVID-19 cases for incarcerated people and staff, respectively.[42] Even more relevant, Defendants' recent experience at

---

[40] RAPP Advocacy Letter, *supra* note 24.
[41] RAPP, June 25, 2020 RAPP Adirondack Letter, http://rappcampaign.com/wp-content/uploads/Adirondack-Sign-on-Letter_June-2020-new.pdf.
[42] N.Y. STATE DEP'T OF CORR. & CMTY. SUPERVISION, DOCCS COVID-19 REPORT, https://doccs.ny.gov/doccs-covid-19-report (last accessed Jan. 8, 2021).

Woodbourne Correctional Facility—which has the second-highest concentration of elderly incarcerated people in the state system, after Adirondack—demonstrates not only the danger that COVID-19 poses in a prison setting with a high concentration of elderly people, but how quickly it can spin out of control. As of December 1, 2020, there had been zero COVID-19 cases at the facility, but today there have been 219, with two resulting in death.[43] Indeed, Defendant Cuomo has acknowledged this risk to elderly and medically vulnerable people in prison.[44] Defendants thus knew of the risk facing members of the General Class, all of whom are at least sixty years old and have underlying medical conditions. *See*, *e.g.*, *Hope v. Pelzer*, 536 U.S. 730, 738 (2002) (court "may infer the existence of this subjective state of mind from the fact that the risk of harm is obvious").

Defendants are deliberately indifferent because, in spite of this knowledge, they refuse to take necessary steps to try to mitigate the risk. Contrasted with the robust, proactive actions that Defendant Cuomo has undertaken to prevent the spread of COVID-19 in other areas, Defendants have done virtually nothing at Adirondack to minimize the spread of the virus, and many of their actions have exacerbated the likelihood that it will spread. Of course, prisons present challenges for social distancing efforts that do not exist in the community at large, *see*, *e.g.*, *Mays v. Dart*, 974 F.3d 810, 820–21 (7th Cir. 2020), but the Constitution requires a necessary response to at least try to abate the risk.

The deliberate indifference standard is guided by the threat to incarcerated people and the options available to prison officials to protect against that threat. As the court explained in *Martinez-Brooks*, "While the Warden is free to exercise discretion in choosing among equally

---

[43] *Compare* Ex. 21, DOCCS COVID-19 Data Compilation at 5 (Dec. 1, 2020), with Ex. 21, DOCCS COVID-19 Data Compilation at 10 (January 6, 2021).
[44] *See*, *e.g.*, N.Y. State, *Governor Cuomo Announces Eighth Region on TRACK TO Hit Benchmark to Begin Reopening Tuesday May 26th*, YOUTUBE (May 23, 2020), https://www.youtube.com/watch?v=4NAycLIsyHU.

24

effective measures to protect inmates from serious risks, choosing inevitably inadequate measures to the exclusion of a plainly superior one constitutes deliberate indifference." 459 F. Supp. 3d at 443. Thus, in *Martinez-Brooks*, the court found that plaintiffs were likely to succeed on their deliberate indifference claim where prison officials had failed to make use of the compassionate release process to send incarcerated people home. The court reasoned that "even with the measures that the Warden has put in place," the virus "continues to pose a grave risk to vulnerable inmates' health." *Martinez-Brooks*, 459 F. Supp. 3d at 443. By failing to employ the compassionate release procedure, prison officials "failed to implement what appears to be the sole measure capable of adequately protecting vulnerable inmates . . . in favor of measures that, even if they were fully and painstakingly implemented, would still leave vulnerable inmates subject to a grave risk to their health." *Martinez-Brooks*, 459 F. Supp. 3d at 443.

In a prison filled with extremely vulnerable people who are at risk of serious illness and death if they contract COVID-19, the necessary steps to respond to that threat include making efforts to prevent the virus from entering the facility and implementing policies and practices that will limit its spread should it enter. Defendants' efforts to combat the spread of COVID-19 at Adirondack are so inadequate to protect members of the General Class that they reflect deliberate indifference to this risk. Defendants' paltry measures flout public health guidance, including CDC guidance, at every turn, and fall short of what prisons and jails around the country are doing. As the Court of Appeals for the Seventh Circuit explained in *Mays*, while "[t]he CDC Guidelines . . . do not themselves set a constitutional standard," they do "provide the authoritative source of guidance on prevention and safety mechanisms for a novel coronavirus in a historic global pandemic where the public health standards are emerging and changing." *Mays*, 974 F.3d at 823. As a result, "implementation (and proper execution) of guidelines that express

an expert agency's views on best practices are certainly relevant" to the constitutional evaluation. *Mays*, 974 F.3d at 823.

Here, Defendants fail to test transferees and fail to quarantine them upon their arrival at Adirondack, "plac[ing] both the existing and incoming inmates at significant risk of COVID-19 infection." Moreover, Defendants' method of transferring people to Adirondack—mixing men from different facilities who have not been tested for COVID-19, on a poorly ventilated bus, without adequate social distancing measures—"present[s] a dangerous situation since it unnecessarily exposed them to SARS-CoV-2 viral transmission during their bus transport." Ex. 16, Fenig Decl. at ¶ 29. CDC guidelines "recommend avoiding transfers between facilities if at all possible" but recommend that individuals be quarantined upon arrival at a new facility before they are assimilated into the general population. Ex. 16, Fenig Decl. at ¶¶ 33, 38. These common-sense measures "provide[] protection to the destination facility inmates by preventing their exposure to asymptomatic carriers of COVID-19 from other incoming facilities." Ex. 16, Fenig Decl. at ¶ 33. While the prison could take steps to ameliorate transfer risks, Schwartz Dec. at ¶ 24, Defendants have failed entirely to do so here.

Once General Class members enter the prison, there is no effort to implement policies providing for regular universal testing, regular symptom screening, quarantining of exposed people, social distancing in housing units, or keeping housing units within the prison separate from each other. Given the potential for asymptomatic transfer of COVID-19, "[r]outine testing of asymptomatic individuals is an important strategy to detect COVID-19 outbreaks early and minimize the number of exposed and affected individuals." Ex. 16, Fenig Decl. at ¶ 39.

Defendants' responses to positive tests and exposures are similarly inadequate. When one person tested positive for COVID-19, staff members he had had close contact with were sent

26

home to quarantine, while absolutely no testing, quarantining, or screening was done for incarcerated people with whom he had been in close contact. Ex. 10, Perez Decl. at ¶¶ 6-7; Ex. 12, Applegate Decl. at ¶¶ 10-13, 17. Because of the possibility of asymptomatic transfer, the CDC recommends that an incarcerated person who has had close contact with a person suspected or confirmed to have COVID-19 be removed from their housing units for fourteen days for quarantine or, if that is impractical, the entire unit may be "quarantined in place." Ex. 16, Fenig Decl. at ¶¶ 30-31. Defendants obviously understand the importance of quarantining, as they sent home staff members who had been exposed, but they were deliberately indifferent to the need to quarantine people who are incarcerated.

Defendants have also failed to provide for social distancing within Adirondack that would limit the spread of COVID-19. Although the CDC Guidelines make clear that social distancing is essential to prevent the spread of COVID-19, distancing at Adirondack is "inconsistently enforced at best, and ignored at worst." Ex. 16, Fenig Decl. at ¶ 14. Up to 15-20 people at a time must cram into day rooms on a daily basis to watch television and socialize; men at Adirondack stand next to each other while waiting in lines for medication or other services; they frequently congregate in the bathroom, including standing next to each other without masks on for extended periods of time while shaving; and, "most concerning[ly,]" they must sit within six feet of each other while eating in the dining halls, which, because it "necessitates that the individual remove their mask, becomes a particularly perilous activity, as there is no barrier to mitigate the viral spread." Ex. 16, Fenig Decl. at ¶¶ 16-19.

Increasing the potential for harm is that, in the dining hall and at other times, people from different housing units are allowed to congregate under non-socially distanced conditions, which creates an opportunity for the virus to spread throughout the entire prison rather than being

limited to a single unit. Ex. 16, Fenig Decl. at ¶ 22 ("Mitigating the potential spread of COVID-19 in congregate living situations such as prisons is best achieved when cohorts of inmates are siloed, such as in housing units. If an infectious outbreak occurs, close contact exposure of different housing units to each other would allow COVID-19 to infect a much larger number of inmates and staff. Adirondack Correctional Facility['s] incapacity to safely keep inmate cohorts separated undermines the ability to contain a potential outbreak, therefore placing these clients as well as all inmates and staff at risk of infection."). This risk of intra-unit spread is heightened by the practice of having guards work in different housing units.

Defendants' acts and omissions at Adirondack fall well short of their constitutional duties. Instead of taking the transfer, testing, screening, quarantining, and social-distancing precautions that the CDC guidelines counsel and that other prisons and jails are taking, Defendants have ignored these requirements in favor of an approach that will be inevitably insufficient to prevent the entry and spread of COVID-19. Through this wanton disregard for the threat that COVID-19 poses to the population at Adirondack, Defendants have created a tinder box that requires only the predictable entry of COVID-19 in order to consume the General Class. Defendants have acted with deliberate indifference to a substantial risk of serious harm, such that Plaintiffs are likely to succeed on the merits of their Eighth Amendment claims.

D.  The Balance of Equities and the Public Interest Support a Preliminary Injunction.

Where, as here, the government is the party opposing a preliminary injunction, the final two factors in the analysis—the balance of the equities and the public interest—merge. *See*, *e.g.*, *Martinez-Brooks*, 459 F. Supp. 3d at 448 (quoting *Coronel v. Decker*, 449 F. Supp. 3d 274, 287 (S.D.N.Y. 2020)). Because relief here would promote public health, prevent death, and prevent further constitutional injury without significant financial cost or logistical burden and no

28

irreparable harm to Defendants, all factors weigh in favor of granting injunctive relief in this case.

The requested relief will promote public health by preventing unnecessary illness and death both within Adirondack and in the surrounding community. Spread between prisons and communities is common, and indeed, prisons act as reservoirs for viruses, continuing their circulation in the community after traditional public health measures would have curtailed that spread. Ex. 13, Shaman Decl. at ¶ 23. Ray Brook, New York, where Adirondack is located, has few public health resources – its local hospitals, Adirondack Medical Center and Elizabethtown Community Hospital, have only 8 intensive care beds and 25 inpatient beds, respectively.[45] That medical system was established to serve the regular needs of the population there, not the needs of the population during a pandemic. It certainly cannot mitigate the heightened risk of community spread from Defendants' addition of 100 elderly, medically needy adults. Courts have recognized this risk. *See, e.g.*, *Banks v. Booth*, 468 F. Supp. 3d 101, 124 (D.D.C. 2020) ("No man's health is an island. If Plaintiffs contract COVID-19, they risk infecting others inside the DOC facilities. Plaintiffs also risk infecting DOC staff members who work inside DOC facilities but also live in the community, thus increasing the number of people vulnerable to infection in the community at large.").

The harm Plaintiffs seek to prevent, death or serious injury, is also extreme and weighs heavily in assessing the balance of equities. *See, e.g.*, *Martinez-Brooks*, 468 F. Supp. 3d at 124 ("Moreover, the Petitioners' interest in avoiding serious illness or death must weigh heavily on the scales.").

Defendants' conduct also violates Plaintiffs' right under the Eighth Amendment to be

---

[45] Elizabeth Izzo, *Local hospitals move to expand capacity*, ADIRONDACK DAILY ENTERPRISE (Mar. 24, 2020), https://www.adirondackdailyenterprise.com/news/local-news/2020/03/local-hospitals-move-to-expand-capacity/.

free from cruel and unusual punishment, and "the public interest is best served by ensuring that the constitutional rights of persons within the United States are upheld." *Id.* at 124 (quoting *Coronel*, 449 F.Supp.3d at 287). As courts have explained, "there is no harm to the Government when a court prevents unlawful practices." *Banks*, 468 F. Supp. 3d at 124.

Protecting these vital interests comes at a little relative cost to Defendants. Defendants can significantly mitigate the imminent risk of a deadly outbreak among the most vulnerable incarcerated people with only a few basic measures that include testing before transfer, quarantining and testing after transfer, testing for asymptomatic incarcerated people and staff, and quarantining and testing people who have come into contact with someone known to have an active case of COVID-19. While an injunction requiring testing would impose some logistical and financial burden, it will be limited. Testing is available to the public nationwide, and already employed to some extent by DOCCS. The testing contemplated by the injunction would also be limited to people entering or currently living and working in Adirondack, and does not place a burden on the DOCCS system as a whole.

Halting transfers of untested people and isolating those who test positive poses no risk to Defendants at all. Prison officials around the country have taken similar measures, and there is no reason why Defendants cannot implement them here. In fact, the relief requested actually benefits Defendants and the community at large by mitigating the risk that staff and those they interact with outside the prison will become infected. While Defendants do have an interest in maintaining procedures that ensure safety, order, and security, the measures sought in the preliminary injunction in no way undermine these goals.

Finally, the harm to Defendants, if any, will not be irreparable. If the Plaintiffs should not ultimately prevail, Defendants can return to their current practices, having suffered only the

financial cost of implementing improved procedures for a limited time. Finances can be recouped. Lost lives cannot.

E. <u>The Remedy Plaintiffs Seek is Appropriate</u>

Plaintiffs seek an injunction ordering Defendants to immediately:

1. Regularly screen and test all staff and incarcerated people at Adirondack, including asymptomatic people, in a manner that allows timely isolation of positive cases;

2. Isolate and distance those testing positive and those suspected of having been exposed to the virus from the rest of the Adirondack population, consistent with the CDC guidelines, by housing incarcerated people separately from those who have not tested positive, and requiring staff to stay home from work; and

3. Cease all transfers of people from other prisons to Adirondack until Defendants can demonstrate that:

   1. Everyone who is being transferred has been tested, quarantined pending results, and been determined to be negative for COVID-19 prior to testing;

   2. Staff who are conducting transfers have been tested, quarantined pending results, and been determined to be negative for COVID-19 prior to conducting transfers;

   3. People are transferred only from one facility at a time and are not exposed to people from other facilities during transport;

   4. People being transferred and staff wear masks and are able to maintain social distance during transport; and

   5. People are quarantined separately from current Adirondack residents for a period of two weeks upon arrival.

These are the most basic and least intrusive measures that can effectively prevent an

outbreak at Adirondack, because they constitute the most minimal action Defendants could take to identify and separate positive COVID-19 cases from the rest of the Adirondack population.[46] Because the virus spreads without symptoms and does not discriminate between the incarcerated or staff, the only way to identify positive cases is with regular screening and testing of all people at Adirondack, regardless of whether they show symptoms. Defendants must also promptly isolate positive individuals because the virus spreads easily in facilities where people often have no choice but to engage in close enough contact for virus transmission to occur.[47] Finally, Defendants cannot continue their reckless practice of transferring new people into Adirondack without ensuring that they test negative for the virus. Trying to control the virus will prove pointless if new people of unknown COVID-19 status are continually added to the population. Hence, the relief requested is tailored to minimize the imposition on Defendants' interest in the orderly and secure administration of its facilities, while also making a significant first step in protecting the lives and constitutional rights of the Plaintiff classes.

## IV.  Conclusion

For the reasons stated herein, Plaintiffs ask that the Court grant the narrow relief Plaintiffs seek to protect against the imminent threat of death or serious physical injury.

Dated: January 11, 2021                    Respectfully Submitted,

/s/ Rebecca Livengood
Sasha Samberg-Champion (Bar Roll #702397)
Jia Cobb*
Gabriel Diaz*
Rebecca Livengood (Bar Roll #702388)
RELMAN COLFAX PLLC

---

[46] Indeed, the CDC recommendations for all correctional facilities go much farther than the relief requested here, *see* CENTERS FOR DISEASE CONTROL AND PREVENTION, *supra* note 27.
[47] Timothy Williams, Benjamin Weiser and William K. Rashbaum, *'Jails Are Petri Dishes': Inmates Freed as the Virus Spreads Behind Bars*, N.Y. TIMES (Mar. 30, 2020), https://www.nytimes.com/2020/03/30/us/coronavirus-prisons-jails html; *see* Henry, *supra* note 15.

32

1225 19th St. NW, Suite 600
Washington, D.C. 20036
T: (202) 728-1888
F: (202) 728-0848


/s/ Stefen R. Short
Stefen R. Short (Bar Roll # 519275)
Sophia Gebreselassie*
David Billingsley*
THE LEGAL AID SOCIETY
PRISONERS' RIGHTS PROJECT
199 Water Street, 6th Floor
New York, N.Y. 10038
T: (212) 577-3530
F: (202) 728-0848

*Attorneys for Plaintiffs*

*\*Pro Hac Vice Applications to Be Submitted*

33

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 11th day of January, 2021, a copy of the foregoing Memorandum of Law in Support of Plaintiffs' Request for Preliminary Injunction and all related filings and attachments were filed using the CM/ECF system for the Northern District of New York and will be hand-delivered via process server upon the following Defendants:

Andrew M. Cuomo
Governor of New York State NYS State
Capitol Building Albany, NY 12224

Office of the Attorney General
The Capitol
o/b/o Andrew Cuomo, Governor of the State of New York
Albany, NY 12224-0341
ATTN: A&O/Personal Service

New York State Department of Corrections and Community Supervision
Harriman State Campus
1220 Washington Avenue, Bldg. #2
Albany, New York 12226

Anthony J. Annucci
Acting Commissioner
New York State Department of Corrections and Community Supervision
Harriman State Campus
1220 Washington Avenue, Bldg. #2
Albany, New York 12226

John Morley, M.D.
Deputy Commissioner and Chief Medical Officer
New York State Department of Corrections and Community Supervision
Harriman State Campus
1220 Washington Avenue, Bldg. #2
Albany, New York 12226

Jeffrey Tedford
Superintendent, Adirondack Correctional Facility
Adirondack Correctional Facility
196 Ray Brook Rd.
P.O. Box 110
Ray Brook, NY 12977

/s/ Rebecca Livengood
Rebecca Livengood
*Attorney for Plaintiffs*