# EXHIBIT
# 15

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK

Allen HARPER, José LEON, and Ranfis
PEREZ on behalf of themselves and all
others similarly situated; and the
RELEASE AGING PEOPLE IN
PRISON CAMPAIGN ("RAPP"),

            Plaintiffs,

    v.

ANDREW CUOMO, in his official
capacity as the Governor of the State of
New York; NEW YORK STATE
DEPARTMENT OF CORRECTIONS
AND COMMUNITY SUPERVISION;
ANTHONY J. ANNUCCI, in his official
capacity as the Acting Commissioner of
the New York State Department of
Corrections and Community Supervision;
JOHN MORLEY, M.D., in his official
capacity as the Deputy Commissioner
and Chief Medical Officer of the New
York State Department of Corrections
and Community Supervision; and
JEFFREY TEDFORD, in his official
capacity as the Superintendent of
Adirondack Correctional Facility

            Defendants.

Civil Action No.  9:21-cv-19 (LEK/ML)

## DECLARATION OF JEFFREY A. SCHWARTZ, PH.D.

I, Jeffrey A. Schwartz, Ph.D., hereby state as follows:

1.      I am over the age of eighteen and am competent to make this Declaration.

2.      My name is Jeffrey A. Schwartz, Ph.D., and my office is at 1610 La Pradera

Drive in Campbell, California.  I am the president of Law Enforcement Training and Research

Associates, Inc. (LETRA), a criminal justice training and consulting organization that has had offices in the San Francisco Bay Area since its incorporation in June 1972. I have worked full-time with law enforcement and correctional agencies across the United States and Canada for over 35 years, both as LETRA's president and as a private consultant. The largest proportion of my work for the last 20 years has been working with prisons and jails and assisting them in applying national corrections standards to their operations.

3.      I have worked with more than 40 of the 50 state Departments of Corrections, with small, medium and large jails, and with local Departments of Corrections. During my career I have toured literally hundreds of prisons and jails. I believe that I have done more work on major emergencies in jails and prisons than anyone else in the United States. I have co-authored three book-length monographs on preparing for and managing major emergencies in jails and prisons, and all three of those volumes have been published by the National Institute of Corrections (NIC), a branch of the U.S. Department of Justice. I have conducted Critical Incident Reviews (also called "After-Action Reports") following some of the most high-profile emergencies and disasters in jails and prisons in the United States in the last 40 years, including the riots in Camp Hill, Pennsylvania; the effects of Hurricanes Rita and Katrina on the Louisiana Department of Corrections; the riot and hostage-taking in Deer Lodge, Montana; the hostage-taking and rape of a Correctional Counselor at the Delaware Correctional Center; the riot at the prison in Lucasville, Ohio; and others. I have also conducted detailed audits of emergency preparedness at a number of prisons and jails across the United States and Canada and co-developed a unique system of emergency preparation and response that has been used in some form by over two thirds of the state Departments of Corrections in the country. I have provided training on emergency preparedness and response to thousands of jail and prison staff, either by

personally conducting that training or by training and certifying emergency preparedness instructors for various correctional agencies.

4.     I was appointed as the Federal Court's security expert in the U.S. Virgin Islands and reviewed security in two correctional facilities there and then testified in a long-running class action and consent decree case.  I also testified in a decades-long consent decree about conditions in the Shelby County, Tennessee Jail and then, at the request of the Federal Judge, conducted an evaluation of progress, leading to the discharge of that consent decree.

5.     I am currently a Federal Court Monitor for the Los Angeles, California, jails in a matter that resulted in a consent decree arising out of a class action use of force lawsuit against those jails. I served as the corrections expert for the Southern Poverty Law Center in reviewing inmate violence and staff use of force in the Orleans Parish jails and testified in Federal Court resulting in a consent decree there.  I similarly completed work as an expert for the U.S. Attorney's Office in the Southern District of New York (Manhattan) resulting in a consent decree that centers on inmate-on-inmate violence and use of force issues at Rikers Island.  I evaluated use of force issues in the San Bernardino County, California jails, worked with the Court and the Prison Law Office to develop a new use of force policy for that jail/system, and I currently serve as a Federal Court Monitor reviewing progress on a use of force consent decree there.

6.     My expert witness work and my consulting and training work have included a major emphasis on staff use of force and inmate-on-inmate violence issues.  I have written and/or drafted use of force policies for state Departments of Corrections as well as county correctional facilities.  I have developed and presented training on use of force to correctional staff in a number of state Departments of Corrections, county jails, and adolescent facilities.  I have also

reviewed use of force investigative and review procedures in many police and correctional agencies and the largest proportion of cases in which I have served as an expert is use of force cases.  I have published six articles on use of force.[1]

7.      Some nine months ago I recognized that the COVID-19 virus was spreading fast but that there was no guidance for prison and jail managers and administrators, although those facilities are the only housing in the United States that is higher density than nursing homes.  In response, I co-authored a monograph, which Dr. Venters and I self-published for free to get it into circulation as quickly as possible.[2] We made minor updates and the Correctional Law Reporter then published that second edition of the monograph in its entirety.[3]

8.      I was retained in this case by Plaintiffs' attorneys Relman Colfax PLLC and the Legal Aid Society in November of 2020.

9.      My C.V. is attached as Exhibit A.

10.     I am not a medical expert and I have not been asked nor have I attempted to form opinions about medical treatment issues in this case.

11.     I am familiar with data showing that one in five inmates in state and federal prisons across the United States has tested positive for COVID-19.[4] That rate is four times higher than the rate in the general population, and according to Homer Venters, formally the Chief

---

[1] A Note on "Verbal and Non-Verbal Indicators to Assaults"; Corrections.com; May 2009; Reducing Exposure in Use of Force Litigation; Corrections Today; June 2009; The Force Continuum: Is It Worth Keeping? Part I; Phil Collins, Jeffrey A. Schwartz, and Donald Leach; Correctional Law Reporter; December/January 2011; The Force Continuum: Is It Worth Keeping? Part II; Phil Collins, Jeffrey A. Schwartz, and Donald Leach; Correctional Law Reporter; April/May 2011; "Come and Get Me! The Best and Worst in Cell Extractions"; American Jails; July/August 2009; "Fixing Use of Force Problems"; American Jails; January/February 2010.
[2] JEFFREY A. SCHWARTZ, PH.D. & HOMER VENTERS, M.D., JAILS, PRISONS, AND THE COVID-19 VIRUS: A MONOGRAPH (2020).
[3] Jeffrey A. Schwartz, Ph.D. & Homer Venters, M.D., *Jails, Prisons, and the Covid-19 Virus: A Monograph*, 32 Corr. Law Rep. 17-23 (2020).
[4] Ben Schwartzapfel, Katie Park & Andrew Demillo, *1 in 5 prisoners in the US has had COVID-19, 1,700 have died*, ASSOCIATED PRESS, Dec. 18, 2020, https://apnews.com/article/pandemics-race-and-ethnicity-prisons-united-states-coronavirus-pandemic-0bef0673013aa579551db5ad61b885e0.

Medical Officer for Rikers Island, it still may be a vast undercount.[5]  The data reflect that in some state prison systems, over half the inmates have been or are currently infected with the virus.  The same two sources, The Associated Press and The Marshall Project, also report the infection rate for prison staff as one in five.

12.      As bad as this pandemic is for the general population of the United States, it is clear that it is a significantly more extreme crisis for correctional facilities.  Being sentenced to prison should not mean that you are getting a death sentence from COVID-19.  While prison inmates are at far higher risk from COVID-19 than the general population, that risk is exacerbated for older inmates and inmates with pre-existing medical conditions.  The inmates at Adirondack are all older and all have pre-existing medical conditions.

13.      This declaration is specific to the Adirondack Correctional Facility ("Adirondack") in upstate New York, near Lake Placid.  Adirondack was a juvenile correctional facility, but as of spring, 2020, the remaining small number of juveniles were moved out.  The facility was re-purposed as a medium security adult prison and adult inmates began populating the facility in the summer.  Adirondack houses a specific and special population.  All of its inmates are at least sixty years old and all have serious pre-existing medical conditions, with diabetes and heart problems being the most common.  None of the inmates are classified as higher than medium security.  The facility has 500 beds but is currently far under that capacity at approximately 100 inmates.

14.      I recognize there are serious, perhaps life-and-death, issues at Adirondack with the lack of medical services for the inmate population there and the lack of available community resources. It is not necessary to be a medical professional to recognize those issues and their

---

[5] *Id.*

importance.  However, those issues are outside my expertise and I will leave them to others to address.  They are not considered in this declaration.

15.     This declaration primarily concerns two general issues: the transfer of additional inmates into Adirondack; and the conditions at Adirondack related to COVID-19.

16.     The picture of what is going on at Adirondack is shocking, not because the prison management is doing one thing that is wrong, or dangerous.  It is shocking because they are doing so many things wrong that together create such a dangerous situation: they are not adequately providing masks, PPE, safe housing, sanitation, meals, testing, screening, quarantining, or recreation.

17.     At the outset, it is crucial to underscore two facts.  First, there is no question that state prisons have an obligation to protect inmates from known threats of harm.  In general, when individuals are incarcerated, there are a number of ways in which they cannot protect themselves. That protection becomes the responsibility of the incarcerating authority.  The classic analogy is that in a fire, inmates locked in their cells are as helpless to protect themselves as horses locked in a barn during a fire.  Likewise, the duty of prisons and of prison staff to protect inmates from harm is long-standing, basic, and consensually accepted throughout U.S. corrections.  That duty is enshrined in case and statutory federal law, state law and Department policy. This general duty to protect inmates includes the specific duty to protect them from illness and disease.  Indeed, in other litigation challenging conditions in prison facilities run by Defendants, Defendants have not disputed that fundamental duty.

18.     The second fact is that the U.S. Centers for Disease Control and Prevention (CDC) has issued guidance for prisons and jails to combat COVID-19.  The CDC issued interim guidance in March of 2020 and by July 14, 2020 had published comprehensive procedures

specific to correctional facilities.  The CDC guidelines are not theoretical, and they are not

controversial; they are specific and they are the product of some of the most renowned scientists

and epidemiologists in the world.  There is no indication that Defendants challenge the science in

the CDC guidelines and, to the contrary, the extensive DOCCS publication "DOCCS COVID-19

Report," online and updated daily, promises the Department is adhering to those guidelines in

ways that they are not.[6]

19.     If Defendants acknowledge their duty to protect inmate lives, and if they do not

dispute the validity of the CDC guidelines, why are they not following those guidelines to the

greatest extent possible?  The CDC guidelines are not intended to be an aspirational "gold

standard"; they are intended to provide guidance that prisons can reasonably adhere to.  If

Defendants find specific provisions impossible, Defendants should say so and state why.

Otherwise, the provisions of the CDC guidelines are the best ways to prevent loss of life from the

pandemic in jails and prisons, and to do less will predictably result in inmate deaths and a clear

breach of Defendants' duty to protect inmates.

20.     The CDC guidelines for transfer provide, in relevant part, that prisons are to:

- "Limit transfers of incarcerated/detained persons to and from other jurisdictions and facilities unless necessary for medical evaluation, medical isolation/quarantine, clinical care, extenuating security concerns, release, or to prevent overcrowding."
- "If a transfer is absolutely necessary: Perform verbal screening and a temperature check as outlined in the Screening section below, before the individual leaves the facility. If an individual does not clear the screening process, delay the transfer and follow the protocol for suspected COVID-19 infection – including giving the individual a cloth face mask (unless contraindicated), if not already wearing one, immediately placing them under medical isolation, and evaluating them for SARS-CoV-2."

---

[6] N.Y. STATE DEP'T OF CORRS. AND CMTY. SUPERVISION, DOCCS COVID-19 REPORT, https://doccs.ny.gov/doccs-covid-19-report (last visited Jan. 6, 2021).

• "If a transfer is absolutely necessary: Ensure that the receiving facility has capacity to properly quarantine or isolate the individual upon arrival."[7]

21.     It is my understanding that no inmates have been transferred into Adirondack since September 2020, but that Defendants have provided no assurances they will not resume such transfers, and as there is still capacity for additional people at Adirondack, Defendants could readily continue these transfers.  When inmates were transferred into the facility, it was done without observing standard, well-recognized preventative procedures against COVID-19.  Based on declarations I have reviewed, inmates were transferred into Adirondack from other New York State prisons without being testing before transfer and without quarantine on arrival.  That was true for all six of the inmate Declarations I reviewed in preparation for this, my own Declaration.  The inmate Declarations also emphasized that it was not possible to maintain six feet of distance from other inmates during the long bus ride to Adirondack.

22.     The relationship between COVID-19 infections and inmate transfers could not be illustrated more graphically than by what happened this summer at San Quentin State Prison in California.  Importantly, while most of California's more than thirty state prisons are located in isolated or rural areas and away from metropolitan communities, San Quentin is in the midst of Marin County, just north of San Francisco and surrounded by suburbs.  San Quentin's 3,500 inmates had zero cases of COVID-19 until the state Department of Corrections transferred 121 inmates into San Quentin from the California Institution for Men in Southern California, which was having a COVID-19 outbreak.  The virus spread through San Quentin like wildfire,

---

[7] Ctrs. for Disease Control & Prevention, Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities (Dec. 31, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html.

eventually infecting more than 2,200 inmates there and killing 28 inmates in the largest single outbreak of the virus in the United States.

23.     If COVID-19 were to gain a foothold at Adirondack and start spreading, it would likely be even more devastating than at San Quentin because of the age of the Adirondack inmates and their pre-existing medical conditions.  That is a proposition that no one needs or wants to be tested.

24.     The relief which Plaintiffs are asking for with regard to transfer of inmates should not be difficult for Defendants.  Plaintiffs are asking that Defendants agree: a. that no more inmates be transferred into Adirondack; or, b. agree that no additional inmates be transferred to Adirondack until the prison can show that it is conducting transfers in compliance with the 8th Amendment and the Americans with Disabilities Act, for example, by ensuring that any inmate transferred is tested for the virus prior to transfer, that only those inmates who test negative shall be transferred, and that any inmate transferred into Adirondack shall, upon arrival, be quarantined for fourteen days from other inmates at the facility and from staff working at the facility.  In my opinion, the guarantees that Plaintiffs are asking from Defendants are little more than common sense.  None of those conditions would present unusual or particularly substantial operational challenges to the running of the facility.  The Adirondack population has remained at approximately 100 for several months, indicating there has been no urgent need to continue to transfer inmates to the facility.  If the need to increase the population arose, a population increase would not present a problem as long as the appropriate safety protocols were followed with regard to transfers.

25.     The remainder of my Declaration has to do with day-to-day operations at Adirondack and the operational measures being used to prevent infections and transmission of the virus, or the lack of such measures.

26.     The CDC guidelines for isolation and quarantine provide, in relevant part:

- " As soon as an individual develops symptoms of COVID-19 or tests positive for SARS-CoV-2 they should be given a mask . . ., immediately placed under medical isolation in a separate environment from other individuals, and medically evaluated."
- "Incarcerated/detained persons who are close contacts of someone with confirmed or suspected COVID-19 . . . should be placed under quarantine for 14 days."[8]

27.     In order to identify who has COVID-19, inmates should be tested for COVID-19 regularly, preferably every two weeks but no less than once a month.  Inmates should be screened with a digital thermometer as often as practical but at least every week.  Staff should be screened daily with a thermometer when they report to work but at the perimeter of the facility.  Staff should be tested weekly.

28.     If an inmate tests positive, that inmate should be isolated, if hospital care is not necessary, and all of that inmate's contacts, both staff and other inmates, should be quarantined for fourteen days.  That is not being done.  The inmate declarants described that when an inmate tested positive, the staff in contact with that individual were sent home to quarantine, but other inmates in contact were not identified and no inmates were put in quarantine or tested after a waiting period to ensure they were not infected.  Here again, it is not that there is controversy about safe practices.  The facility is concerned about staff safety, so staff are quarantined after a contact.  Why then would Defendants not similarly follow this procedure for inmates?  In both of the jails I am most familiar with, in Los Angeles and in San Bernardino County, isolation and

---

[8] *Id.*

quarantine procedures for inmates after someone tests positive are standard and have been for some time.  That is also true in other jails and prisons I know about across the country from Hawaii to Virginia.  The Virginia Department of Corrections is a good example.  I know that they follow the CDC guidelines explicitly and in detail, from masks to transfers to isolation and quarantine.  Obviously, it is not the case that a state correctional agency cannot comply with CDC guidance if they choose to.

29.     With 100 inmates in a 500-bed facility, there is no reason for any inmates to be double celled or to be housed in rooms without doors.  However, the inmate declarations describe housing units with 12 to 16 rooms with doors and 6 to 8 rooms without doors.  Some of the inmates submitting declarations are assigned to rooms with no doors.  That creates an unnecessary risk of transmission.

30.     Adirondack is a 500-bed facility with only 100 beds in use.  It is my understanding that many parts of the facility are not in use.  There is no reason Defendants cannot open additional areas so that there is an isolation unit, a quarantine unit, and enough general population units such that each inmate can have a single room with a door.

31.     The CDC guidelines concerning mask use provide, in relevant part, that prisons should:

- "Provide masks at no cost to incarcerated/detained individuals and launder them routinely."
- Provide "[c]loth face masks for source control"[9]

32.     It appears that the situation with masks for inmates is improved from the summer but is still grossly inadequate.  Of the six inmate declarations I reviewed, five said they have paper masks which they must wash in the sink with soap and water because they are not replaced

---

[9] *Id.*

or replaced often. The sixth inmate uses a bandana as a face covering, something he fashioned himself.  All inmates should be issued cloth masks.  Paper masks are not acceptable unless they are provided in sufficient numbers to allow them not to require cleaning; providing so few paper masks that inmates must wash them is unacceptable, as it degrades the masks' quality.  Inmates should be issued a new cloth mask no less frequently than every two weeks.  CDC guidelines specify cloth masks of at least two layers of material. Their publications do not mention or acknowledge paper masks.

33.     None of this should be surprising for Defendants; indeed, they purport to be taking these steps right now, though they are not doing so at Adirondack. The website with most current DOCCS public report on Covid-19 (Dec. 31, 2020) prominently features this notice above the title of the Report: "COVID-19 is still spreading, even as the vaccine is here. Wear a mask, social distance and stay up to date on New York State's vaccination program.". Yet neither of those things are being done at Adirondack.  In the section of the report "What DOCCS is Doing", the report lists a number of steps.  The first two listed are: "Mandating all staff to wear face masks while on duty" and "Supplying all incarcerated individuals with surgical-type masks."[10]  Neither of these publicly heralded measures are true at Adirondack, or they are not conducted and enforced in a meaningful way.

34.     Inmate declarations are consistent in stating that although staff have been issued masks, many staff either do not wear them or do not wear them consistently.  Adirondack must mandate that all staff wear masks throughout their workday and must discipline those staff who do not comply.  Prison staff work in a highly regulated environment.  There are hundreds of pages of policy and procedure and the penalty for violating established policy may be days of

---

[10] New York State Department of Corrections and Community Supervision, *supra* note 6.

suspension without pay or even termination.  Staff quickly learn, however, which policies are

enforced and which are only paper requirements.  Based on the inmate declarations, no mask

policy is being enforced.  That is relatively easy to correct.  If the facility management

emphasizes to all officers, supervisors, and managers that masks, properly worn, are mandatory

at all times while on duty and that all violations will be met with formal discipline, the situation

will change.  As soon as an officer is given days off for a second mask violation, the word will

spread and masks will be worn.

35.     The CDC guidelines concerning movement within prisons provide, in relevant

part, that prisons should:

- "Make every possible effort to modify staff assignments to minimize
  movement across housing units and other areas of the facility. For example,
  ensure that the same staff are assigned to the same housing unit across shifts
  to prevent cross-contamination from units where infected individuals have
  been identified to units with no infections."
- "Make a list of possible social distancing strategies that could be implemented
  as needed at different stages of transmission intensity."[11]

36.     Activities such as recreation, showers, feeding and the like should be designed so

that all inmates can maintain social distance from other inmates and from staff.  That is not the

case at Adirondack.  For meals, inmates go to the dining hall ("mess hall") 45 to 50 at a time.

They line up to receive food very close to each other and then sit at tables and eat without masks

with people on either side and directly across.  Because of the policy of requiring people to eat in

the dining hall together, it is not possible to maintain six feet of distance there.  The prison could

either serve inmates their meals in their rooms, as is done at many correctional facilities, or

spread out meal time and feed in smaller groups, maintaining social distance in food lines and at

dining tables.  Similarly, the dayrooms where inmates pass time watching television have several

---

[11] Centers for Disease Control and Prevention, *supra* note 7.

benches and the declarations make it clear that inmates sit next to each other because the only alternative would be to stand for hours.  There is a simple solution.  Portable or folding chairs could be added to each dayroom in sufficient numbers such that every inmate could watch television while maintaining adequate distance from others.  That would not work at a maximum security facility because the chairs are potential weapons but at Adirondack, with medium security inmates who are also elderly, the risk is not high.

37.     The fact that the prison feeds people three times a day in crowded, unsafe conditions reflects indifference to and refusal to implement the most obvious and common-sense measures that would decrease the chance that these men will get COVID-19.  That conclusion is not difficult.  The prison officials knew about COVID-19 many months ago – one would have to live on Mars not to have heard a great deal about it, and I suspect that even on Mars they were receiving Governor Cuomo's daily press conferences.  Yet, some of the obvious preventative measures have not been taken.  Perhaps extra cleaning supplies and cloth masks were a budget issue or a matter of availability, but compliance with a mask policy for staff costs nothing and presents no additional operational challenges or complexities.  Enforcing social distancing in lines in the dining hall when waiting for food costs nothing and might actually decrease inmate tension.  It is what those same prison officials must do after work when in line at a grocery store, so why have they not done it for inmates?  Arranging feeding differently, perhaps in smaller groups so that inmates from different living units do not mix, would not be rocket science.  There are many other examples of steps that could have been taken and have not been.

38.     With respect to soap, the CDC guidelines provide, in relevant part, that prisons should:

- "Provide a no-cost supply of soap to incarcerated/detained persons. . . Provide liquid or foam soap where possible."[12]

39.     The inmate declarations are also consistent in complaining that cleaning supplies and hand sanitizers are not readily available.  Inmates receive only two bars of soap for every two weeks, to be used for all of their soap needs, including regular hand-washing, as no hand soap is provided in the bathrooms.  In many instances, if inmates run out of this soap they are required to buy more. Inmates should be given enough soap and other disinfectants that are effective against the virus to allow every inmate to clean their cell or sleeping area at least once a day and to wash their hands with soap eight times per day.

40.     As was true with the question of transferring additional inmates into Adirondack, these issues that Plaintiffs are specifying should not present insurmountable problems operationally or from the perspective of facility management.

41.     In other litigation and in many other places, the New York State Department of Corrections and Community Supervision readily acknowledges that it has a long-standing, well-established and incontrovertible duty to protect inmates, including the duty to protect them from illness.  The Department goes to great lengths and great expense in some cases to comply with that duty.  Here, without extraordinary resources and without major disruption of operations, the facility could take a number of steps to better protect the health of the inmate population.

42.     New York's Governor, Andrew Cuomo, was one of the first in the United States to take strong preventive measures to protect the state's residents.  It is not unreasonable to ask that a branch of his state government take fundamental measures to protect individuals who are at far higher risk and far more inherently vulnerable than most New York State residents.

---

[12] *Id.*

that a branch of his state government take fundamental measures to protect individuals who are at far higher risk and far more inherently vulnerable than most New York State residents.

I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED WITHIN THE UNITED STATES ON: _Jan. 7, 2021_____, ~~2021~~.

BY: _Jeffrey A. Schwartz_
Jeffrey A. Schwartz

# EXHIBIT

# A

# Jeffrey A. Schwartz, Ph.D.

1610 La Pradera Drive                                    (408) 379-9400 Office
Campbell, CA 95008              jasletra@aol.com          (408) 379-9410 Fax

## SUMMARY

Thirty years experience in criminal justice management coupled with a psychology Ph.D. in research methodology. Detailed, hands-on experience with police, prisons, jails, community corrections; adult and juvenile; local, state, federal and foreign correction agencies. Development of innovative training programs and new approaches to training methodology. Planning for "turnaround management" and culture change in troubled institutions and agencies.

## PROFESSIONAL EXPERIENCE

LETRA, Inc., Campbell, CA (1972 - present), A non-profit training and research organization, serving criminal justice and other governmental agencies, business and industry.

> *Founder and Chief Executive Officer:*
> All phases of corporate and fiscal management, supervision of professional staff, consultants. Policy development and procedures for emergency preparedness, use of force and conflict resolution. Design of new training programs and training of trainers.

RICHMOND POLICE DEPARTMENT, Richmond, CA (1968-1976)

> *Administrative Consultant to the Chief of Police:*
> Organizational development, research, program evaluation, new training programs and grants. Developed first generalist police crisis intervention training program in the U.S.. Planned and organized innovative department-wide juvenile diversion project, used as state model. National research on female and minority employment in policing.

PALO ALTO VETERAN'S HOSPITAL, Palo Alto, CA (1969-1971)

> *Chief of Program Evaluation Unit:*
> Founded, organized and managed new applied research unit in large medical/psychiatric teaching hospital. Developed research and statistical strategies for evaluating effectiveness of clinical programs. Served on Hospital Director's Executive staff.

## EDUCATION

| | | |
|---|---|---|
| 1960-1964 | Western Reserve University | B.A.  Chemistry and English Literature. |
| 1964-1965 | Toledo University | Graduate work:  Psychology |
| 1965-1968 | Denver University | M.A. & Ph.D. Experimental Psychology (Research Methods, Learning, Statistics) |
| 1968-1969 | Palo Alto Veteran's Hospital | Internship:  Clinical and Community Psychology |

Resume:  Jeffrey A. Schwartz, Ph.D.                    2                              1/1/19

## CORRECTIONS EXPERIENCE (representative sample)

National Institute of Corrections: Thirty years experience working with NIC.  Conducted two large national management training programs over three years.  Developed original curriculum, innovative training methodology, trained 500 managers from all areas of corrections from all 50 states in a residential 7-day, intense corrections-specific management skills training program.  Administrated all aspects of these projects.  Project Director for more than 10 major NIC grants / cooperative agreements; technical expert on more than 25 NIC technical assistance projects from all four NIC operating Divisions; authored 3 book length NIC publications.  Helped plan new NIC courses and evaluated NIC operating procedures.

Shelby County, TN (Memphis) Jail:  Comprehensive operational review of deeply troubled large jail system after Federal Court found the county in contempt of all five major elements of consent decree (2000).  Developed plan to cure contempt findings, drafted response to Civil Rights Division of US DOJ to avoid second1983 suit, worked on transformation of jail to direct supervision and on population management, use of force, inmate grievance system, management training and practices.  Achieved discharge from Federal Court supervision in 2005 and from DOJ supervision in 2009.

California Youth Authority (CYA):  The development of Conflict Management and Crisis Intervention procedures in all Youth Authority institutions; training and procedures for the management of hostage situations; training of trainers.  LETRA's Crisis Intervention training program has been required by policy of all CYA institutional staff and in use for over 15 years, and LETRA's Emergency Preparedness course was in use state-wide for over ten years.

Montana Department of Corrections (DOC):  After the maximum security unit riot and hostage situation at the Montana State Prison in Deer Lodge, in 1991, selected by NIC to head the seven person Administrative Inquiry Team commissioned to investigate the events leading to and surrounding the riot.  Coordinated the writing of the Inquiry Team Final Report ("Riot at Max") and managed extensive media contacts for the Inquiry Team.

Michigan DOC, Hawaii DOC, Alaska DOC:  Initiated state-wide training programs in each state on institutional crisis intervention.  All three State DOC's continued to provide this training to all or almost all institution staff for many years.

Pennsylvania DOC:  After Camp Hill riots, conducted assessment of Department's emergency response capacity, developed plan to increase preparedness including recommendations for specialized equipment, staff, etc.  Conducted administrative policy seminar, tailored emergency training curriculum to department's needs, trained cadre of mid-managers to deliver emergency preparedness training at all 16 institutions to both management and line/supervisory staff and developed format for new institutional emergency plans.

Nebraska, Iowa, Wyoming, Oregon, Kentucky, North Carolina, Missouri, Kansas, Florida, Delaware, North Dakota, Hawaii, Nevada, Arkansas, Vermont and New Hampshire DOC's, the Omaha, Jacksonville, Greenville and Boise jail systems: Emergency Preparedness. Typically began with security analysis and evaluation of existing emergency plans and procedures, review of emergency policies, leading to adaptation of LETRA's detailed, comprehensive and generic ("all risk") emergency system.  Provided Emergency Preparedness training for all staff at all institutions on new emergency system by training and certifying department instructors.

Resume: Jeffrey A. Schwartz, Ph.D.                    3                         1/1/19

Hawaii DOC:  Created new Use of Force policy, then developed curriculum to train all staff to new policy. Prepared Department staff as instructors so Department would be self-sufficient. Achieved substantial reduction in allegations of improper use of force. Similarly adapted LETRA's model use of force policy and training for state DOC's in Oregon, New Mexico, Shelby Co. Jail.

Correctional Services of Canada:  Crisis Intervention and Conflict Resolution work at Stony Mountain Penitentiary following riot and murder of two staff members.  Developed Conflict Resolution program (in English and French) for all Regions of Penitentiary Service.  Revised and expanded emergency policies governing crisis management at all Federal institutions in Canada.

### POLICE CONSULTATION EXPERIENCE (representative sample)

FBI National Academy, Quantico, Virginia:  Presented two seminars on Domestic Crisis Intervention to police executives from largest 50 police departments in U.S.  LETRA was the first outside group (non-FBI) to be invited to present an entire course at the FBI Academy.

Richmond, California, Police Department:  Developed new 40-hour training program for generalist patrol officers on child and juvenile issues.  Course ranged from gangs to drug abuse to battered and neglected children.  All uniformed officers and detective trained within one calendar year.

Sacramento, California, Police Department and Sheriff's Office:  Long-term project to train trainers in Crisis Intervention.  Over 1500 patrol officers trained in LETRA's Domestic Crisis Intervention during an 18 month period.  Evaluation showed 40% reduction of officer injuries, reduction in time spent on disputes. Similar projects in Rochester, NY; San Jose, CA; and other police agencies.

### COLLEGE/UNIVERSITY TEACHING EXPERIENCE

Denver University, San Francisco State University, San Jose City College, University of California at Santa Cruz, Guest Lecturer at Stanford Law School.  Psychology courses taught: Learning, Theory of Measurement, Educational Psychology, Introductory Statistics. Criminal justice courses:  Correctional Management, Police Supervisory Training, Training for Trainers, etc.

### EXPERT WITNESS (Plaintiff and defense-side experience)

Use of Force (Police and Corrections); Operation of Correctional Facilities; Failure to Protect (Staff Sexual Misconduct with Offenders; Suicide; etc.); Emergency Preparedness and Emergency Response (Prisons and Jails); Crisis Intervention (Police, Probation, Parole, Jails and Prisons)

Currently a Federal Court Monitor On a Los Angeles Jails class action consent decree on use of force; Also Federal Court Monitor, use of force consent decree, San Bernardino County Jails.
Class Action and related cases: Corrections expert in class action by Southern Poverty Law Center and Special Litigation Section of DOJ resulting in 2013 Consent Decree against New Orleans Jails; Corrections expert for Manhattan U.S. Attorney's Office in CRIPA investigation of adolescent conditions, Rikers Island; Invited testimony before Citizens' Commission on Jail Violence (CCJV), Los Angeles Jails; Federal Court security expert, consent decree on conditions, Virgin Islands Jails;

### CRITICAL INCIDENT REVIEWS ("after-action reports")

Camp Hill (PA) riots; Hurricanes Katrina and Rita and the LA DOC; Hostage taking at Delaware Correctional Center; "Riot at Max" at Montana State Prism; Wyoming Penitentiary carbon monoxide poisonings; Southern Ohio Correctional Facility (Lucasville) riot.

## AWARDS, PUBLICATIONS AND INVITED ADDRESSES

NDEA Fellow in Graduate Psychology.  Presented invited addresses at ACA, APPA, AJA, CPPCA, IACP meetings, State Correctional Associations.  Published numerous articles and chapters on corrections, research methodology, police science and psychology.  Authored or co-authored more than 15 training texts, three book length NIC publications early NIC programmed learning course.

## PROFESSIONAL ORGANIZATIONS  (current and former)

American Correctional Association; American Probation and Parole Association; American Jail Association; California Probation, Parole and Corrections Association; American Psychological Association; International Association of Chiefs of Police

## COMMUNITY INVOLVEMENT

Elected Trustee, West Valley-Mission Community College District, three terms.  Served as President of Governing Board 1984-85 and 2005-2006.  The District serves over 25,000 students, with more than 1000 employees and a budget of over $100 million dollars per year.

Member, Bd. of Directors, former President of large homeowners' association in Saratoga,  CA.

Vice Chair,  Board of Directors (1988 - 1995), Women's Housing Connection, which was the only homeless shelter in Santa Clara County exclusively for women and women with young children.

Co-founder and Director (1986-2009), Visa Technologies (later Momar Industries), a computer supply and flexible packaging company with over  $10M in sales, annually.

Volunteer Mediator, Child Find, Inc., A national organization that attempts to locate missing children, reconcile run-away children and juveniles with their families, and prevent child abduction.

## ADDITIONAL SKILLS AND EXPERIENCE

Budget and Personnel Management:  As President of a College Board of Trustees, oversaw a budget in excess of $100M/year with approximately 1000 professional and support staff.  Oversaw private corporate budget (Visa Technologies) in excess of $10M/year with 65 employees.  Extensive experience teaching leadership development, personnel administration, budget and fiscal control and other management topics to criminal justice managers.

Media Relations and Public Speaking:  Extensive media experience in community activities as well as with criminal justice work. Frequent public speaking in a wide variety of contexts.

Legislative Liaison and Policy Analysis:  Substantial experience working with local legislative delegations, testifying before legislation bodies, analyzing and drafting policy and regulations.

Special Consultant to the California Assembly:  (1) Investigation and hearings leading to resignation of Insurance Commissioner Charles Quackenbush.   (2) Investigation and hearings on the state of California contract for Oracle software.