# EXHIBIT
# 16

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Allen HARPER, José LEON, and Ranfis PEREZ on behalf of themselves and all others similarly situated; and the RELEASE AGING PEOPLE IN PRISON CAMPAIGN ("RAPP"), <br><br>             Plaintiffs, <br><br>     v. <br><br> ANDREW CUOMO, in his official capacity as the Governor of the State of New York; NEW YORK STATE DEPARTMENT OF CORRECTIONS AND COMMUNITY SUPERVISION; ANTHONY J. ANNUCCI, in his official capacity as the Acting Commissioner of the New York State Department of Corrections and Community Supervision; JOHN MORLEY, M.D., in his official capacity as the Deputy Commissioner and Chief Medical Officer of the New York State Department of Corrections and Community Supervision; and JEFFREY TEDFORD, in his official capacity as the Superintendent of Adirondack Correctional Facility <br><br>             Defendants. | Civil Action No. 9:21-cv-19 (LEK/ML) |

## DECLARATION OF MARK FENIG, MD

I, Mark Fenig, MD, hereby state as follows:

1.      I am over the age of eighteen and am competent to make this Declaration.

2.      I am a physician duly licensed to practice medicine in the State of New York. I have over 10 years of experience working as a full-time attending emergency medicine physician in the Bronx, New York.

3.      I received my medical degree from the Sackler School of Medicine in 2007 and completed my Emergency Medicine residency training at Emory University School of Medicine in 2010. After completing my specialty training I served as a full time attending physician in Montefiore Medical Center's Department of Emergency Medicine – Weiler Division from August 2010 until August 2012. I was then a full time attending physician for NYC-HHC Lincoln Medical and Mental Health Center from August 2012 until August 2017. I then returned to the Montefiore Medical Center's Weiler Division where I resumed my full-time duties as an attending physician and where I am presently employed.

4.      I have also held academic appointments at both Weill Cornell Medical School and the Albert Einstein College of Medicine. I am an Assistant Professor of Emergency Medicine at the Albert Einstein College of Medicine (November 2010 – 2014 and again from August 2017 – present). I was a clinical Instructor of Emergency Medicine at Weill Cornell Medical College (November 2012 – August 2017).

5.      I am a Diplomate of the American Board of Emergency Medicine (certification valid from June 2011 to December 2021). I was a Fellow of the American Academy of Emergency Medicine (FAAEM 2012 – 2016), and a Fellow of the American College of Emergency Physicians (FACEP 2007 – 2012; 2017).

6.      As an emergency medicine physician in the Bronx, New York, a region that was particularly hard hit with severe COVID-19 infection, I have treated and continue to treat many patients infected with COVID-19.

7.      As part of my clinical work, it is my responsibility to remain current on much of the relevant COVID-19 scientific literature in order to educate patients about their individual risk factors for severe COVID-19 illness and to educate patients about methods of infection prevention.

8.      My C.V. is attached as Exhibit A.

9.      At the request of Relman Colfax PLLC and the Legal Aid Society, I have reviewed the following documents:

Centers for Disease Control (CDC) Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities;  Interim Considerations for SARS-CoV-2 Testing in Correctional and Detention Facilities; Centers for Disease Control (CDC) Certain Medical Conditions and Risk for Severe COVID-19 Illness; DOCCS COVID-19 Report - COVID-19 Safety Measures; New York State Department of Public Health COVID-19 Recommendations; the declarations of the following men incarcerated at Adirondack Correctional Facility: Allen Harper ("Plaintiff Harper"), Jose Leon ("Plaintiff Leon"), Gregory Jenkins ("Witness Jenkins"), Ranfis Perez ("Plaintiff Perez"), John Spadaro ("Witness Spadaro"), Juan Cangiano ("Witness Cangiano"), Gregory Jenkins ("Witness Jenkins"), Bradford Applegate ("Witness Applegate"), and Francisco Salinas ("Witness Salinas"); and the supplemental declarations of Plaintiff Perez, Plaintiff Harper, Plaintiff Leon, and Witness Spadaro.

10.     SARS-CoV-2 is a virus that causes the COVID-19 disease.[1] To date, there is no curative medical treatment. Multiple vaccines have been developed, but it will take at least

---

[1] Unless otherwise specified, "SARS-CoV-2" and "COVID-19" will be used interchangeably throughout this declaration.

months before there will be sufficient herd immunity from mass vaccination to effectively arrest the spreading pandemic.

11.     The CDC has promulgated guidelines to prevent or mitigate the spread of SARS-CoV-2, including specific guidelines for slowing the spread of the virus in jail and prison settings. While these guidelines are not laws, they represent common sense public health measures that are based on science and directed to prevent the spread of COVID-19. Specifically, they recommend: (1) social distancing, (2) temperature and symptom screening of everyone who enters or leaves a facility, (3) isolation of individuals with symptoms of COVID-19, (4) quarantining close contacts of COVID-19 cases, (5) testing all symptomatic and quarantined individuals for the SARS-CoV-2 virus, (6) asymptomatic routine testing for new incarcerated or detained persons ("IDPs") before joining general population or quarantine for fourteen days before assimilation along with testing prior to transferring to a new facility, (7) frequent cleaning and disinfecting of surfaces and objects that are repeatedly touched, (8) providing sufficient and proper hygiene supplies at no cost to facilitate frequent handwashing, and (9) mandatory mask wearing by all individuals who have the potential for direct or indirect exposure to COVID-19 cases.

12.     Adirondack Correctional Facility ("Adirondack") is a congregate environment where inmates spend a significant portion of each day in close proximity to each other. As such, the risk for COVID-19 exposure, infection, and transmission is increased. Inmates are therefore at especially high risk of infection without protective measures in place. These measures include physical distancing, mask wearing, screening and testing protocols, non-punitive quarantining and isolation, and rigorous cleaning and hygiene practices.

13.     Based on my review of the aforementioned declarations, it is clear to me that the following protective health measures have not been consistently operationalized or practiced in Adirondack Correctional Facility:

## I.     Physical Distancing

14.     While jails and prisons do present challenges for the enactment of social distancing measures, social distancing in prisons is possible and recommended, as the CDC guidance reflects. Still, all six witnesses who were interviewed declared that physical distancing was inconsistently enforced at best and ignored at worst.

15.     The CDC has stated that high risk airborne droplet transmission of SARS-CoV-2 occurs in enclosed spaces, during prolonged exposure to respiratory particles, and in settings with inadequate ventilation or air handling.[2] Other studies have demonstrated that SARS-CoV-2 is spread through non-contact transmission[3] (such as droplets or airborne particles) and is particularly dangerous in indoor environments that are crowded and poorly ventilated.[4,5] The CDC brief specifies that airborne transmission of SARS-CoV-2 occurs in "enclosed spaces within which an infectious person either exposed susceptible people at the same time or to which susceptible people were exposed shortly after the infectious person had left the space."[6] This accurately describes the environment at Adirondack Correctional Facility, where inmates are

---

[2] CENTERS FOR DISEASE CONTROL AND PREVENTION, SCIENTIFIC BRIEF: SARS-CoV-2 AND POTENTIAL AIRBORNE TRANSMISSION (Oct. 5, 2020), *available at* https://www.cdc.gov/coronavirus/2019-ncov/more/scientific-brief-sars-cov-2.html.
[3] Jasper Fuk-Woo Chan et al., *Surgical Mask Partition Reduces the Risk of Noncontact Transmission in a Golden Syrian Hamster Model for Coronavirus Disease 2019 (COVID-19)*, 71 CLINICAL INFECTIOUS DISEASES 16, 2139 (2020), available at https://academic.oup.com/cid/article/71/16/2139/5848814.
[4] Lidia Morawska & Donald K. Milton, *It Is Time to Address Airborne Transmission of Coronavirus Disease 2019 (COVID-19)*, 71 CLINICAL INFECTIOUS DISEASES 9, 2311 (2020), available at https://academic.oup.com/cid/article/71/9/2311/5867798.
[5] Keun-Sang Kwon et al., *Evidence of Long-Distance Droplet Transmission of SARS-CoV-2 by Direct Air Flow in a Restaurant in Korea,* 35 J. KOREN MED. SCI. 46, 415 (2020), *available at* https://jkms.org/DOIx.php?id=10.3346/jkms.2020.35.e415.
[6] CENTERS FOR DISEASE CONTROL AND PREVENTION, *supra*.

particularly susceptible to infection due to advanced age and their enclosed living environment without adequate physical distancing.  Social distancing measures should therefore be adopted at Adirondack, as the CDC specifically states that "existing interventions to prevent the spread of SARS-CoV-2 appear sufficient to address transmission both through close contact and under the special circumstances favorable to potential airborne transmission."[7]

### A.  Day Rooms

16.     Common areas include, but are not limited to, housing unit day rooms where there are benches for communal seated gathering and televisions; areas where inmates are expected to line up, such as the food or medication line; and the mess hall where inmates dine.

17.     All six witnesses consistently expressed a lack of critical social distancing in different areas of Adirondack prison. Plaintiff Harper, Plaintiff Leon, Plaintiff Perez, and Witness Spadaro described the day room as a communal space where Adirondack has made no effort to facilitate physical distancing. The benches that exist as the only seating options do not afford sufficient seating space between inmates. Plaintiff Leon declared that, "There are two day rooms… The rooms are small and there are regularly 15-20 people in the rooms at one time." Declaration of Jose Leon ("Leon Decl."). Similarly, Plaintiff Harper declared that, "There is a room where we watch television in my house. The room is extremely small and people sit immediately next to each other when they are in there - there is no way to socially distance." Declaration of Allen Harper ("Harper Decl."). Plaintiff Perez confirmed the same concern during a telephonic interview I conducted with him. Supplemental Declaration of Ranfis Perez ("Perez Supp. Decl."). Witness Spadaro echoed the same concern in his declaration and added that he is prohibited from introducing a chair into the dayroom. Declaration of John Spadaro ("Spadaro

---

[7] *Id.*

Decl."). Adirondack's policies prevent physical distancing in Adirondack Correctional Facility's day rooms.

### B.      Bathrooms

18.     Similar to day rooms, Adirondack's bathrooms can become crowded, creating an environment that precludes physical distancing. Both Witness Spadaro and Witness Cangiano declared that they are required to use the bathroom with multiple other people at once – for example, when shaving – and disclosed to counsel that there is frequently less than six feet of distance between people in the bathroom. Additionally, Witness Salinas states that during the time for shaving, multiple inmates stand shoulder to shoulder in front of the bathroom mirror, without masks. Declaration of Francisco Salinas ("Salinas Decl."). Close contact without masks, above all else, encourages the spread of SARS-CoV-2 virus.

### C.      Dining Hall

19.     The most concerning deviation from the physical distancing guidelines as outlined by the CDC's Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities[8] and NYSDOH guidelines[9] to prevent the spread of COVID-19 is in the dining halls. Inmates do not wear masks as they eat. Obviously, physical distancing becomes especially critical when inmates are exposed to other inmates who are not wearing masks. Plaintiff Harper, Plaintiff Leon, Witness Jenkins, Plaintiff Perez and Witness Cangiano all reported that there is insufficient physical distancing during meal times in the dining areas. Plaintiff Harper states, "There are often 45-50 other individuals eating at the same

---

[8] CENTERS FOR DISEASE CONTROL AND PREVENTION, INTERIM GUIDANCE ON MANAGEMENT OF CORONAVIRUS DISEASE 2019 (COVID-19) IN CORRECTIONAL AND DETENTION FACILITIES (DEC. 31, 2020), *available at* https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html.
[9] NEW YORK STATE DEPT. OF HEALTH, PROTECT YOURSELF AND YOUR FAMILY FROM CORONAVIRUS (COVID-19) (last accessed Jan. 7, 2021),  available at https://coronavirus.health.ny.gov/protect-yourself-and-your-family-coronavirus-covid-19.

time," and because of this arrangement, "it is not possible to maintain six feet of distance during meal times. People are closer than six feet from each other when getting food and sitting and eating. Previously people only sat on one side of the table… now they have implemented a rule where people sit across from each other… We are not allowed to bring food from the mess hall to eat in our rooms." Harper Decl..

20.     Studies have shown that spread of SARS-CoV-2 is more likely in crowded, poorly ventilated indoor environments.[10,11,12] Eating, which necessitates that the individual remove their mask, becomes a particularly perilous activity, as there is no barrier to mitigate the viral spread.[13] Thrice daily, inmates at Adirondack Correctional Facility are faced with the following choice: having access to a meal or avoid the most dangerous exposure to COVID-19.

### D.     Physical Distancing when Assembling in Lines

21.     Lines are frequent points of assembly in prison environments. Plaintiff Harper noted that there was no physical distancing when lining up in the mess hall for food.. Witness Jenkins also documents that only 2 feet of physical distancing exists while waiting for medications in the med line. Declaration of Gregory Jenkins ("Jenkins Decl.").

### E.     Physical Distancing Between Housing Units

22.     Mitigating the potential spread of COVID-19 in congregate living situations such as prisons is best achieved when cohorts of inmates are siloed, such as in housing units. If an infectious outbreak occurs, close contact exposure of different housing units to each other would allow COVID-19 to infect a much larger number of inmates and staff. Thus, the CDC

---

[10] Lidia Morawska & Donald K. Milton, *supra*.
[11] Keun-Sang Kwon et al., *supra*.
[12] CENTERS FOR DISEASE CONTROL AND PREVENTION, *supra*.
[13] Jasper Fuk-Woo Chan et al., *supra*.

recommends that when possible, prisons reduce interactions between housing units, such as during meals and group or work detail activities.[14]

23.    Plaintiff Harper, Plaintiff Leon, Plaintiff Perez and Witness Jenkins all state that housing units are not staggered during meal times; rather, different housing units eat at the same time in the same mess hall. Supplemental Declaration of Allen Harper ("Harper Supp. Decl."); Supplemental Declaration of Jose Leon ("Leon Supp. Decl."); Perez Supp. Decl.; Jenkins Decl.. As mentioned above, mealtime at Adirondack Correctional Facility is especially fraught with risk of contracting COVID-19 because of insufficient physical distancing between inmates without masks over extended periods of time.

24.    Plaintiff Perez disclosed to me during a telephonic interview that during his work detail as an orderly he is required to work alongside inmates from other housing units without physical distancing and that his work detail group cleans in many different housing units. In other words, inmates are unnecessarily exposed to members of other housing units during their work detail, and different housing units are also exposed to the work group's collective COVID-19 exposure.

25.    The migration of inmates from multiple prisons to Adirondack also involved mixing prisons populations in confined spaces even before arrival to Adirondack. Witness Spadaro states "People from Green Haven Correctional Facility and Otisville Correctional Facility were transported to Fishkill, where we were all placed on the bus to Adirondack." Spadaro Decl. at ¶ 4.

---

[14] CENTERS FOR DISEASE CONTROL AND PREVENTION, *supra*.

26.     Adirondack Correctional Facility's refusal to safely keep inmate cohorts separated undermines the ability to contain a potential outbreak, therefore placing these clients as well as all inmates and staff at risk of infection.

**F.     Physical Distancing During a Transfer**

27.     The CDC recognizes that migrating cohorts of inmates poses a risk of exposing a COVID-19-free cohort to another cohort that may be infected with COVID-19. Therefore, the common-sense guidelines that the CDC recommends include symptom screening and temperature checks prior to an inmate's transfer. The CDC also recommends bus operators open bus windows to increase airflow while transporting passengers.[15]  Spacing inmates apart from each other, consistent with both the CDC and NYDOH guidelines should also be enforced so as to limit viral spread in this confined environment. Research has shown that respiratory droplets in confined spaces are much more likely to linger and infect others than when in larger or outdoor environments.[16]

28.     All six declarants were transferred to Adirondack Correctional Facility from other prisons. At least one, Plaintiff Harper, was transferred during a COVID-19 outbreak at his previous facility. Harper Decl.. The mass mixing and assimilation of multiple prison cohorts as reflected in the Plaintiffs' and Witness' declarations include Plaintiff Harper's transfer from Woodbourne Correctional Facility, Plaintiff Leon's transfer from Otisville Correctional Facility, Plaintiff Perez's transfer from Eastern Correctional Facility, and Witness Jenkins', Witness Spadaro's and Witness Cangiano's transfer from Fishkill Correctional Facility.

---

[15] CENTERS FOR DISEASE CONTROL AND PREVENTION, COVID-19 EMPLOYER INFORMATION FOR BUS TRANSIT OPERATORS (DEC. 31, 2020), *available at* https://www.cdc.gov/coronavirus/2019-ncov/community/organizations/bus-transit-operator html.
[16] Lidia Morawska & Donald K. Milton, *supra*.

29.     Plaintiff Harper, Plaintiff Leon, Witness Jenkins, Witness Spadaro and Witness Cangiano all attested to a lack of physical distancing during the bus ride. These inmates describe sitting immediately in front and behind one another. No option for distancing existed during the transport of these clients. This disregarded the DOCCS Reopening Plans, which states, "DOCCS will slowly resume the internal movement and transfer of incarcerated individuals, on or about June 1, 2020, while instituting social distancing on transportation vehicles, with both staff and the incarcerated population required to wear masks."[17] In addition, one study found that on a bus with one COVID-19-positive passenger and no mask-wearing or open windows, more than a third of the passengers subsequently developed COVID-19 after just 100 minutes of exposure.[18] This study illustrates how unsafe these bus trips were for the clients and all inmates involved. Therefore, the DOCCS Adirondack inmate migration presented a dangerous situation since it unnecessarily exposed them to SARS-CoV-2 viral transmission during their bus transport.

## II. Quarantine

30.     Inmate quarantine is when an inmate is separated from their cohort after the inmate has had a possible COVID-19 exposure. A close contact exposure is one in which an individual was less than six feet from a person with COVID-19, for more than fifteen minutes. Longer exposures or exposures in closer proximity present a higher risk of contracting COVID-19. All close contacts are considered exposed if they had close contact with the infected person beginning two days prior to onset of the infected person's symptoms or two days prior to the

---

[17] NEW YORK STATE DEPARTMENT OF CORRECTIONS AND COMMUNITY SUPERVISION, DOCCS RE-OPENING PLAN FACT SHEET (LAST ACCESSED JAN. 7, 2021), *available at* https://doccs.ny.gov/system/files/documents/2020/07/web-page-doccs-re-opening-fact-sheet.pdf.
[18] Ye Shen et al., *Community Outbreak Investigation of SARS-CoV-2 Transmission Among Bus Riders in Eastern China*, 180 JAMA INTERN. MED. 12, 1665 (2021), available at https://jamanetwork.com/journals/jamainternalmedicine/fullarticle/2770172.

infected person's positive COVID-19 test. The CDC recommends that quarantined inmates be separated from their housing units for fourteen days if they have had close contact exposure with a person suspected or confirmed to have COVID-19.

31.     If it is impractical to contact trace individual exposures, such as in congregate living environments where all inmates in a larger cohort share common spaces, then an entire housing unit may be quarantined. This is called quarantining-in-place. The CDC outlines recommended conditions when this larger cohort quarantine may end.

32.     During both individual quarantine or a larger cohort quarantine-in-place, inmates should be frequently screened for COVID-19 signs and symptoms and routinely tested for COVID-19. Inmates who screen positive or test positive must be removed from the cohort and placed into a COVID-19-positive isolation. Failure to implement immediate quarantine measures will invite opportunity for accelerated spread of COVID-19 throughout the prison.

### A.     Quarantine Prior to Assimilating into a New Prison Population

33.     Public health recommendations include the protective measure to quarantine inmates before assimilating them into a new facility.[19] This provides protection to the destination facility inmates by preventing their exposure to asymptomatic carriers of COVID-19 from other incoming facilities. None of the declarants who were transferred to Adirondack during the COVID-19 pandemic was quarantined on arrival. Since arriving, inmates immediately engaged in congregate living without consistent physical distancing. For example, Witness Spadaro described his transfer to, and assimilation into Adirondack Correctional Facility as follows:

> I was transferred to Adirondack by bus. Approximately 20 people from 3 different correctional facilities were placed on a bus together. People from Greenhaven Correctional Facility and Otisville Correctional Facility were transported to Fishkill where we were all placed on a bus to Adirondack… [i]t was not possible to maintain 6 feet of distance between people during the bus ride. People were coughing during the bus

---

[19] CENTERS FOR DISEASE CONTROL AND PREVENTION, *supra*.

ride and no one wore masks…[a]t the time of transfer from Fishkill to Adirondack in June 2020, about 12 people had died at Fishkill. I was not tested or quarantined when I arrived at Adirondack. We all went into regular housing units. Spadaro Decl..

34.     Ignoring this public health protective measure placed both the existing and incoming inmates at significant risk of COVID-19 infection.

### B.     Quarantine of Individuals Exposed to COVID-19

35.     One person I spoke to and whose declarations I reviewed, Mr. Perez, had a close contact exposure to Witness Applegate, an inmate from a neighboring cell. Perez Supp. Decl. Applegate was subsequently removed from the congregate living unit due to his confirmed COVID-19. Declaration of Bradford Applegate ("Applegate Decl."). Plaintiff Perez reports that he was never contacted regarding this close contact exposure, nor was he tested for COVID-19 or screened for symptoms. Perez Supp. Decl.. Plaintiff Perez and his housing unit were never quarantined. Applegate Decl. Plaintiff Perez resumed regular acts of daily living in his congregate housing unit and also continued his work detail in multiple housing units and alongside inmates from different housing units. Perez Supp. Decl.

36.     Failing to screen, test, or separate Plaintiff Perez from other unexposed inmates after his close contact exposure to a person who had tested positive for COVID-19 threatened the health and lives of both Plaintiff Perez's housing unit as well as the rest of the inmates and staff at Adirondack Correctional Facility.

### III. Testing/Screening

37.     Screening for COVID-19 is an effective way to quickly identify inmates who may be infected with COVID-19. Screening can take the form of questions about symptoms or looking for signs of infection such as elevated body temperatures. Since inmates may have COVID-19 infection without showing any signs or symptoms, the CDC also describes the

benefit of testing for infection as an effective screening tool. Specifically, the CDC notes the usefulness of this approach in prison settings.[20]

38.    None of the declarants interviewed described regular screening checks for COVID-19, including questions regarding symptoms and temperature checks. CDC guidelines recommend avoiding transfers between facilities if at all possible, and states: "If a transfer is absolutely necessary…[p]erform verbal screening and a temperature check...before the individual leaves the facility."[21] All declarants whose statements I reviewed were transferred to Adirondack Correctional Facility during the COVID-19 pandemic. None commented on screenings and temperature checks prior to transfer or upon arrival to the new facility. Plaintiff Harper and Plaintiff Leon were tested approximately four weeks prior to being transferred. These tests become increasingly irrelevant as time elapses between testing and transferring. For this reason, the CDC guidelines for travel recommend testing within 72 hours of departure.[22]

39.    Routine testing of asymptomatic individuals is an important strategy to detect COVID-19 outbreaks early and minimize the number of exposed and affected individuals. The CDC recommends a triaged approach to screening inmates with COVID-19 tests based on positive cases that exist in their facilities and surrounding communities.[23] The following table illustrates these recommendations: [24]

---

[20] CENTERS FOR DISEASE CONTROL AND PREVENTION, CDC GUIDANCE FOR EXPANDED SCREENING TESTING TO REDUCE SILENT SPREAD OF SARS-CoV-2 (DEC. 3, 2020), *available at* https://www.cdc.gov/coronavirus/2019-ncov/php/open-america/expanded-screening-testing html.
[21] CENTERS FOR DISEASE CONTROL AND PREVENTION, *supra*.
[22] CENTERS FOR DISEASE CONTROL AND PREVENTION, DOMESTIC TRAVEL DURING THE COVID-19 PANDEMIC (DEC. 2, 2020), *available at* https://www.cdc.gov/coronavirus/2019-ncov/travelers/travel-during-covid19 html.
[23] CENTERS FOR DISEASE CONTROL AND PREVENTION, *supra*.
[24] *Id.*

| (consider higher categorization based on either of the 2 indicators below) | Low | Moderate | High | Highest |
|---|---|---|---|---|
| Cumulative number of new cases per 100,000 persons within the last 7 days | < 10 | 10 to 50 | 51-100 | ≥ 100 |
| Percentage of viral tests that are positive during the last 7 days | < 5% | 5% to 7.9% | 8% – 10% | ≥ 10.1 % |

| | |
|---|---|
| Low | Focus on ensuring testing for all close contacts of cases and potentially expanding using a tiered approach to those who might have exposure |
| Moderate | Weekly screening testing of select groups plus testing of close contacts |
| High | Weekly or twice a week screening testing of select groups plus testing of close contacts |
| Highest | Twice a week or more frequent screening testing for select groups plus testing of close contacts |

40. All declarants reported no routine testing at their facilities. They report sporadic testing. Witness Jenkins and Plaintiff Perez were tested approximately one month after arrival to Adirondack. Witness Cangiano has been tested twice.

41. The CDC recommends that individuals in close contact with another individual who may have been exposed to COVID-19 should quarantine for ten to fourteen days. While daily temperature checks are part of the recommended health monitoring, a single temperature recording is not a substitute for a fourteen-day quarantine from the time of exposure.

### IV. Mask wearing

42. CDC guidelines recommend that all individuals wear masks as a way to mitigate virus transmission by reducing the spread of the wearer's respiratory droplets. COVID-19 is

known to spread through asymptomatic carriers which necessitates universal masking; one can spread infectious droplets before showing any signs or symptoms of the disease. Mask-wearing has been shown to decrease incidence of COVID-19 infection.[25,26]

43.     The protective efficacy of masks is higher when masks are worn by the virus spreader, and there is a synergistic effect when masks are worn by all.[27] While wearing one's mask provides some protection against virus particles, individuals are reliant on those around them to also wear masks to minimize virus spread. In settings where social distancing is limited or impossible, such as the congregate living settings at Adirondack Correctional Facility, the full effectiveness of masks relies on every person, both inmates and staff, complying with masking policies.

44.     Every declarant disclosed inconsistent mask use by the prison guards, describing that guards were not always wearing masks while with the inmates and when around other guards. Witness Cangiano testified that "I have seen guards either not wearing masks or wearing masks around their chins so that they are not covering their noses or mouths." Cangiano Decl.. This is particularly concerning for several reasons. First, the prison staff have daily contact with the outside community, making it possible for staff to introduce a new infection into the inmate community. This risk would be decreased by consistent mask use while in the prison, but as disclosed in our Plaintiffs' and Witnesses' declarations, mask use by the staff is inconsistent at best. Second, there is an inherent power differential between the correctional officers and the inmates that makes it uncomfortable if not dangerous for inmates to request staff to comply with

---

[25] Jasper Fuk-Woo Chan et al., *supra*.

[26] Kevin Zhang et al., *The impact of mask-wearing and shelter-in-place on COVID-19 outbreaks in the United States*, 101 INT. J. INFECT. DIS. 334 (2020), *available at* https://www ncbi nlm nih.gov/pmc/articles/PMC7544634/.

[27] Hiroshi Ueki et al., *Effectiveness of Face Masks in Preventing Airborne Transmission of SARS-CoV-2*, AM. SOCIETY FOR MICROBIOLOGY E00637 (2020), available at https://www.ncbi nlm nih.gov/pmc/articles/PMC7580955/.

mask use. Finally, the DOCCS website shows that as of December 19, 2020, 2,506 DOCCS staff have tested positive for COVID-19, and six have died.[28] Infection with COVID-19 is a significant concern among prison staff, and the failure of prison staff to properly and consistently wear masks while at the Adirondack Correctional Facility jeopardizes the health and safety of the inmates.

45.     Mask availability has been another limitation described by the Plaintiffs and Witnesses. The CDC recommends that correctional facilities should "provide masks at no cost to incarcerated/detained individuals and launder them routinely."[29] All clients reported they have received several masks, with a mix of cloth and surgical-style masks. None have had masks laundered for them; each describes washing even the surgical-style masks by hand in the sink. Surgical masks are designed to be single use; our clients report reusing surgical masks for months on end. Adirondack Correctional Facility has failed in its responsibility to provide an adequate number of clean masks to our clients, and to ensure universal masking of staff to minimize viral spread between inmates and staff. This failure has placed these inmates at an increased risk of COVID-19 exposure and infection.

## V. Cleaning/Hygiene

46.     Fomites are objects that can carry infectious bacteria or viruses and have potential to transfer disease. Transfer is more likely from fomites that are hard and lustrous, such as tabletops, door knobs, or telephones. These are also examples of frequently touched objects and therefore pose a particularly high risk for transferring infection.

---

[28] NEW YORK STATE DEPARTMENT OF HEALTH, DOCCS COVID-19 REPORT (LAST ACCESSED DEC. 19, 2020), *available at* https://doccs.ny.gov/doccs-covid-19-report.
[29] CENTERS FOR DISEASE CONTROL AND PREVENTION, *supra*.

47.    A recent study analyzing the lifespan of SARS-CoV-2 on common surfaces revealed that infectious SARS-CoV-2 was isolated from all analyzed surfaces, except cotton, for up to 28 days at 68°F.[30]

48.    Because of the infectious exposure to fomites, both the CDC and the New York Department of Public Health recommend frequent hand washing as well as frequent disinfection of surfaces that are handled often. Hand washing for 20 seconds with soap and water is the best way to prevent autoinoculation (infecting oneself, e.g. after touching a telephone receiver covered in infectious virus then touching one's own eyes or mouth) and spreading infectious virus to other surfaces (e.g. after touching a telephone receiver covered in infectious virus and then touching a counter surface).

49.    Typically, inmates have limited access to soap. They are often required to purchase additional bars of soap from the prison commissary. Because the CDC recognized this practice would encourage soap-rationing behavior, they make the common-sense recommendation to suspend this barrier to soap acquisition, and suggest that during the pandemic inmates be given sufficient soap free of charge. "Provide a no-cost supply of soap to incarcerated/detained persons, sufficient to allow frequent hand washing...and ensure that individuals do not share bars of soap."[31] This intervention would limit transmission of infection to other fomites, inmates or officers.

50.    Inmates at Adirondack Correctional Facility are unable to consistently wash their hands with soap and water for 20 seconds because soap is still being rationed in this prison.

---

[30] Shane Riddell et al., *The effect of temperature on persistence of SARS-CoV-2 on common surfaces*, 17 VIROLOGY JOURNAL 145 (2020), available at https://virologyj.biomedcentral.com/articles/10.1186/s12985-020-01418-7#citeas.
[31] CENTERS FOR DISEASE CONTROL AND PREVENTION, *supra*.

51.     Witness Salinas noted that bars of soap were only given out once every two weeks and that this was insufficient. When Witness Salinas ran out of soap, he was forced to buy more at his own expense. Salinas Decl.

52.     Frequent cleaning of commonly touched surfaces and the barrier to soap access are examples of easily achievable interventions that would limit the transmission potential of SARS-CoV-2 at Adirondack Correctional Facility.

## VI.   Risk factors predisposing clients to a severe form of COVID-19 infection

53.     The disease course of COVID-19 is varied. While most infected individuals have mild or no symptoms, hundreds of thousands of people infected with SARS-CoV-2 virus suffered a moderate to severe disease course that often resulted in death. Much of the damage wrought during the disease process is pulmonary, and manifests as a viral pneumonia. Patients who suffer from COVID-19 pneumonia often need supplemental oxygen in a hospital setting to assist their breathing. In severe cases of the disease, this supplemental oxygen must be supplied by some form of mechanical ventilation. Some patients progress to even more severe forms of the disease when their responding immune systems begin to 'inadvertently' damage their own organs. Frequently, patients, many whom I have personally cared for, progressed to this severe form of disease. Their kidneys often fail and they develop shock states requiring different forms of life support medications. Unfortunately, despite aggressive measures with all available treatments, COVID-19 proves fatal in many patients who suffer this severe form of disease.

54.     It is now well documented that certain pre-existing diseases predispose patients to a more severe course of COVID-19 disease.[32] These pre-existing conditions include, but are not limited to, obesity, diabetes, cardiac disease, hypertension, and reactive airway disease. Advanced age, while not a disease, has also been identified as a major determinant for risk of a severe form of COVID-19.

55.     All Individual Plaintiffs have chronic medical conditions that put them at higher risk for the severe form of COVID-19 disease. Specific conditions as they relate to these clients are outlined below:

**A.     Age as a risk factor for severe COVID-19 disease**

56.     Advanced age, perhaps above all other risk factors, is a characteristic that has received the greatest amount of attention. This is likely due to the devastating toll SARS-CoV-2 had on elderly congregate living environments such as aged care homes. DOCCS moved older inmates to Adirondack Correctional Facility and transferred younger inmates out of Adirondack Correctional Facility to other prisons.[33] Everyone imprisoned at Adirondack Correctional Facility is 60 years old and above. Since the migration of older inmates to Adirondack Correctional Facility, the prison, not unlike aged care homes, has become a high-risk congregate living environment.

57.     The following table illustrates the increasing case fatality rate as ages incrementally rise:[34]

---

[32] CENTERS FOR DISEASE CONTROL AND PREVENTION, EVIDENCE USED TO UPDATE THE LIST OF UNDERLYING MEDICAL CONDITIONS THAT INCREASE A PERSON'S RISK OF SEVERE ILLNESS FROM COVID-19 (Nov. 2, 2020), available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/evidence-table.html.
[33] NEW YORK STATE DEPARTMENT OF CORRECTIONS AND COMMUNITY SUPERVISION, *supra*.
[34] CENTERS FOR DISEASE CONTROL AND PREVENTION, COVID-19 HOSPITALIZATION AND DEATH BY AGE (Aug. 18, 2020), available at https://www.cdc.gov/coronavirus/2019-ncov/covid-data/investigations-discovery/hospitalization-death-by-age.html.

| | Hospitalization[1] | Death[2] |
|---|---|---|
| 18-29 years | Comparison Group | Comparison Group |
| 30-39 years | 2x higher | 4x higher |
| 40-49 years | 3x higher | 10x higher |
| 50-64 years | 4x higher | 30x higher |
| 65-74 years | 5x higher | 90x higher |
| 75-84 years | 8x higher | 220x higher |
| 85+ years | 13x higher | 630x higher |

58.     After 50 years of age, the risk of dying from COVID-19 begins to rise rapidly. There are several declarants in this high risk group, including Plaintiff Leon, Witness Jenkins, and Plaintiff Perez, aged 62, 62, and 60, respectively. The risk of death for an infected person over the age of 65 jumps exponentially. Witnesses Spadaro and Cangiano have an alarming 90-fold risk of death compared to an inmate who is 29 years old. Plaintiff Harper is 75 years old. Not only is he living in a congregate environment with insufficient pandemic protective measures, but if he were to contract COVID-19, his risk of dying is 220-fold the risk of a 29-year-old inmate.

59.     Eight out of ten deaths reported in the United States have been among people over the age of 65. It behooves the reader to recognize these clients specifically, and Adirondack

Correctional Facility more broadly, as cohorts at especially high risk for severe disease, hospitalization, respiratory distress, and death.[35]

**B.      Obesity as a risk factor for severe COVID-19 disease**

60.      In addition to the heightened risk of advanced age, two clients suffer from obesity. Overweight is defined as BMI 25 to 29.9; obesity is a BMI of 30 or greater. Clients 2 and 6, with body mass indexes of 30 and 37 respectively, have a 4-fold increased chance of severe disease requiring hospitalization compared to normal or overweight individuals. If these clients contract COVID-19 they are at increased risk for severe course of infection and death.[36]

**C.      Hypertension as a risk factor for severe COVID-19 disease**

61.      All Individual Plaintiffs have hypertension, or elevated blood pressure. Hypertension causes chronic changes in the heart that may cause patients to be more susceptible to infection with SARS-CoV-2.[37]  One multicenter trial found the patients with hypertension who were infected with COVID-19 had a higher proportion of severe cases (64.6% vs 38.1%), and had a higher proportion of intensive care admission (21.5% vs 11.3%).[38] A large meta-analysis that looked at comorbid conditions and outcomes of COVID-19 illness found that out of chronic conditions such as chronic obstructive pulmonary disease (COPD), diabetes and malignancy, those with hypertension had the highest percentage of the deaths.[39] In addition to COVID-19,

---

[35] CENTERS FOR DISEASE CONTROL AND PREVENTION, OLDER ADULTS: AT GREATER RISK OF REQUIRING HOSPITALIZATION OR DYING IF DIAGNOSED WITH COVID-19 (DEC. 13, 2020), *available at* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html.
[36] Christopher M. Petrilli, MD et al., Factors associated with hospitalization and critical illness among 4,103 patients with Covid-19 disease in New York City (2020), *available at* https://www.medrxiv.org/content/10.1101/2020.04.08.20057794v1.full.pdf.
[37] Spoorthy Kulkarni et al., *COVID-19 and hypertension*, J. OF THE RENIN-ANGIOTENSIN ALDOSTERONE SYSTEM 1 (2020), *available at* https://journals.sagepub.com/doi/10.1177/1470320320927851.
[38] Songjiang Huang et al., *COVID-19 patients with hypertension have more severe disease: a multicenter retrospective observational study*, 43 HYPERTENSION RESEARCH 824 (2020), *available at* https://www.nature.com/articles/s41440-020-0485-2.
[39] Ruchong Chen, MD et al., *Risk Factors of Fatal Outcome in Hospitalized Subjects With Coronavirus Disease 2019 From a Nationwide Analysis in China*, 158 CHEST 97 (2020), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7158802/.

high blood pressure also causes damage to multiple organs including the heart, kidneys, and brain. This compounded attack on the body's organs lead to an increased risk of severe COVID-19 course of disease.[40] If Plaintiffs Harper, Perez, and Leon, or Witnesses Jenkins and Cangiano, contract COVID-19, they are more likely to have a severe infection and die due to their hypertension.

### D.   Diabetes as a risk factor for severe COVID-19 disease

62.    Plaintiff Perez and Witnesses Spadaro and Cangiano suffer from type 2 diabetes. Plaintiff Perez has poorly controlled diabetes. Witness Spadaro reports taking multiple medications to control his diabetes and has neuropathy in his feet requiring that he wears medical boots. Spadaro Decl. This level of end-organ damage to the nerves and microvasculature in Witness Spadaro's feet is indicative of poorly controlled diabetic disease. In patients with COVID-19, those with type 2 diabetes required more medical interventions and had a significantly higher mortality (7.8% vs 2.7%) and multiple-organ injury than non-diabetic individuals.[41] Another study found that the mortality rate among patients with diabetes was 28.8%, compared to 6.2% in patients without diabetes or hyperglycemia.[42] Both Plaintiff Perez and Witness Spadaro are at a significantly increased risk of death should they contract COVID-19.

---

[40] Tadesse Melaku Abegaz et al., *Target Organ Damage and the Long Term Effect of Nonadherence to Clinical Practice Guidelines in Patients with Hypertension: A Retrospective Cohort Study*, 2017 INT J HYPERTENS 1 (2017), *available at* https://pubmed ncbi.nlm.nih.gov/28695006/.

[41] Lihua Zhu et al., *Association of Blood Glucose Control and Outcomes in Patients with COVID-19 and Pre-existing Type 2 Diabetes*, 31 CELL METABOLISM 1068 (2020), *available at* https://www.ncbi nlm nih.gov/pmc/articles/PMC7252168/.

[42] Bruce Bode, MD et al., Glycemic Characteristics and Clinical Outcomes of COVID-19 Patients Hospitalized in the United States, 14 J. OF DIABETES SCIENCE AND TECHNOLOGY 813 (2020), *available at* https://doi.org/10.1177/1932296820924469.

### E.    Chronic Kidney Disease as a risk factor for severe COVID-19 disease

63.    Chronic kidney disease (CKD) is the presence of kidney damage or impaired

function for more than three months. While often clinically silent in its early stages, it can lead to

multiple health complications and eventually result in renal failure requiring hemodialysis. Both

Plaintiff Harper and Witness Jenkins suffer from CKD stage III (on a scale from I to V, with

patients with CKD V often requiring hemodialysis). Patients who become critically ill with

COVID-19 and have renal impairment such as CKD have high mortality rates, and patients with

severe CDK have a very high risk of mortality if infected with COVID-19.[43][44] CKD places

Plaintiff Harper and Witness Jenkins at an increased risk of death should they be infected with

COVID-19.

### F.    Asthma as a risk factor for severe COVID-19 disease

64.    Asthma leads to increased severity and mortality in patients with COVID-19.[45]

Plaintiff Perez has a history of bronchial asthma. Older patients and male patients with asthma

were even more susceptible to death due to COVID; Plaintiff Perez has all three risk factors.[46]

Asthma is also linked to more days on a mechanical ventilator and longer hospitalization times

for patients aged 50-64 years old who contract COVID-19; Plaintiff Perez is 60 years old.[47] His

history of asthma puts him at an increased risk of death or severe disease should he get COVID-

19, with a prolonged hospital stay.

---

[43] Williamson, E.J., Walker, A.J., Bhaskaran, K. et al., *Factors associated with COVID-19-related death using OpenSAFELY*. 584 NATURE 430 (2020), *available at* https://www.nature.com/articles/s41586-020-2521-4.
[44] M. Gasparini et al., *Renal impairment and its impact on clinical outcomes inpatients who are critically ill with COVID-19: a multicentreobservational study*, 2020 ANAESTHESIA 1 (2020), *available at* 0https://associationofanaesthetists-publications.onlinelibrary.wiley.com/doi/10.1111/anae.15293.
[45] Singh, Awadhesh Kumar, and Anoop Misra. *Impact of COVID-19 and comorbidities on health and economics: Focus on developing countries and India*, 14 DIABETES & METABOLIC SYNDROME 1625 (2020), *available at* https://www.ncbi nlm nih.gov/pmc/articles/PMC7451213/.
[46] Lee, S.C., Son, K.J., Han, C.H. et al., *Impact of comorbid asthma on severity of coronavirus disease (COVID-19)*, 10 SCI REP 21805 (2020), *available at* https://www.nature.com/articles/s41598-020-77791-8.
[47] Mahdavinia M, Foster KJ, Jauregui E, et al., *Asthma prolongs intubation in COVID-19*, 8 J ALLERGY CLIN. IMMUNOL. PRACT. 2388 (2020), *available at* https://www ncbi nlm nih.gov/pmc/articles/PMC7224651/.

### G.      Heart Conditions as a risk factor for severe COVID-19 disease

65.      Leon has coronary artery disease and suffered from a heart attack (myocardial infarction) about one year ago. He required a percutaneous coronary intervention with a stent placed in one of the arteries in his heart. Notably, the majority of our other clients also have risk factors associated with cardiovascular disease including hypertension, hyperlipidemia, diabetes and smoking.[48] Patients with underlying cardiovascular disease have a higher mortality rate when infected with COVID-19.[49][50] If infected with COVID-19, Leon is more likely to die due to his coronary artery disease.

## VII. Conclusion

66.      In conclusion, I believe that New York's DOCCS has failed to operationalize sufficient protective measures to prevent COVID-19 infection at Adirondack Correctional Facility. Review of these declarations has made it apparent that the protective health practices of physical distancing, screening and testing, quarantining, consistent mask wearing, and rigorous cleaning and hygiene have not been upheld. Given the lack of these protective measures, it is my medical opinion, to the best of my knowledge, that these declarants are at unusually and unnecessarily high risk for contracting COVID-19. Furthermore, it is my medical opinion, to the best of my knowledge, that the clients' medical conditions put them at especially high risk for a severe course of COVID-19 that may result in respiratory failure, extended hospitalization and death.

---

[48] Ben Lacey et al., *The Role of Emerging Risk Factors in Cardiovascular Outcomes*, 19 CURR ATHEROSCLER. REP. 28 (2017), *available at* https://pubmed ncbi.nlm nih.gov/28477314/.
[49] Tao Guo et al., *Cardiovascular Implications of Fatal Outcomes of Patients With Coronavirus Disease 2019 (COVID-19)*, 5 JAMA Cardiol. 811 (2020), *available at* https://jamanetwork.com/journals/jamacardiology/fullarticle/2763845.
[50] Ruchong Chen, MD et al., *supra*.

I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED WITHIN THE UNITED STATES ON: _January  8_____, 2021.

BY:  _M. Fenig_____

Mark Fenig MD

# EXHIBIT

# A

## MARK FENIG MD MPH

79 Boat Basin, Apt 20, New York, NY 10024; (C) 404.387.5528                Email: markfenig@gmail.com

---

**EDUCATION**

**McMaster University**, Hamilton, On, Canada
*Bachelor of Arts (BA),* November 2000
Concentration in Cultural Anthropology & Pre-Medical Sciences

**Yale University – School of Epidemiology & Public Health**, New Haven, CT
*Masters of Public Health (MPH),* June 2003
Concentration in Epidemiology of Microbial Diseases & Global Health

**Sackler School of Medicine – New York State Program**, Tel Aviv, Israel
*Medical Doctor (MD),* May 2007
Completed four-year American medical curriculum in Tel Aviv

**POST-GRADUATE TRAINING & EDUCATIONAL ACTIVITIES**

**Emory School of Medicine – Department of Emergency Medicine**, Atlanta, GA
*Emergency Medicine Resident,* Aug 2007 – Aug 2010
Providing care to over 250,000 patients annually in five metro Atlanta Emergency Departments,
including the region's only Level 1 trauma center and the leading adult and pediatric referral centers.

**Advanced Hazmat Life Support**, Macon, GA, May 2009
*Provider & Instructor Certified*

**PROFESSIONAL EMPLOYMENT**

**Montefiore Medical Center**, Weiler Division, Bronx, NY
Attending Physician, Department of Emergency Medicine, 8/2010 – Present

**Albert Einstein College of Medicine,** Bronx, NY
Assistant Professor of Emergency Medicine, 11/ 2010 – 4/2013, 8/2017 - Present

**Lincoln Medical and Mental Health Center,** Bronx NY
Attending Physician, Department of Emergency Medicine, 10/2012 – 7/2017

**Weill Cornell Medical College**, New York, NY
Clinical Instructor of Emergency Medicine, 11/2012 – 8/2017

**BOARD CERTIFICATION**

**Diplomate of the American Board of Emergency Medicine**
June 2011 – December 2021

**MEMBERSHIPS**

**Fellow of the American Academy of Emergency Medicine (FAAEM)** 2012 - 2016
**Fellow of the American College of Emergency Physicians (FACEP)** 2007-2012, 2017

**AWARDS & HONORS**

**Weinerman Fellowship**, Yale University                                Summer 2002
Funds from this award were applied to research during a refugee health internship with the International Rescue Committee in Azerbaijan.

**Award of Excellence in Medical Toxicology,** Emory University                June 2009
Georgia Poison Center in conjunction with the Department of Emergency Medicine recognizes the resident who went above and beyond the requirements of the toxicology rotation.

# MARK FENIG MD MPH

79 Boat Basin, Apt 20, New York, NY 10024; (C) 404.387.5528                    Email: markfenig@gmail.com

---

**PROFESSIONAL ACTIVITIES**

**EM Student Education**                                                                                                August 2017 – Present
*Weiler Division Preceptor of 4th year student elective rotations, Department of Emergency Medicine, Montefiore Medical Center – Weiler Division*
Supervise clinical shift for all 4th year medical students at the Weiler division during their month-long Montefiore sub-internship rotation

**EM Student Education**                                                                                                August 2016 – June 2017
*Co-director of 4th year student elective rotations, Department of Emergency Medicine, Lincoln Medical and Mental Health Center*
Develop and supervise a curriculum for approximately 160 4th year medical students who annually complete a clinical rotation in our adult and pediatric emergency departments. Evaluate the students' performance based on standardized clinical competencies and complete a Standard Letter of Evaluation (SLOE) for each student based on faculty consensus scoring.

**Clinical Competency Committee**                                                                                June 2013 – June 2017
*Chair of Committee, Department of Emergency Medicine, Lincoln Medical and Mental Health Center*
Implementation and management of ACGME/RRC/EBEM/CORD new emergency medicine resident educational milestones. These milestones will be used as outcome measures for continuous ACGME and departmental monitoring of physician in training practices and competencies.

**Hospital Incident Command Center**                                                                          June 2013 – June 2017
*Chemical Disaster Response Officer, Lincoln Medical and Mental Health Center*
Member of the hospital emergency preparedness committee responsible for hospital-wide disaster drills as well as vulnerability assessments and surge capacity preparation. Serve Incident Command in capacity of response specialist in case of chemical disaster.

**STEMI-Accelerator Project**                                                                                       May 2013 – June 2014
*Co-Principal Investigator, Lincoln Medical and Mental Health Center*
Co-PI for Lincoln's participation in a multi-center project to establish regional STEMI systems of care by implementing a plan for collaboration between EMS, regional hospitals, emergency departments and cardiology specialists. Lincoln is one of the national STEMI Accelerator Non-PCI hospital sites for this project.

**Sackler School of Medicine Admissions Committee,**                                              October 2012 - Present
*Committee Member, New York, NY*
Member of a seven-person committee responsible to review medical school applications and make final determination regarding matriculation.

**International Earthquake Disaster Response,** Jimani, Dominican Republic                January 2010
*Emergency Medicine Volunteer Physician, BR2Haiti Organization*
Member of a seven-person team sent on medical mission to Good Samaritan Hospital along the Haitian border in the Dominican Republic. Directed the establishment of an urgent care center on the hospital compound. Responsible for an inpatient ward of 70 victims.

**American Red Cross**, New Haven, Connecticut                                                       January - May 2002
*Intern, Yale School of Public Health: Community Health Program Planning and Evaluation*
Worked in a consultancy capacity as a member of a research team for a joint Yale University-American Red Cross Project. Conducted health care disaster volunteer availability analyses. Results of this study were used to design the American Red Cross's future disaster preparedness infrastructure.

**Integrated Community-based Development Project (ICDP)**, Imishli, Azerbaijan            May-August 2002
*Health Intern, International Rescue Committee (IRC)*
Composed and edited country specific health education materials, analyzed primary health care survey results, and provided a water installation project with public health direction.

**Howard Hospital,** Glendale, Zimbabwe                                                                November-February 2000
*Volunteer Consultant, "Veahavta" - a non-profit organization, Toronto Canada*
Evaluated and reorganized patient admission process and patient hospital medical record management. Created a dynamic patient information database to accommodate admission and administrative needs.

2

# Mark Fenig MD MPH

79 Boat Basin, Apt 20, New York, NY 10024; (C) 404.387.5528                    Email: markfenig@gmail.com

| | |
|---|---|
| **Research & Publications** | **Publication,** Textbook Chapter<br>Zummer J, Fenig M, "Pediatric Trauma" in Waseem et al (eds.), Prepare for the Pediatric Emergency Medicine Board Examination; Springer Nature Switzerland AG (2020); ISBN 978-3-030-28372-8<br><br>**Publication,** Academic Emergency Medicine<br>Caputo, Azan, Dominguez, Donner, Fenig, et al. EmergeNcy Department Use of Apneic Oxygenation Versus Usual Care During Rapid Sequence Intubation: A Randomized Controlled Trial (The ENDAO Trial). Acad Emerg Med 24(11):1387-1394, 2017<br><br>**Publication,** Annals of Emergency Medicine<br>Gold M, Fenig M, Images in Emergency Medicine: Man with Pain in his Neck (Traumatic Hypoglossal Nerve Paralysis) Ann Emerg Med 68:545,561, 2016<br><br>**Publication,** American Journal of Emergency Medicine<br>Fenig M, et al, Laryngeal fracture after coughing, Am J Emerg Med 31:1421.e1-1421.e3, 2013<br><br>**Publication,** American Journal of Emergency Medicine<br>Fenig M, Lowman R, Thompson B, Shayne P, Fatal Posterior Sternoclavicular Joint Dislocation Due to Occult Trauma, Am J Emerg Med 28:385.e5 - 385.e8, 2010<br><br>**Publication,** Prehospital Emergency Care<br>Fenig M, Cone DC, Advancing Disaster Epidemiology and Response: Developing a National Disaster-Victim Database. Prehosp Emerg Care 9:457-467, 2005<br><br>**Abstract Presentation, American Public Health Association**, Philadelphia, PA                    November 2002<br>Fenig M, Stockman L, Nguyen K, Rosenstein S, Lwanga E, Assessment of September 11th Spontaneous Health Care Volunteers: Potential Impact on American Red Cross and Disaster Preparedness<br>Presented at the 130th Annual American Public Health Association Meeting. The Presentation has been included in the Meeting's Disaster Preparedness and Emergency Response session of the Injury Control and Emergency Health Services Program. APHA, Abstract 44993, 2002 |

| | |
|---|---|
| **Certifications** | **ACLS, ATLS, PALS, AHLS, HERT** |