# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Allen HARPER, José LEON, and Ranfis PEREZ on behalf of themselves and all others similarly situated; and the RELEASE AGING PEOPLE IN PRISON CAMPAIGN ("RAPP"), <br><br> Plaintiffs, <br> v. <br><br> ANDREW CUOMO, in his official capacity as the Governor of the State of New York; NEW YORK STATE DEPARTMENT OF CORRECTIONS AND COMMUNITY SUPERVISION; ANTHONY J. ANNUCCI, in his official capacity as the Acting Commissioner of the New York State Department of Corrections and Community Supervision; JOHN MORLEY, M.D., in his official capacity as the Deputy Commissioner and Chief Medical Officer of the New York State Department of Corrections and Community Supervision; and JEFFREY TEDFORD, in his official capacity as the Superintendent of Adirondack Correctional Facility <br><br> Defendants. | Civil Action No. 9:21-cv-19 (LEK/ML) |

**PLAINTIFFS' REPLY TO DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

## **TABLE OF CONTENTS**

**TABLE OF AUTHORITIES** .................................................................................... iii, iv

    **I.**    **INTRODUCTION**...............................................................................................1

    **II.**   **DEFENDANTS' ARGUMENT THAT ADIRONDACK'S CASE NUMBERS RENDER AN INJUNCTION PREMATURE IS BOTH FACTUALLY MISLEADING AND LEGALLY UNFOUNDED**........................................................1

    **III.**  **PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR ADA AND RA CLAIMS OF FAILURE TO MAKE REASONABLE MODIFICATIONS AND DISCRIMINATION** ........................................................4

    **IV.**  **PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR EIGHTH AMENDMENT CLAIM** ........................................................................6

        A.  DEFENDANTS' FOCUS ON THE LACK OF CASES TO DATE IS LEGALLY BASELESS..............................................................................................6

        B.  DEFENDANTS' CONDUCT TO DATE FALLS WELL SHORT OF THE EIGHTH AMENDMENT'S REQUIREMENTS ...........................................................7

    **V.**   **THE RISK OF A DEADLY OUTBREAK IS IMMINENT AND GRAVE, WARRANTING A FINDING OF IRREPARABLE HARM** .................................9

    **VI.**  **THE BALANCE OF EQUITIES FALLS CLEARLY IN FAVOR OF GRANTING THE PRELIMINARY INJUNCTION**..............................................10

    **VII.** **CONCLUSION** ................................................................................................10

# TABLE OF AUTHORITIES

Cases                                                                                                          Pages

*Alexander v. Nev. Dep't of Corr.*, No. 3:15-cv-213, 2016 WL 11184185
(D. Nev. Sept. 7, 2016) ..............................................................................................6

*Bartlett v. N.Y. State Bd. of Law Exam'rs*, 156 F.3d 321 (2d. Cir. 1998) .......................6

*Basank v. Decker*, 449 F. Supp. 3d 205 (S.D.N.Y. 2020) .............................................10

*Cameron v. Bouchard*, 815 Fed. App'x 978 (6th Cir. 2020) ..........................................9

*Duvall v. Cnty. of Kitsap*, 260 F.3d 1124 (9th Cir. 2001)................................................6

*Gebser v. Lago Vista Indep. School Dist.*, 524 U.S. 274 (1998) ....................................6

*Helling v. McKinney*, 509 U.S. 25 (1993)........................................................................8

*Farmer v. Brennan*, 511 U.S. 825 (1994)...............................................................6, 7, 8

*Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268 (2d Cir. 2009) ...............................6

*Martinez-Brooks v. Easter*, 459 F. Supp. 3d 411 (D. Conn. 2020).......................7, 9, 10

*Mays v. Dart*, 453 F. Supp. 3d 1074 (N.D. Ill. 2020) ..............................................10, 11

*Pennsylvania v. West Virginia*, 262 U.S. 553 (1923) ....................................................8

*Schoolcraft v. City of New York*, 955 F. Supp. 2d 192 (S.D.N.Y. 2013) ........................7

*Toure v. Hott*, 458 F. Supp. 3d 387 (E.D. Va. 2020) ) ..................................................11

*Valentine v. Collier*, 978 F.3d 154 (5th Cir. 2020) .........................................................8

*Wilson v. Williams*, 961 F.3d 829 (6th Cir. 2020) .....................................................9, 10

Statutes                                                                                                       Pages

42 U.S.C. § 12102, et seq............................................................................... *passim*

29 U.S.C. § 794, et seq................................................................................... *passim*

U.S. Const. amend. VIII................................................................................. *passim*

| Other Authorities | Pages |
|---|---|

N.Y. State Dep't of Corr. & Cmty. Supervision, DOCCS COVID-19 Report, https://doccs.ny.gov/doccs-covid-19-report ..............4

Robert Harding, *Auburn prison COVID-19 outbreak spreads to inmates*, The Auburn Citizen (Dec. 13, 2020), https://auburnpub.com/news/local/auburn-prison-covid-19-outbreak-spreads-to-inmates/article_dabb1624-9728-5048-9bbc-277c9adf3565.html ..............4

I.       **Introduction**

Defendants contend that because there has been no large scale COVID-19 outbreak at Adirondack, Plaintiffs' Motion for a Preliminary Injunction must fail. Plaintiffs seek to enjoin dangerous conditions at Adirondack, however, to ensure no such outbreak occurs. Relying on factual assertions that Plaintiffs' evidence belies, and that Plaintiffs will contest in the forthcoming evidentiary hearing, Defendants suggest that intervention is premature because no one has yet died at Adirondack. But the Constitution does not require the Court to wait for a highly predictable disaster to materialize in order to intervene, and for good reason: as examples in New York and around the country show, absent necessary precautions, COVID-19 spreads rapidly in prisons. Few cases balloon into hundreds in a matter of weeks, causing deaths and permanent injury. The Court need not wait until more people contract the virus and die in order to grant the narrow relief Plaintiffs seek to prevent an outbreak.

Below, Plaintiffs address Defendants' specious argument that the COVID-19 prevalence rate at Adirondack reflects Defendants' good conduct and renders intervention unnecessary. Plaintiffs then turn to Defendants' arguments on the merits of Plaintiffs' claims and the propriety of a preliminary injunction, including Defendants' argument that the harm is too speculative to warrant relief. As explained in Plaintiffs' Memorandum of Law and below, Plaintiffs have demonstrated the need for and propriety of the narrow Preliminary Injunction they seek.

II.      **Defendants' Argument that Adirondack's Case Numbers Render an Injunction Premature is Both Factually Misleading and Legally Unfounded.**

Defendants claim that relief is not warranted "because ACF has successfully managed the COVID-19 pandemic for elderly inmates in such a way that only three of its inmates have tested positive for COVID-19 out of 198 tests that have been administered[,]" Defs.' Mem. of Law in Opp. To Pls.' Mot. For Prelim. Inj. at 2 (hereinafter the "Resp.") (emphasis omitted). Case

1

numbers do not prove the constitutional adequacy of Defendants' conduct, however. Defendants' argument is therefore legally unfounded, as described in Section IV, *infra*, addressing Defendants' Eighth Amendment argument, as well as factually misleading, as described herein.

As a factual matter, case numbers alone are not evidence of good practices or constitutionally sound conditions at Adirondack. Here, low case numbers are simply a product of Defendants' luck. Defendants have fortuitously avoided a COVID-19 outbreak at Adirondack despite their failure to implement constitutionally necessary precautions. This is clear from abundant evidence that under prison conditions like those at Adirondack, COVID-19 outbreaks take hold very quickly, even in prisons that had previously been unaffected.

Defendants' recent experience with Woodbourne Correctional Facility, discussed in Plaintiffs' Memorandum of Law, illustrates precisely this danger. As of December 1, 2020, Woodbourne—which has the second-highest concentration of elderly people in the New York State prison system, after Adirondack—had zero cases and zero deaths since the start of the pandemic.[1] By December 22, 2020, three weeks later, the facility had reported 121 total positive cases and, by January 20, 2021, there had been 226 total positive cases at Woodbourne, along with two deaths.[2] Auburn, Bare Hill, Coxsackie, Gouverneur, and Groveland Correctional Facilities also reported between zero to two total positive cases as of December 1, 2020; now, as of January 20, 2021 these facilities together report a total of 744 positive cases and five deaths.[3] Similarly, Greene Correctional Facility had reported only two positive cases as of September 28, 2020, but approximately two weeks later, that number rose to over 90.[4] Elmira Correctional

---

[1] Ex. A, DOCCS COVID-19 Data Compilation at 5 (Dec. 1, 2020).
[2] *Id*. at 7 (Dec. 22, 2020), 8 (Jan. 20, 2020).
[3] *Compare id*. at 5 (Dec. 1, 2020), *with id*. at 8 (January 20, 2021).
[4] *Compare id*. at 1 (Sep. 28, 2020), *with id*. at 3 (Oct. 14, 2020).

Facility had only reported one positive case as of September 28, 2020 but, by October 28, 2020— just one month later—there had been a staggering 590 reported cases at the facility.[5] The low case numbers at Adirondack provide *no assurance* against an outbreak, imminently or in the near future. It is current conditions, not retrospective statistics, that drive COVID-19 outbreaks. As the record demonstrates, conditions at Adirondack are woefully inadequate.

Plaintiffs seek a narrow intervention before Adirondack experiences the same calamity as other facilities in New York and around the country. The people incarcerated at Adirondack are some of the most vulnerable people in the New York State prison system. They would be devastated by a COVID-19 outbreak. Defendants reliance on case numbers is alarming and shows that they are ignoring the severity of the risk: Defendants could have made a similar argument about Woodbourne on November 30, 2020, or Greene and Elmira on September 27, 2020. Plaintiffs do not have to wait to suffer the same fate that those facilities suffered on Defendants' watch in order to get relief. Rather than looking at whether there has not yet been an outbreak at the facility, this Court must determine whether Defendants are satisfying their statutory and constitutional obligations to take necessary steps to respond to the risk COVID-19

---

[5] *Compare id*. at 1 (Sep. 28, 2020), *with id*. at 4 (Oct. 28, 2020). These numbers all likely undersell the extent of the outbreaks, as they only account for infections among incarcerated people. As of January 20, 2021, there had been 4,543 confirmed cases of COVID-19 among the incarcerated population and 4,041 among staff, but the latter are not included in the statistics broken down by facility. N.Y. STATE DEP'T OF CORR. & CMTY. SUPERVISION, DOCCS COVID-19 REPORT, https://doccs.ny.gov/doccs-covid-19-report (last accessed Jan. 22, 2021). To illustrate the point, on December 8, 2020, DOCCS had reported only two positive cases among people incarcerated at Auburn Correctional Facility, Ex. A, DOCCS COVID-19 Data Compilation at 6 (Dec. 8, 2020) but, that same day, representatives from the union representing corrections officers claimed that over 120 corrections officers at the facility had either tested positive or been quarantined as a result of contact with a person who had been confirmed positive. Robert Harding, *Auburn prison COVID-19 outbreak spreads to inmates*, THE AUBURN CITIZEN (Dec. 13, 2020), https://auburnpub.com/news/local/auburn-prison-covid-19-outbreak-spreads-to-inmates/article_dabb1624-9728-5048-9bbc-277c9adf3565.html.

poses to Plaintiffs. They are not.

### III. Plaintiffs Are Likely to Succeed on the Merits of their ADA and RA Claims of Failure to Make Reasonable Modifications and Discrimination.

Plaintiffs raise two distinct Americans with Disabilities Act ("ADA") and Rehabilitation Act ("RA") claims – (1) failure to provide reasonable modifications, and (2) disparate treatment. Defendants do not even address Plaintiffs' reasonable modification claim, offering only the conclusory and unsupported assertion that no denial has taken place. Resp. at 13. This is flatly incorrect. As detailed in Plaintiffs' Memorandum of Law, Plaintiffs in the Disability Subclass claim that Defendants have violated their rights under the ADA and RA by failing to provide reasonable modifications that would enable them to access Adirondack's programs and services. Specifically, Disability Subclass members maintain that because of the particular risk COVID-19 poses, and Defendants' failure to provide reasonable modifications that would mitigate that danger, Disability Subclass members cannot safely participate in Adirondack's programs and services, including using the day rooms, eating in dining halls, and shaving in bathrooms. For the reasons stated in Plaintiffs' Memorandum of Law, they are likely to succeed on the merits of their reasonable modification claim under the ADA and RA.

Plaintiffs raise a separate claim of disparate treatment under the ADA and RA, because Defendants discriminated against them by transferring them to Adirondack on the basis of their disability and then failed to provide protections to reduce the likelihood of a COVID-19 outbreak there and to mitigate the harms of an outbreak if one did occur.

Defendants' arguments concerning Plaintiffs' disparate treatment RA and ADA claims also fail, as Defendants identify the incorrect legal standard for those claims. Without citation, Defendants wrongly contend that the same deliberate indifference analysis governs Eighth Amendment and ADA and RA claims. Resp. at 15. The Second Circuit has been clear, however,

4

that the standard for deliberate indifference under the ADA and RA is "deliberate indifference to the strong likelihood of a [statutory] violation," *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 275 (2d Cir. 2009) (alterations omitted) (quoting *Bartlett v. N.Y. State Bd. of Law Exam'rs*, 156 F.3d 321, 331 (2d. Cir. 1998)), which requires only that an official have "actual knowledge of discrimination . . . , [and] authority to correct the discrimination, and fail[] to respond adequately." *Loeffler*, 582 F.3d at 276 (quoting *Gebser v. Lago Vista Indep. School Dist.*, 524 U.S. 274, 290 (1998)). By contrast, the Eighth Amendment deliberate indifference standard requires that a defendant "know[] of and disregard[] an excessive risk to inmate health and safety[.]" *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). *See also, e.g.*, *Alexander v. Nev. Dep't of Corr.*, No. 3:15-cv-213, 2016 WL 11184185, at *3 (D. Nev. Sept. 7, 2016) (Eighth Amendment deliberate indifference standard differs from ADA and RA standard).[6] For the reasons stated in Plaintiffs' Complaint and Memorandum of Law, Defendants knew of the discrimination at issue here, had authority to correct it, and failed to respond adequately. Far from "bureaucratic inaction," *Loeffler*, 582 F.3d at 276 (quotation marks omitted), Defendants made a deliberate choice to transfer people to Adirondack due to their disability, and knowingly failed to protect them. Although Plaintiffs do not need to succeed on their intentional discrimination claim to succeed on their ADA and RA claims, they have nevertheless shown a likelihood that they will prevail on both categories of their ADA and RA claims.

---

[6] Indeed, courts identified deliberate indifference as the ADA and RA discrimination standard as a less onerous requirement than discriminatory animus in order to fulfill the remedial purposes of the ADA and RA. *See, e.g.*, *Loeffler*, 582 F.3d at 275; *Bartlett*, 156 F.3d at 331, *rev'd on other grounds by* 527 U.S. 1031; *Duvall v. Cnty. of Kitsap*, 260 F.3d 1124, 1138–39 (9th Cir. 2001).

### IV. Plaintiffs Are Likely to Succeed on the Merits of their Eighth Amendment Claim.

Defendants violate the Eighth Amendment when they incarcerate people under conditions that pose an objective risk of serious harm and, despite subjective knowledge of that harm, act with deliberate indifference to the risk the harm poses. *See*, *e.g. Martinez-Brooks v. Easter*, 459 F. Supp. 3d 411, 439 (D. Conn. 2020) (quoting *Farmer*, 511 U.S. at 832). Defendants argue that their actions do not constitute deliberate indifference because they claim (1) there has not been a large-scale COVID-19 outbreak at Adirondack so far, and (2) their efforts are consistent with efforts other courts have upheld as constitutionally adequate. *See* Resp. at 9.[7] Both points are legally incorrect and factually misleading.

A. <u>Defendants' Focus on the Lack of Cases to Date is Legally Baseless.</u>

Defendants' suggestion that the lack of COVID-19 cases at Adirondack to date demonstrates that they have not violated the Constitution errs in two ways. First, Eighth Amendment jurisprudence makes clear that Defendants have an Eighth Amendment duty to respond reasonably to the *risk* of harm, not just to *materialized* harm. Second, the argument is legally baseless because the Eighth Amendment focuses on Defendants' conduct, not on whatever outcomes have so far taken place because of that conduct.

---

[7] By arguing only that their actions do not constitute deliberate indifference, Defendants have conceded the other elements: that the potential harm is objectively serious and that they were subjectively aware of it. *See, e.g.*, *Schoolcraft v. City of New York*, 955 F. Supp. 2d 192, 199–200 (S.D.N.Y. 2013) (Defendants conceded likelihood of success on the merits by arguing only irreparable harm in their response). Moreover, as stated in Plaintiffs' Memorandum of Law, Plaintiffs have made a clear showing that the risk of harm is serious and that Defendants knew of this risk, which Defendants' response corroborates. As Defendants noted, they "transformed ACF . . . to a facility for elderly inmates . . . specifically to combat COVID-19 in the more vulnerable population of the elderly inmates." Resp. at 4-5.

6

Long-established jurisprudence makes clear that a risk of harm is sufficient to violate the Eighth Amendment. *See Farmer*, 511 U.S. at 845 (plaintiffs need not "await the consummation of threatened injury to obtain preventive relief.") (quoting *Pennsylvania v. West Virginia*, 262 U.S. 553 (1923)); *Helling v. McKinney*, 509 U.S. 25, 33 (1993) ("It would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to them. The Courts of Appeals have plainly recognized that a remedy for unsafe conditions need not await a tragic event."). Indeed, Plaintiffs bring their claims now to avert a potential injury, to "prevent a substantial risk of serious injury from ripening into actual harm[.]" *Farmer*, 511 U.S. at 845. As described in Section II, *supra*, without adequate precautions, in the prison setting COVID-19 can rapidly escalate from a few cases to a catastrophic outbreak. Defendants know this; as described above, they have seen these spikes before and are seeing them now around the state. Yet despite this proven danger, Defendants would have the Court ignore the wave of COVID-19 infections that are at this moment ravaging prisons throughout New York. The Eighth Amendment does not require this Court to sit idly by and await the arrival of this foreseeable catastrophe.

Defendants' reliance on the number of cases so far is also misplaced because the Eighth Amendment analysis focuses on Defendants' *conduct*, rather than chance circumstances at the prison. *See, e.g.*, *Valentine v. Collier*, 978 F.3d 154, 163 (5th Cir. 2020) ("[T]he Eighth Amendment inquiry concerns TDCJ's state of mind, not the scope of the injury.").

B.  Defendants' Conduct to Date Falls Well Short of the Eighth Amendment's Requirements.

Defendants cite numerous cases for the uncontroversial proposition that the Eighth Amendment does not require courts to micromanage prisons or second guess officials' reasonable responses. *See*, *e.g.* Resp. at 9-11. While courts defer to prison officials' reasonable

7

choices, the Constitution limits that deference: prisons are not free to ignore a serious threat to health and safety of incarcerated people or respond in an obviously deficient manner.

Instead, the Eighth Amendment requires prison officials to respond "reasonably" to serious threats to health and safety. As discussed in Plaintiffs' Memorandum of Law, Defendants have not taken meaningful efforts to prevent COVID-19 from entering the facility and have not enacted adequate protocols to either identify its presence in the facility or stop it from spreading, should it enter. *See* Memo. of Law at 25-28. Defendants cite a portion of the decision in *Cameron v. Bouchard*, 815 Fed. App'x 978 (6th Cir. 2020) identifying the steps the court in *Wilson v. Williams*, 961 F.3d 829 (6th Cir. 2020) found sufficient to survive constitutional scrutiny, and they contend that they "are taking all of the same preventive measures mentioned above, which necessarily means that they are not being deliberately indifferent to the Plaintiffs at ACF." Resp. at 16-17. This argument fails for two reasons. First, the reasonableness of a response depends on the particular risk of harm incarcerated people face —as a result, measures to mitigate the spread of COVID-19 that are adequate for one prison may amount to deliberate indifference in another, depending on, for example, the nature of the population and the risk of infection in the community. *See, e.g.*, *Martinez-Brooks*, 459 F. Supp. 3d at 442–43 (analyzing warden's Eighth Amendment duty in light of options available in that facility). For that reason, taking measures similar to those taken by a different prison with a different population in a different state at a different point in the COVID-19 outbreak cannot "necessarily" demonstrate compliance with the Eighth Amendment. Second, Defendants' response falls far short of the actions described in *Cameron*. As explained in Plaintiffs' Memorandum of Law and accompanying exhibits, Defendants are not adequately isolating and quarantining people who have contracted the virus, limiting group gatherings, providing incarcerated people continuous

access to soap, or even testing people before transferring them in or when they have had close contact with infected people. Defendants' response is comparable to responses courts have found constitutionally inadequate. *See, e.g.*, *Martinez-Brooks*, 459 F. Supp. 3d at 442–43; *Mays v. Dart*, 974 F.3d 810, 823–24 (7th. Cir. 2020). Because Defendants have acted with deliberate indifference to the serious risk Plaintiffs face, Plaintiffs are likely to succeed on the merits of their Eighth Amendment claim.

### V. The Risk of a Deadly Outbreak is Imminent and Grave, Warranting a Finding of Irreparable Harm.

Defendants contend that the risk of contracting COVID-19 and suffering death or serious complications does not constitute irreparable harm because it is too "speculative." Resp. at 18. This contention not only contradicts the demonstrated spread of COVID-19 in other prisons in New York, *see* Section II, *supra*, but it also ignores the clear weight of authority on this point. Courts have had no trouble finding that the risk of contracting COVID-19 in a prison constitutes irreparable harm sufficient to warrant preliminary injunctive relief. *Martinez-Brooks*, 459 F. Supp. 3d at 447 ("Courts across the country have concluded that the risk of contracting COVID-19 as a result of unsafe conditions of confinement constitutes irreparable harm."); *Basank v. Decker*, 449 F. Supp. 3d 205, 213 (S.D.N.Y. 2020) ("The risk that Petitioners will face a severe, and quite possibly fatal, infection if they remain in immigration detention constitutes irreparable harm warranting a TRO."); *Mays v. Dart*, 453 F. Supp. 3d 1074, 1098 (N.D. Ill. 2020) (risk of COVID-19 constitutes irreparable harm, especially for plaintiffs who are "over the age of 65 or with preexisting health conditions" and so "risk severe health consequences, including death, if they contract coronavirus"); *Wilson,* 961 F.3d at 844 ("The district court correctly noted that

9

inmates at Elkton face a risk of irreparable injury if they are infected by COVID-19.").[8]

This Court must act now. Irreparable harm is thus not a "mere possibility," *Mays*, 453 F. Supp. 3d at 1098; under Defendants' current practices, including the failure to test people before they enter the prison, the virus could easily enter the facility at any time, and by the time case numbers rise, it is too late to prevent deaths.

### VI. The Balance of Equities Falls Clearly in Favor of Granting the Preliminary Injunction.

Defendants allege no reason why the requested, extremely limited relief would impose any hardship, burden, or cost on them or on the public, essentially conceding Plaintiffs' point. Defendants merely assert that the balance of equities tips in their favor because they are "diligently serving the State's public health interest[.]" Resp. at 19. Plaintiffs also seek to further the interest of public health, and Defendants' conclusory assertion would provide a categorical exemption to Defendants from ever being subject to preliminary injunctive relief. Of course, no such exemption exists. For the reasons set forth in Plaintiffs' Memorandum of Law, the balance of equities clearly falls in favor of granting the preliminary injunction in its entirety.

### VII. Conclusion

For the foregoing reasons, Plaintiffs have demonstrated the urgent need for a Preliminary Injunction and ask that the Court grant that motion in its entirety.

---

[8] Defendants' reliance on *Toure v. Hott*, 458 F. Supp. 3d 387 (E.D. Va. 2020), Resp. at 18, is misplaced for several reasons. First, *Toure* was decided in April of 2020, before the nature of spread within correctional facilities was understood to the extent it is understood today. Moreover, the *Toure* Court relied on the undisputed fact that Defendants were isolating transferees. Here, Defendants have failed to isolate transferees. Likewise, the *Toure* Court found that Plaintiffs had failed to show the inadequacy of Defendants' medical resources. Here, Defendants' medical resources are inadequate. Finally, *Toure* did not include a concentration of high-risk individuals. In sum, *Toure* differs in crucial ways from the facts before this Court and is not instructive here.

Dated: January 22, 2021                              Respectfully Submitted,

/s/ Rebecca Livengood
Sasha Samberg-Champion (Bar Roll #702397)
Jia Cobb *Pro Hac Vice* (Bar Roll #520798)
Gabriel Diaz *Pro Hac Vice*
Rebecca Livengood (Bar Roll #702388)
RELMAN COLFAX PLLC
1225 19th St. NW, Suite 600
Washington, D.C. 20036
T: (202) 728-1888
F: (202) 728-0848

/s/ Stefen R. Short
Stefen R. Short (Bar Roll # 519275)
Sophia Gebreselassie*
David Billingsley (Bar Roll #702407)
THE LEGAL AID SOCIETY
PRISONERS' RIGHTS PROJECT
199 Water Street, 6th Floor
New York, N.Y. 10038
T: (212) 577-3530
F: (202) 728-0848

*Attorneys for Plaintiffs*

**Pro Hac Vice Application Pending*

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 22nd day of January, 2021, a copy of the foregoing Reply to Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for a Preliminary Injunction was filed using the CM/ECF system for the Northern District of New York which will send notification to the following counsel of record:

Michael G. McCartin
Assistant Attorney General, Of Counsel
Bar Roll No. 511158
Tel.: (518) 776-2620
michael.mccartin@ag.ny.gov

Kostas D. Leris
Assistant Attorney General, Of Counsel
Bar Roll No. 519646
Tel.: (518) 776-6125
Kostas.Leris@ag.ny.gov

/s/ Rebecca Livengood
Rebecca Livengood
*Attorney for Plaintiffs*