UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

ALLEN HARPER, on behalf of himself and
all others similarly situated; JOSE LEON, on
behalf of himself and all others similarly
situated; RANFIS PEREZ, on behalf of himself
and all others similarly situated; and RELEASE
AGING PEOPLE IN PRISON CAMPAIGN,
"RAPP,"

       Plaintiffs,

v.

ANDREW CUOMO, in his official capacity as
the Governor of the State of New York; NEW
YORK STATE DEP'T OF CORR. AND CMTY.
SUPERVISION; ANTHONY J. ANNUCCI, in his
official capacity as the Acting Commissioner of
the New York State Dep't of Corr. and Cmty.
Supervision; JOHN MORLEY, M.D., in his official
capacity as the Deputy Comm'r and Chief Medical
Officer of the New York State Dep't of Corr. and
Cmty. Supervision; and JEFFREY TEDFORD, in
his official capacity as the Superintendent of
Adirondack Corr. Facility,

      Defendants.

_____

9:21-CV-0019
(LEK/ML)

APPEARANCES:

RELMAN COLFAX PLLC
  Co-Counsel for Plaintiffs
1225 19th Street, N.W., Suite 600
Washington, D.C. 20036

LEGAL AID SOCIETY
  Co-Counsel for Plaintiffs
199 Water Street, 6th Floor
New York, New York 10038

OF COUNSEL:

REBECCA LIVENGOOD, ESQ.
GABRIEL DIAZ, ESQ.
JIA M. COBB, ESQ.

STEFEN SHORT, ESQ.
DAVID BILLINGSLEY, ESQ.
SOPHIA GEBRESELASSIE, ESQ.

LETITIA A. JAMES                                     MICHAEL G. MCCARTIN, ESQ.
Attorney General for the State of New York          KONSTANDINOS D. LERIS, ESQ.
  Counsel for Defendants                            Assistant Attorneys General
The Capitol
Albany, New York 12224


MIROSLAV LOVRIC, United States Magistrate Judge


## ORDER and REPORT-RECOMMENDATION

This matter has been referred to me for a Report and Recommendation by the Honorable

Lawrence E. Kahn, Senior United States District Judge.  Currently before the Court, in this civil

rights action filed by Allen Harper, Jose Leon, Ranfis Perez, and Release Aging People in Prison

Campaign ("RAPP") (collectively "Plaintiffs") against Andrew Cuomo, New York State

Department of Corrections and Community Supervision ("DOCCS"), Anthony J. Annucci, John

Morley, and Jeffrey Tedford (collectively "Defendants"), is Plaintiffs' motion for a preliminary

injunction pursuant to Fed. R. Civ. P. 65.  (Dkt. No. 8.)  Defendants have opposed Plaintiffs'

motion; Plaintiffs have replied to Defendants' opposition; and the Court has held a hearing on

Plaintiffs' motion.  (Dkt. No. 19; Dkt. No. 29; Text Minute Entries, 2/8/2021, 2/9/2021,

2/10/2021, 2/11/2021, 2/12/2021, and 2/16/2021.)  For the reasons set forth below, I recommend

that Plaintiffs' motion be denied.

## I.      RELEVANT BACKGROUND

### A.      Plaintiffs' Claims

Generally, liberally construed, Plaintiffs' Complaint alleges that Defendants have

transferred nearly one hundred elderly and medically vulnerable inmates to Adirondack

Correctional Facility ("Adirondack") without the basic health and safety protocols necessary to

prevent the spread of COVID-19.  (*See generally* Dkt. No. 1 [Pls.' Compl.].)

Generally, based on these allegations, the Complaint asserts three causes of action: (1) a claim of deliberate indifference to Plaintiffs' medical needs against Defendants Cuomo, Annucci, Morley, and Tedford pursuant to the Eighth and Fourteenth Amendments and 42 U.S.C. § 1983; (2) a claim that Defendants discriminated against Plaintiffs in violation of Title II of the Americans with Disabilities Act ("ADA"); and (3) a claim that Defendants DOCCS and Adirondack[1] discriminated against Plaintiffs in violation of Section 504 of the Rehabilitation Act ("RA"), 29 U.S.C. § 794.  (*Id.*)

### B.      Parties' Briefing on Plaintiffs' Motion

#### 1.      Plaintiffs' Memorandum of Law-in-Chief

Generally, in support of their motion for preliminary injunction, Plaintiffs assert four main arguments.  (*See generally* Dkt. No. 8, Attach. 1.)

First, Plaintiffs argue that they have demonstrated irreparable harm in the form of potential death or serious long-term injury that may result because of Defendants' failure to institute policies that would prevent an outbreak of COVID-19 at Adirondack.  (*Id.* at 19-23.) More specifically, Plaintiffs argue that "Adirondack is populated exclusively with people who are at the gravest risk for serious harm from COVID-19."  (*Id.* at 19.)  In addition, Plaintiffs argue that "courts around the country have recognized that the specific risk of death or injury COVID-19 poses to incarcerated people, and particularly to the medically vulnerable, satisfies the irreparable harm requirement."  (*Id.* at 20.)  Plaintiffs argue that Defendants' failure to

---

[1]      The Court notes that although Plaintiffs assert this claim against "Defendants DOCCS and Adirondack" (Dkt. No. 1 at 56), Plaintiffs do not identify Adirondack as a Defendant in the caption of their Complaint, nor is Adirondack likely an entity amenable to suit.  *See Dove v. Broome Cnty. Corr. Facility*, 10-CV-0002, 2011 WL 1118452, at *1, n.1 (N.D.N.Y. Feb. 17, 2011) (Peebles, M.J.) ("[T]he Broome County Correctional Facility is not a separate entity with its own legal identity and amenable to suit."), *report-recommendation adopted by* 2011 WL 867072 (N.D.N.Y. Mar. 10, 2011) (Hurd, J.).

conduct a meaningful testing and quarantining regimen creates an imminent risk of spread within Adirondack, which is particularly acute because if an outbreak did occur at Adirondack, it would overwhelm the local healthcare infrastructure.  (*Id*. at 21-22.)

Second, Plaintiffs argue that they are likely to succeed on the merits of their claims.  (*Id*. at 23-36.)  More specifically, Plaintiffs assert that they are likely to succeed on the merits of their ADA and RA claims because (a) Defendants have intentionally discriminated against members of the disability subclass by transferring them to Adirondack, and (b) Defendants have failed to provide reasonable modifications—including testing asymptomatic people, testing and quarantining people known to have come into contact with COVID-19 positive individuals, testing people before transferring them to Adirondack, quarantining and testing people after they arrive at Adirondack, allowing adequate distancing between inmates at mealtimes, in the bathrooms, and in recreation areas, and ensuring that inmates have doors on their bedrooms— and Defendants' failure to provide these modifications deters Plaintiffs' from accessing the programs and services at Adirondack safely.  (*Id*.)  Plaintiffs also assert that Defendants cannot demonstrate that the relief Plaintiffs seek would impose an undue hardship.  (*Id*.)  In addition, Plaintiffs argue that they are likely to succeed on the merits of their Eighth Amendment claim because (a) Defendants have exposed Plaintiffs to a substantial risk that COVID-19 will enter Adirondack and spread uncontrollably, and (b) Defendants have acted with deliberate indifference in exposing Plaintiffs to a serious risk of harm.  (*Id*.)

Third, Plaintiffs argue that the balance of the equities and public interest support a preliminary injunction.  (*Id*. at 36-39.)  More specifically, Plaintiffs argue that the preliminary injunction would promote public health, prevent death, and prevent further constitutional injury

without significant financial cost or logistical burden and no irreparable harm to Defendants. (*Id*.)

Fourth, Plaintiffs argue that the remedy they seek is appropriate.  (*Id*. at 39-40.)  More specifically, Plaintiffs argue that they seek an injunction ordering Defendants to immediately: (a) regularly screen and test all staff and incarcerated people at Adirondack, in a manner that allows timely isolation of positive cases; (b) isolate and distance those who tested positive and those suspected of having been exposed to COVID-19 from the rest of the Adirondack population; (c) cease transfers of inmates from other prisons to Adirondack until (i) everyone who is being transferred has been tested, quarantined pending results, and determined to be negative for COVID-19 before the transfer, (ii) staff conducting transfers have been tested, quarantined pending results, and determined to be negative for COVID-19 before the transfer, (iii) inmates are transferred from only one facility at a time and are not exposed to people from other facilities during transport, (iv) inmates being transferred and staff wear masks and are able to maintain social distance during transport, and (v) newly transferred inmates are quarantined separately from the current Adirondack population for a period of two weeks upon arrival at Adirondack. (*Id*.)

## 2.       Defendants' Opposition Memorandum of Law

Generally, in opposition to Plaintiffs' motion, Defendants assert three main arguments. (*See generally* Dkt. No. 19.)

First, Defendants argue that Plaintiffs cannot establish a substantial likelihood of success on the merits.  (*Id*. at 15-23.)  More specifically, Defendants argue that Plaintiffs cannot prevail on their ADA and RA claims because (a) Plaintiffs were not denied the opportunity to participate in or benefit from any of DOCCS's services, programs, or activities at Adirondack, (b) Plaintiffs

cannot establish that Defendants acted with deliberate indifference—which is required to

establish their intentional discrimination claim—in light of the fact that only three inmates at

Adirondack have tested positive (two in July 2020 and one in September 2020) for COVID-19

and no inmates have died.  (*Id*. at 18-21.)  In addition, Defendants argue that Plaintiffs cannot

prevail on their Eighth Amendment claims because they cannot demonstrate a clear likelihood of

success on their claim that Adirondack's response to COVID-19 reflects deliberate indifference

to a substantial risk of serious harm in violation of the Eighth Amendment.  (*Id*. at 21-23.)

Second, Defendants argue that Plaintiffs cannot establish irreparable harm.  (*Id.* at 24.)

More specifically, Defendants argue that Plaintiffs' allegation that they may contract COVID-19

and die as a result, is too speculative to be an injury that is "actual and imminent."  (*Id*.)

Third, Defendants argue that Plaintiffs cannot establish that the balance of hardships tips

in their favor or that granting preliminary injunctive relief is in the public interest.  (*Id*. at 25-26.)

More specifically, Defendants argue that they are diligently serving the State's public health

interest by preventing COVID-19 from spreading within Adirondack and keeping incarcerated

people at Adirondack free of COVID-19 for when they are released from confinement.  (*Id*.)

### 3.    Plaintiffs' Reply Memorandum of Law

Generally, in further support of their motion for preliminary injunction, Plaintiffs assert

five main arguments.  (*See generally* Dkt. No. 29.)

First, Plaintiffs argue that Defendants' argument that Adirondack's case numbers render a

preliminary injunction premature, is factually misleading and legally unfounded.  (*Id*. at 5-8.)

More specifically, Plaintiffs argue that the low case numbers at Adirondack are "a product of

Defendants' luck" and "COVID-19 outbreaks take hold very quickly, even in prisons that had

previously been unaffected."  (*Id*. at 6.)  Plaintiffs argue that rather than look at whether there has

not yet been an outbreak at Adirondack, the Court must determine whether Defendants are satisfying their statutory and constitutional obligations to take necessary steps to respond to the risk COVID-19 poses to Plaintiffs, which they are not.  (*Id*. at 7-8.)

Second, Plaintiffs argue that they are likely to succeed on the merits of their ADA and RA claims that Defendants (a) failed to make reasonable modifications, and (b) discriminated against Plaintiffs based on disparate treatment.  (*Id*. at 8-9.)  More specifically, Plaintiffs argue that Defendants' opposition did not address their reasonable modification claim, "offering only the conclusory and unsupported assertion that no denial has taken place."  (*Id*. at 8.)  However, Plaintiffs argue that Defendants failed to provide reasonable modifications that would enable them access to Adirondack's programs and services like safely using the day rooms, eating in the dining halls, and shaving in the bathrooms.  (*Id*.)  In addition, Plaintiffs argue that Defendants wrongly contend that the same deliberate indifference standard governs Eighth Amendment, ADA, and RA claims.  (*Id*.)  However, Plaintiffs argue that the "less onerous" standard for deliberate indifference under the ADA and RA is a "deliberate indifference to the strong likelihood of a [statutory] violation."  (*Id*. at 9.)  Plaintiffs argue that Defendants knew of the discrimination at issue here, had authority to correct it, and failed to respond adequately.  (*Id*.)

Third, Plaintiffs argue that they are likely to succeed on the merits of their Eighth Amendment claim.  (*Id*. at 10-13.)  More specifically, Plaintiffs argue that Defendants' focus on the lack of cases to date in Adirondack is legally baseless because (a) Defendants have an Eighth Amendment duty to respond reasonably to the risk of harm, not just materialized harm, and (b) the Eighth Amendment focuses on Defendants' conduct, not on whatever outcomes have so far taken place because of that conduct.  (*Id*. at 10.)  In addition, Plaintiffs argue that Defendants' conduct to date falls well short of the Eighth Amendment's requirements, which requires prison

officials to respond "reasonably" to serious threats to health and safety.  (*Id.* at 11-12.)  Plaintiffs

argue that (a) the reasonableness of the response depends on the particular risk of harm

incarcerated people face—as a result, mitigating measures that are adequate in one prison, may

amount to deliberate indifference in another, and (b) Defendants are not adequately isolating and

quarantining people who have contracted COVID-19, limiting group gatherings, providing

inmates continuous access to soap, or testing inmates before transferring them in or when they

have had close contact with infected people.  (*Id.* at 12-13.)

Fourth, Plaintiffs argue that the risk of a deadly outbreak is imminent and grave,

warranting a finding of irreparable harm.  (*Id.* at 13-14.)  More specifically, Plaintiffs argue that

the demonstrated spread of COVID-19 in other New York prisons establishes that the harm is

not "speculative."  (*Id.*)  In addition, Plaintiffs argue that other courts "have had no trouble

finding that the risk of contracting COVID-19 in prison constitutes irreparable harm sufficient to

warrant preliminary injunctive relief."  (*Id.* at 13-14.)

Fifth, Plaintiffs argue that the balance of the equities falls clearly in favor of granting the

preliminary injunction.  (*Id.* at 14.)  More specifically, Plaintiffs argue that Defendants assert no

reason why the requested relief would impose any hardship, burden, or cost on them or the

public.  (*Id.*)  In addition, Plaintiffs argue that they, too, seek to further the interest of public

health.  (*Id.*)

### C.    Hearing on Plaintiffs' Motion

The Court held a video conferencing hearing on Plaintiffs' motion on February 8, 2021,

February 9, 2021, February 10, 2021, February 11, 2021, February 12, 2021, and February 16,

2021.  (*See generally* Text Minute Entries, 2/8/2021, 2/9/2021, 2/10/2021, 2/11/2021, 2/12/2021,

2/16/2021.)  At the hearing, Plaintiffs called the following witnesses: (1) Mark Fenig, (2)

Bradford Applegate, (3) Jeffrey Shaman, (4) Francisco Salinas, (5) Ranfis Perez, (6) Allen

Harper, and (7) Jeffrey Schwartz.  (*See generally* Text Minute Entries, 2/8/2021, 2/9/2021,

2/10/2021, 2/11/2021.)  Plaintiffs also presented exhibits 1-20, that were admitted into the record

at the hearing.  (*See generally* Text Minute Entry, 2/10/2021.)  At the hearing, Defendants called

the following witnesses: (1) Kelly Slaven, (2) Benjamin Malark, (3) Jeffrey Tedford, (4) Rhonda

Marrone, and (5) Bonnie Perryman.  (*See generally* Text Minute Entries, 2/11/2021, 2/16/2021.)

In addition, Defendants presented exhibits 1-45 and 47-49, that were admitted into the record at

the hearing.  (*See generally* Text Minute Entry, 2/10/2021.)  At the conclusion of the hearing, the

Court provided the parties with an opportunity to supplement the record and submit additional

arguments.[2]

## II.    GOVERNING LEGAL STANDARD

"'The purpose of a preliminary injunction is . . . to preserve the relative positions of the

parties.'"  *N. Am. Soccer League, LLC. v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 37-38 (2d Cir.

2018) (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)).  "A preliminary

injunction is an 'extraordinary and drastic remedy' . . . ; it is never awarded as of right. . . . "

*Munaf v. Geren*, 553 U.S. 674, 689-90 (2008) (internal citations omitted).  Generally, in the

---

[2]     The Court notes that after considering (1) the testimony and exhibits presented at the
hearing, and (2) the declarations submitted by the parties with respect to Plaintiffs' motion for a
preliminary injunction, the safety protocols in response to COVID-19 at Adirondack are, like
everywhere, evolving as the world learns more about COVID-19.  The safety protocols at
Adirondack in June 2020, were not the same safety protocols in place at the time that the hearing
was conducted.  For example, during the hearing, it was revealed that thirty-seven inmates at
Adirondack received their first round of the COVID-19 vaccination on February 8, 2021.
Yesterday, on February 28, 2020, the United States approved a third COVID-19 vaccine.  As a
result, it would not be surprising to learn that additional safety protocols have been enacted since
the conclusion of the hearing.  Despite the ever-changing landscape before the Court in this
matter, as set forth more fully, *infra*, after carefully considering the conditions at Adirondack as
testified to at the preliminary injunction hearing, I recommend denying Plaintiffs' motion for a
preliminary injunction.

Second Circuit, a party seeking a preliminary injunction must establish the following three elements: (1) that there is either (a) a likelihood of success on the merits and a balance of equities tipping in the party's favor or (b) a sufficiently serious question as to the merits of the case to make it a fair ground for litigation and a balance of hardships tipping decidedly in the party's favor; (2) that the party will likely experience irreparable harm if the preliminary injunction is not issued; and (3) that the public interest would not be disserved by the relief.  *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (reciting standard limited to first part of second above-stated element and using word "equities" without the word "decidedly"); *accord, Glossip v. Gross*, 576 U.S. 863 (2015); *see also Am. Civil Liberties Union v. Clapper*, 785 F.3d 787, 825 (2d Cir. 2015) (reciting standard including second part of second above-stated element and using words "hardships" and "decidedly"); *Citigroup Global Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 38 (2d Cir. 2010) (holding that "our venerable standard for assessing a movant's probability of success on the merits remains valid [after the Supreme Court's decision in *Winter*]").

With regard to the first part of the first element, a "likelihood of success" requires a demonstration of a "better than fifty percent" probability of success.  *Abdul Wali v. Coughlin*, 754 F.2d 1015, 1025 (2d Cir. 1985), *disapproved on other grounds, O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349, n.2 (1987).  "A balance of equities tipping in favor of the party requesting a preliminary injunction" means a balance of the hardships against the benefits.  *See, e.g., Ligon v. City of New York,* 925 F. Supp.2d 478, 539 (S.D.N.Y. 2013) (characterizing the balancing "hardship imposed on one party" and "benefit to the other" as a "balanc[ing] [of] the equities"); *Jones v. Nat'l Conference of Bar Examiners,* 801 F. Supp. 2d 270, 291 (D. Vt. 2011) (considering the harm to plaintiff and any "countervailing benefit" to plaintiff in balancing the

equities); *Smithkline Beecham Consumer Healthcare, L.P. v. Watson Pharm., Inc.,* 99-CV-9214, 1999 WL 34981557, at *4-5 (S.D.N.Y. Sept. 13, 1999) (considering the harm to defendant and the "benefit" to consumers in balancing the equities); *Arthur v. Assoc. Musicians of Greater New York*, 278 F. Supp. 400, 404 (S.D.N.Y. 1968) (characterizing "balancing the equities" as "requiring plaintiffs to show that the benefit to them if an injunction issues will outweigh the harm to other parties"); *Rosenstiel v. Rosenstiel*, 278 F. Supp. 794, 801-02 (S.D.N.Y. 1967) (explaining that, in order to "balance the equities," the court "will consider the hardship to the plaintiff . . ., the benefit to [the] plaintiff . . ., and the relative hardship to which a defendant will be subjected") (internal quotation marks omitted).[3]

With regard to the second part of the first element, "[a] sufficiently serious question as to the merits of the case to make it a fair ground for litigation" means a question that is so "substantial, difficult and doubtful" as to require "a more deliberate investigation." *Hamilton Watch Co. v. Benrus Watch Co.*, 206 F.2d 738, 740 (2d Cir. 1953); *accord, Semmes Motors, Inc. v. Ford Motor Co.,* 429 F.2d 1197, 1205-06 (2d Cir. 1970).[4] "A balance of hardships tipping decidedly toward the party requesting a preliminary injunction" means that, as compared to the hardship suffered by other party if the preliminary injunction is granted, the hardship suffered by the moving party if the preliminary injunction is denied will be so much greater that it may be characterized as a "real hardship," such as being "driven out of business . . . before a trial could

---

[3]     *See also Abbot Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 12, n.2 (7th Cir. 1992) ("Weighing the equities as a whole favors X, making preliminary relief appropriate, even though the *undiscounted* balance of harm favors Y.") (emphasis added).

[4]     *See also Six Clinics Holding Corp., II v. Cafcomp Sys., Inc.*, 119 F.3d 393, 402 (6th Cir. 1997); *Rep. of the Philippines v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988); *City of Chanute v. Kansas Gas and Elec. Co.,* 754 F.2d 310, 314 (10th Cir. 1985); *R.R. Yardmasters of Am. v. Penn. R.R. Co.*, 224 F.2d 226, 229 (3d Cir. 1955).

be held." *Buffalo Courier-Express, Inc. v. Buffalo Evening News, Inc.*, 601 F.2d 48, 58 (2d Cir. 1979); *Int'l Bus. Mach. v. Johnson*, 629 F. Supp.2d 321, 333-34 (S.D.N.Y. 2009); *see also Semmes Motors, Inc.,* 429 F.2d at 1205 (concluding that the balance of hardships tipped decidedly in favor of the movant where it had demonstrated that, without an injunctive order, it would have been forced out of business as a Ford distributor).[5]

With regard to the second element, "irreparable harm" is "certain and imminent harm for which a monetary award does not adequately compensate." *Wisdom Import Sales Co. v. Labatt Brewing Co.*, 339 F.3d 101, 113 (2d Cir. 2003). Irreparable harm exists "where, but for the grant of equitable relief, there is a substantial chance that upon final resolution of the action the parties cannot be returned to the positions they previously occupied." *Brenntag Int'l Chem., Inc. v. Bank of India*, 175 F.3d 245, 249 (2d Cir. 1999).

With regard to the third element, the "public interest" is defined as "[t]he general welfare of the public that warrants recognition and protection," and/or "[s]omething in which the public as a whole has a stake[,] esp[ecially], an interest that justifies governmental regulation." Public Interest, *Black's Law Dictionary* (9th ed. 2009).

---

[5]     The Court notes that, under the Second Circuit's formulation of this standard, the requirement of a balance of *hardships* tipping *decidedly* in the movant's favor is added only to the second part of the first element (i.e., the existence of a sufficiently serious question as to the merits of the case to make it a fair ground for litigation), and not also to the first part of the first element (i.e., the existence of a likelihood of success on the merits), which (again) requires merely a balance of *equities* (i.e., hardships and benefits) tipping in the movant's favor. *See Citigroup Global Markets, Inc.*, 598 F.3d at 36 ("Because the moving party must not only show that there are 'serious questions' going to the merits, but must additionally establish that 'the balance of hardships tips decidedly' in its favor . . ., its overall burden is no lighter than the one it bears under the 'likelihood of success' standard.") (internal citation omitted); *cf. Golden Krust Patties, Inc. v. Bullock*, 957 F. Supp.2d 186, 192 (E.D.N.Y. 2013) ("[T]he *Winter* standard . . . requires the balance of equities to tip in the movant's favor, though not necessarily 'decidedly' so, even where the movant is found likely to succeed on the merits.").

The Second Circuit recognizes three limited exceptions to the above-stated general standard. *Citigroup Global Markets, Inc.*, 598 F.3d at 35, n.4.

First, where the moving party seeks to stay government action taken in the public interest pursuant to a statutory or regulatory scheme, the district court should not apply the less rigorous "serious questions" standard but should grant the injunction only if the moving party establishes, along with irreparable injury, a likelihood that he will succeed on the merits of his claim. *Id.* (citing *Able v. United States*, 44 F.3d 128, 131 (2d Cir. 1995)); *see also Otoe-Missouria Tribe of Indians v. New York State Dep't of Fin. Servs.*, 769 F.3d 105, 110 (2d Cir. 2014) ("A plaintiff cannot rely on the 'fair-ground-for-litigation' alternative to challenge governmental action taken in the public interest pursuant to a statutory or regulatory scheme.") (internal quotation marks omitted). This is because "governmental policies implemented through legislation or regulations developed through presumptively reasoned democratic processes are entitled to a higher degree of deference and should not be enjoined lightly." *Able,* 44 F.3d at 131.

Second, a heightened standard–requiring both a "clear or substantial" likelihood of success and a "strong" showing of irreparable harm"–is required when the requested injunction (1) would provide the movant with all the relief that is sought and (2) could not be undone by a judgment favorable to non-movant on the merits at trial. *Citigroup Global Markets, Inc.*, 598 F.3d at 35, n.4 (citing *Mastrovincenzo v. City of New York*, 435 F.3d 78, 90 (2d Cir. 2006)); *New York v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015) ("When either condition is met, the movant must show [both] a 'clear' or 'substantial' likelihood of success on the merits . . . *and* make a 'strong showing" of irreparable harm' . . . .") (emphasis added).

Third, the above-described heightened standard may also be required when the preliminary injunction is "mandatory" in that it would "alter the status quo by commanding some

positive act," as opposed to being "prohibitory" by seeking only to maintain the *status quo.*

*Citigroup Global Markets, Inc.*, 598 F.3d at 35, n.4 (citing *Tom Doherty Assocs. v. Saban Entm't*,

60 F.3d 27, 34 (2d Cir. 1995)).[6]

Here, Plaintiffs seek a mandatory preliminary injunction, and thus, are subject to the

heightened standard.

## III.    ANALYSIS

### A.    Likelihood of Success on the Merits

After carefully considering the matter, I find that Plaintiffs have not met their burden of

establishing a "clear or substantial" likelihood of success on the merits.

#### 1.    Plaintiffs' Eighth Amendment Claims

Prison conditions can constitute "cruel and unusual punishment" if prison officials act (or

fail to act) with "deliberate indifference to a substantial risk of serious harm to a prisoner."

*Farmer v. Brennan*, 511 U.S. 825, 836 (1994).  A constitutional violation under these principles

has both objective and subjective components.  First, a prisoner must be incarcerated under

conditions that, objectively, pose "a substantial risk of serious harm."  *Hayes v. N.Y.C. Dep't of*

*Corr.*, 84 F.3d 614, 620 (2d Cir. 1996) (citing *Farmer*, 511 U.S. at 834).  Second, because "only

the unnecessary and wanton infliction of pain implicates the Eighth Amendment," a prison

official must possess "a 'sufficiently culpable state of mind,'" which "[i]n prison-conditions

cases . . . is one of 'deliberate indifference' to inmate health or safety."  *Farmer*, 511 U.S. at 834

(quoting *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)).

---

[6]    Alternatively, in such a circumstance, the "clear or substantial likelihood of success" requirement may be dispensed with if the movant shows that "extreme or very serious damage will result from a denial of preliminary relief."  *Citigroup Global Markets, Inc.*, 598 F.3d at 35, n.4 (citing *Tom Doherty Assocs. v. Saban Entm't*, 60 F.3d 27, 34 [2d Cir. 1995]).

On the record before me at the preliminary injunction stage, I find that Plaintiffs have not demonstrated a clear likelihood of success on their claim that Defendants' response to COVID-19 reflects deliberate indifference to a substantial risk of serious harm.[7]

### a.    Objective Element

Plaintiffs have not shown a clear likelihood of success in demonstrating that they face "a substantial risk of serious harm" based on the conditions at Adirondack, *Lewis v. Siwicki*, 944 F.3d 427, 430-31 (2d Cir. 2019) (quoting *Farmer*, 511 U.S. at 834), given the measures that prison officials have instituted to address COVID-19 and the low COVID-19 positivity rate that those measures have attained at Adirondack.

There is no "bright line test" to determine if a risk of serious harm is "substantial" for Eighth Amendment purposes.  *Lewis*, 944 F.3d at 432.  Rather, a court must "assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk."  *Helling v. McKinney*, 509 U.S. 25, 36 (1993) (emphasis in original); *see Darnell v. Pineiro*, 849 F.3d 17, 30 (2d Cir. 2017) (citing *Blissett v. Coughlin*, 66 F.3d 531, 537 (2d Cir. 1995)) ("There is no 'static

---

[7]     "The question here is not whether [D]efendant[s] can or should do more, or whether court would adopt different policies if it were in charge of the Jails."  *Criswell v. Boudreaux*, 20-CV-1048, 2020 WL 7646405, at *18 (E.D. Cal. Dec. 23, 2020).  As one court has recently explained when considering a motion for a preliminary injunction brought by prisoners alleging deliberate indifference claims based on the prison's response to COVID-19:

> No one questions the magnitude of the challenge that COVID-19 presents in a prison setting, and if the Court were in the Governor's or Secretary's position, it may adopt additional or different measures.  But the question before the Court is not what it thinks is the best possible solution.  Rather, the question is whether Defendants' actions to date are reasonable.

*Plata v. Newsom*, 445 F. Supp. 3d 557, 568 (2020).

test' to determine whether a deprivation is sufficiently serious; instead, 'the conditions themselves must be evaluated in light of contemporary standards of decency.'"); *Phelps v. Kapnolas*, 308 F.3d 180, 185 (2d Cir. 2002) (citing *Helling*, 509 U.S. at 35-36; *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)) ("Ultimately, to establish the objective element of an Eighth Amendment claim, a prisoner must prove that the conditions of his confinement violate contemporary standards of decency.").  "In other words," the Supreme Court has written, "the prisoner must show that the risk of which he complains is not one that today's society chooses to tolerate." *Helling*, 509 U.S. at 36.

The Supreme Court has made clear that whether a particular danger poses a substantial risk of serious harm in a prison must be evaluated in light of the steps that the facility has already taken to mitigate the danger. *Id*. at 35-36.  For instance, when addressing a prisoner's Eighth Amendment challenge to environmental tobacco smoke exposure in *Helling*, the Court held that a lower court must consider the prison's new "formal smoking policy" and the recent changes to the prisoner's confinement circumstances in assessing whether conditions at the prison presented a substantial risk to the plaintiff's health. *Id.* at 36.  The Court described it as "[p]lainly relevant" to "the objective factor" that the plaintiff had been moved to a new prison and was "no longer the cellmate of a five-pack-a-day smoker." *Id.* at 35.  The Court also stated that "[i]t is possible that the new [formal smoking] policy will be administered in a way that will minimize the risk to [the plaintiff] and make it impossible for him to prove that he will be exposed to unreasonable risk with respect to his future health or that he is now entitled to an injunction." *Id.* at 36.  Thus, determining whether prison conditions pose a substantial risk of serious harm from COVID-19, or any other risk, must be determined "after accounting for the protective measures [the prison system] has taken." *Valentine v. Collier*, 956 F.3d 797, 801 (5th Cir. 2020).

Under these principles, there is no question that an inmate can face a substantial risk of serious harm in prison from COVID-19 if a prison does not take adequate measures to counter the spread of the virus.  "Courts have long recognized that conditions posing an elevated chance of exposure to an infectious disease can pose a substantial risk of serious harm."  *Chunn v. Edge*, 465 F. Supp. 3d 168, 200 (E.D.N.Y. 2020).  Thus, the Supreme Court has rejected the proposition that prison officials are permitted to "be deliberately indifferent to the exposure of inmates to a serious, communicable disease."  *Helling*, 509 U.S. at 33.  Moreover, the Second Circuit has explained that "correctional officials have an affirmative obligation to protect inmates from infectious disease."  *Jolly v. Coughlin*, 76 F.3d 468, 477 (2d Cir. 1996); *see Phelps*, 308 F.3d at 185 (noting that the Eighth Amendment reaches conditions that present an "unreasonable risk of serious damage to [prisoners'] future health").

As noted above, however, the relevant inquiry is whether Plaintiffs have shown a substantial risk of serious harm from COVID-19 at Adirondack in light of the countermeasures that the facility has in place to mitigate the risk of harm.  The preliminary injunction record leaves substantial reason to doubt Plaintiffs will ultimately succeed in making that showing.  Adirondack's response to COVID-19 has been aggressive and has included, *inter alia*, (1) measures to enforce social distancing in the dining hall (Dkt. No. 37, Attach. 1 at 1) such as (a) blue tape on the floor to direct inmates where they may stand, (b) tape on seats that inmates may occupy, and (c) a fifty percent maximum capacity in the dining hall, (2) providing hand sanitizer dispensers throughout the facility (*id*. at 25-26), (3) random testing for COVID-19 among inmates (which amounts to testing ten percent of the inmate population per week) (Dkt. No. 19, Attach. 1 at 5; Dkt. No. 19, Attach. 3 at 1), (4) additional cleaning supplies provided to each housing unit, (5) a computer tablet program that permits inmates to download movies and music

for recreation in their single occupancy cells, (6) doors on most cells (Dkt. No. 37, Attach. 1 at 7), (7) no new inmate transfers to Adirondack since August 2020, (8) the distribution of disposable and cloth masks to each inmate (with the option for additional masks upon request), (9) permitting inmates to eat food—from the commissary or sent to them by friends and family—in their cells, (10) separating phones by at least six feet, (11) requiring staff to wear masks at all times, (12) screening staff when they arrive for duty before permitting them to enter Adirondack—including taking the staff member's temperature and asking COVID-19 screening questions (*id.* at 78), (13) mandating staff to (a) stay home if they feel sick, and (b) go home if they become sick at work, (14) permitting inmates to shave with electric shavers in their cells, (15) requiring all servers to wear masks in the dining hall, (16) requiring inmates to wear masks at all times when out of their private cells and not eating in the dining hall, (17) beginning to vaccinate eligible incarcerated individuals, and (18) providing at least two isolation rooms in Adirondack's infirmary for quarantining (*id.* at 34) including at least one negative pressure isolation room.

In addition, the data—though limited—suggests that these measures have been quite effective in containing COVID-19 thus far.  Not a single Adirondack inmate has died from or been hospitalized as a result of COVID-19, even though Adirondack's population has a relatively high rate of comorbidities.  (Dkt. No. 19, Attach. 1 at 7-8; Dkt. No. 19, Attach. 4 at 2); *see Malcom v. Starr*, 20-CV-2503, 2021 WL 190870, at *9 (D. Minn. Jan. 15, 2021) ("The limitation of a highly infectious illness to a single active case in a prison setting cannot in any reasonable way be viewed as a 'deliberate indifference' to Petitioners' serious medical need."); *Criswell v. Boudreaux*, 20-CV-1048, 2020 WL 7646405, at *20 (E.D. Cal. Dec. 23, 2020) (holding that "the test results from the October 2020 testing of 135 inmates, which yielded only one positive test, to

be at least somewhat persuasive.  While the court understands plaintiffs' concerns that this testing event is not a representative sample and only provides a snapshot at that particular time, it stands to reason that the policies employed by defendant must have been effective at least to some extent for there to be a *nearly zero* positivity rate for those 135 inmates tested at that time.").

A plaintiff can certainly raise a claim under the Eighth Amendment based on risks that have not manifested themselves in any adverse health outcome.  *See Helling*, 509 U.S. at 33.  However, given that COVID-19 can lead to adverse health consequences quickly, and that Adirondack has seen no deaths or hospitalization so far, it is hard to conclude that inmates are at an elevated risk of contracting COVID-19 inside Adirondack relative to the risk they would face in the surrounding community.  That raises serious questions about whether Plaintiffs can satisfy the objective prong of the Eighth Amendment test.  It is hard to say that prisoners are exposed to a risk that "is not one that today's society chooses to tolerate," or a risk "so grave that it violates contemporary standards of decency," *id.* at 36, if the risk inside the facility is no greater than— and perhaps less than—the risk outside of it.

A comparison to cases in which district courts *have* found a substantial risk of serious harm for Eighth Amendment purposes illustrates the point.  The courts in those cases have commonly relied on evidence of elevated COVID-19 risks compared to the outside community.  In *Mays v. Dart*, for example, the court relied on statistical evidence that the jail "currently has the highest rate of new coronavirus infections in the country," and it determined that the plaintiffs had "demonstrated that certain of the conditions created by the intentional actions of the Sheriff enable the spread of coronavirus and significantly heighten detainees' risk of contracting the virus."  *Mays v. Dart*, 453 F. Supp. 3d 1074, 1092 (N.D. Ill. 2020).  In *Banks v.*

*Booth*, the court found that the plaintiffs were likely to prevail only after concluding that the defendants' argument "that Plaintiffs' risk of infection is the same as that of the outside community" was undercut by undisputed data showing that "the infection rate in [Department of Corrections] facilities was over seven times the infection rate of the District of Columbia at large." *Banks v. Booth*, 20-CV-0849, 2020 WL 1914896, at *6 (D.D.C. Apr. 19, 2020).  In *Martinez-Brooks v. Easter*, the court relied on the fact that it was "undisputed that there is an active and serious outbreak of COVID-19" at the facility in question, *Martinez-Brooks v. Easter,* 459 F. Supp. 3d 411, 439 (D. Conn. 2020), which the Attorney General had identified "as one of three experiencing significant outbreaks" across the entire Bureau of Prisons ("BOP") system of more than 100 facilities, 459 F. Supp. 3d at 426.  In *Alcantara*, the court found that in light of the COVID-19 outbreak at the detention facility, the immigration detainees' continued confinement amounted to punishment that was "excessive in relation to its purpose." *Alcantara v. Archambeault*, 20-CV-0756, 2020 WL 2315777, at *8-9 (S.D. Cal. May 1, 2020).

This case is quite different, at least at this stage of the litigation, because Plaintiffs have not made a comparable showing that those within the facility face a higher risk of infection than those outside of it.  Under those circumstances and on this preliminary injunction record, I conclude that Plaintiffs have not demonstrated a clear likelihood of success in establishing that they face a risk so grave that it violates contemporary standards of decency, given Adirondack's existing precautions.

### b.    Subjective Element

Plaintiffs have also not shown a clear likelihood that they will succeed in establishing the subjective component of an Eighth Amendment violation—that Adirondack officials have exhibited "'deliberate indifference' to inmate health or safety," *Farmer*, 511 U.S. at 834 (quoting

*Wilson*, 501 U.S. at 302-03), in their response to COVID-19.  The Eighth Amendment prohibits

only cruel and unusual "punishments," as a result, a prisoner who seeks to establish an Eighth

Amendment violation based on conditions of confinement must demonstrate that officials'

conduct reflects "the deliberate infliction of punishment," and not just "an ordinary lack of due

care for prisoner interests or safety."  *Francis v. Fiacco*, 942 F.3d 126, 150 (2d Cir. 2019); *see*

*Farmer*, 511 U.S. at 834-35 ("Deliberate indifference describes a state of mind more

blameworthy than negligence.").  While officials need not engage in "acts or omissions for the

very purpose of causing harm or with knowledge that harm will result," they must at least

"know[ ] of and disregard[ ] an excessive risk to inmate health or safety."  *Farmer*, 511 U.S. at

835, 837.  In other words, they must act with a *mens rea* "consistent with recklessness in the

criminal law."  *Id*. at 837.  Under this standard, "the official must both be aware of facts from

which the inference could be drawn that a substantial risk of serious harm exists, and he must

also draw that inference."  *Id.* at 835; *see, e.g.*, *Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir.

2006) ("This mental state requires that the charged official act or fail to act while actually aware

of a substantial risk that serious inmate harm will result.").  "[A]n official's failure to alleviate a

significant risk that he should have perceived but did not, while no cause for commendation,

cannot . . . be condemned as the infliction of punishment."  *Farmer*, 511 U.S. at 838.  "Whether

a prison official had the requisite knowledge of a substantial risk is a question of fact subject to

demonstration in the usual ways, including inference from circumstantial evidence."  *Id.* at 842.

       i.     **Adirondack's Aggressive Actions to Combat COVID-19
Belie Claims of Deliberate Indifference**

Under these principles, even if I determined that Plaintiffs had made the required

objective showing of substantial risk from COVID-19 under current conditions at Adirondack, I

would nevertheless conclude that Plaintiffs had not demonstrated a clear likelihood that

Defendants or Adirondack officials have displayed "deliberate indifference" to the risks of COVID-19 at the facility.  As set forth above in Part III.A.1.a. of this Order and Report-Recommendation, the evidence shows that Adirondack officials have been acting urgently to prevent COVID-19 from spreading and from causing harm.  These and other measures indicate that prison officials are "trying, very hard, to protect inmates against the virus and to treat those who have contracted it," and belie any suggestion that prison officials "have turned the kind of blind eye and deaf ear to a known problem that would indicate" deliberate indifference.  *Money v. Pritzker*, 453 F. Supp. 3d 1103, 1132 (N.D. Ill. Apr. 10, 2020); *see Swain v. Junior*, 958 F.3d 1081, 1090 (11th Cir. 2020) ("Accepting, as the district court did, that the defendants adopted extensive safety measures such as increasing screening, providing protective equipment, adopting social distancing when possible, quarantining symptomatic inmates, and enhancing cleaning procedures, the defendants' actions likely do not amount to deliberate indifference."); *Brown v. Wetzel*, 20-CV-0512, 2020 WL 8413496, at *1 (W.D. Pa. Dec. 18, 2020) (denying the plaintiff's second motion for a preliminary injunction for substantially the same reasons as plaintiff's first motion for a preliminary injunction was denied, holding that "the record reflects that officials [at the prison] have implemented policies to mitigate the risk of exposure [to COVID-19].  Those policies, including requiring the use of masks, limiting inmates' movements to promote social distancing, screening incoming visitors and staff; quarantining inmates that test positive for COVID-19; and providing inmates with antibacterial soap, which they are encouraged to use, appear to be consistent with Centers for Disease Control and Prevention ("CDC") guidance for limiting the spread of the virus. Given these precautions, Plaintiff does not show that the specific relief he requests . . . [is] necessary to avoid irreparable harm."); *United States v. Credidio*, 19-CR-0111, 2020 WL 1644010, at *2 (S.D.N.Y. Apr. 2, 2020) ("[T]he Court

cannot find that the BOP has been deliberately indifferent to [the inmate's] needs, in light of the numerous and significant plans and protocols recently implemented by the BOP to protect prisoners.").

Plaintiffs argue for a contrary result because, in their view, Defendants "have not taken meaningful efforts to prevent COVID-19 from entering the facility and have not enacted adequate protocols to either identify its presence in the facility or stop it from spreading should it enter." (Dkt. No. 29 at 12.)  However, Defendants' policies are evolving as new information regarding COVID-19 becomes available.  In addition, Adirondack has implemented and adopted policies intended to address the COVID-19 pandemic.  (Dkt. No. 37, Attach. 1 at 72-94.)  While there is evidence that some inmates were transported to Adirondack without proper COVID-19 precautions (i.e. without wearing masks throughout the duration of the trip, without proper distancing between individuals in the transport vehicle, and without testing and isolation before and after the transport), the record does not suggest that any such instances reflected deliberate indifference, rather than negligent errors in implementing a new policy under emergency conditions.  In fact, the CDC's guidance on the proper procedure for transporting inmates was amended on July 14, 2020,[8] which was after Bradford Applegate, Francisco Salinas, and Plaintiff Perez testified that they were transported to Adirondack.  *See Malcolm*, 2021 WL 190870, at *9 ("Although Petitioners seem to be arguing that the Eighth Amendment requires Respondents to maintain perfect compliance with those policies, perfection is not constitutionally required."); *Swain*, 958 F.3d at 1089 ("[L]apses in enforcement" of social-distancing policies during COVID-

---

[8]     *See* Centers for Disease Control and Prevention, Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities, https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (last visited March 1, 2021).

19 "do little to establish that the defendants were deliberately indifferent," absent evidence that prison officials were "ignoring or approving the alleged lapses."); *cf. Trammell v. Keane*, 338 F.3d 155, 165 (2d Cir. 2003) (concluding that although "deprivation of toiletries, and especially toilet paper, can rise to the level of unconstitutional conditions of confinement," the plaintiff failed to establish deliberate indifference when "[i]t appear[ed] . . . that the defendants were negligent in replenishing [the plaintiff's] supply"); *Rangolan v. Cnty. of Nassau*, 217 F.3d 77, 79 (2d Cir. 2000) (finding no deliberate indifference when "the County took steps to protect" a vulnerable inmate "but mistakenly failed to implement them"). The sweeping measures that Defendants and Adirondack officials have adopted—which the record reflects meaningful efforts—counsel strongly against a finding that Defendants are being deliberately indifferent to risks associated with COVID-19.

### ii. Plaintiffs Have Not Shown Defendants' Failure to Fully Implement Several CDC Recommendations Reflects a *Mens Rea* More Culpable Than Negligence

Plaintiffs contend that Adirondack officials have displayed deliberate indifference to the risks of the virus because they have not fully implemented several measures that the CDC recommends. Plaintiffs have adduced evidence that Adirondack officials have fallen short of the CDC's guidance in several respects: (1) inmates were transferred to Adirondack from other prisons without being tested before transfer, without quarantine on arrival, and it was not possible to maintain six feet of distance between inmates during the transfer to Adirondack, (2) inmates who were in close contact of someone with confirmed or suspected COVID-19 were not placed in quarantine for fourteen days, and (3) inadequate social distancing occurs in the bathrooms and day rooms at Adirondack.

Under standards of care that both parties have accepted, Adirondack officials' apparent failure to fully implement the CDC guidance in these areas constitutes a deficiency in Adirondack's response to COVID-19. Defendants have not disputed that the CDC protocols should guide their response to COVID-19. In fact, Defendants' witnesses embraced the CDC standards. To the extent that these areas remain deficient, they warrant prison officials' attention.

To establish an Eighth Amendment violation, however, Plaintiffs must show not only that prison officials have committed errors but also that prison officials made those errors with a mental state equivalent to criminal recklessness, "know[ing] of and disregard[ing] an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 837. Here, the surrounding circumstances suggest that it is far more likely that Defendants have made negligent errors in implementing complex guidelines during a novel crisis than that they have knowingly disregarded an excessive risk of serious harm. Adirondack's swift and extensive countermeasures are evidence that Defendants are taking the threat of COVID-19 seriously, amid "shifting parameters and guidance regarding how to combat a previously little known virus," *Money*, 453 F. Supp. 3d at 1131, rather than consciously turning a blind eye to any known danger. In fact, the changing nature of Defendants' countermeasures and procedures as additional information about COVID-19 becomes available is evidence that Defendants are not acting with a mental state equivalent to criminal recklessness. *See Malcolm*, 2021 WL 190870, at *8 (finding that prison officials increased the amount of PPE and cleaning supplies available to inmates, which reflects an evolving response to COVID-19 and does not support a finding of deliberate indifference); *Brown*, 2020 WL 8413496, at *4 (finding that since the denial of the plaintiff's first motion for a preliminary injunction, "additional protocols have been implemented, including the use of

enhanced PPE on [p]laintiff's unit.  Given these precautions, [p]laintiff has not shown that the specific measures he requests . . . are necessary to avoid irreparable harm.").

Moreover, the principal CDC guidance that Defendants appear to have fallen short to date—transfer of inmates among DOCCS facilities and the use of quarantine—requires complex implementation.  The guidance pertaining to transferring inmates among facilities, calls for a limit of transfers, but that if a transfer is necessary, DOCCS should perform a verbal screening and temperature check before leaving the facility and ensuring that the receiving facility has the capacity to quarantine or isolate the individual upon arrival.  (Dkt. No. 37, Attach. 1 at 51.)

Plaintiffs' incarcerated witnesses testified regarding varying degrees of compliance with respect to this guidance.  For example, Francisco Salinas testified that his temperature was taken, and he was asked COVID-19 screening questions before leaving Fishkill Correctional Facility ("Fishkill").  Plaintiff Harper testified that his temperature was taken before leaving Woodbourne Correctional Facility ("Woodbourne").  Each of Plaintiffs' incarcerated witnesses testified that during their transfer to Adirondack, inmates were spaced one inmate per bench despite the room available for two or three inmates on the bench.  This evidence reflects an effort by Defendants and Adirondack officials, albeit not perfectly, to reasonably socially distance the inmates.

In addition, the parties acknowledge that Adirondack is a DOCCS facility that has over one hundred and seventy-five beds but is "currently far under that capacity" with less than one hundred inmates.  (Dkt. No. 8, Attach. 18 at 6; Dkt. No. 19, Attach. 4 at 2.)  Adirondack was "re-purposed" in the spring of 2020, "as a medium security adult prison" that houses only male inmates who are "at least sixty years old and . . . have serious pre-existing medical conditions." (Dkt. No. 8, Attach. 18 at 6.)  These inmates were transferred to Adirondack "specifically . . . to

minimize contact and potential to get COVID-19."  (Dkt. No. 19, Attach. 4 at 2.)  Inmates at

Adirondack, unlike some other DOCCS facilities, "have their own separate rooms and do NOT

bunk together."  (*Id.* at 3.)  Thus, the transfer of Plaintiffs to Adirondack, while not in perfect

compliance with the CDC guidance, was conducted for the purpose of providing additional

protection to Plaintiffs in light of the COVID-19 pandemic.[9]

     The guidance also calls for quarantining an asymptomatic individual who has had close

contact of someone with COVID-19 and monitoring that individual for symptoms at least once

per day for fourteen days.  (Dkt. No. 37, Attach. 1 at 53.)  Plaintiffs presented evidence at the

preliminary injunction hearing that Defendants did not comply with this guideline after inmate

Bradford Applegate tested positive for COVID-19 in early October 2020.  However, Plaintiffs

also presented evidence that Defendants complied with this guidance after an Adirondack staff

member tested positive in the later part of December 2020.  Shortfalls in the immediate

implementation of guidelines this complex and resource-intensive do not suggest knowing

disregard of a substantial risk of harm, rather than negligent error.  *See Criswell*, 2020 WL

7646405, at * 20 (holding that instances where the defendant's intake and observation policies

were not followed, "whether they be due to mistake or carelessness, do not rise to the level of

reckless disregard.").

     Finally, any inference that Defendants or Adirondack officials have been knowingly

disregarding an excessive risk in their implementation of CDC guidance is undercut by the data

about the effectiveness of Adirondack's countermeasures thus far.  As noted above, Adirondack

has had no COVID-19-connected fatalities or COVID-19-linked hospitalization.  (Dkt. No. 19,

---

[9]    The Court also notes that no inmates have been transferred to Adirondack since August 2020.  (Dkt. No. 8, Attach. 18 at 9; Dkt. No. 19, Attach. 4 at 2.)

Attach. 4 at 1, 3.)  Plaintiffs offer little reason to conclude that prison officials have drawn the inference that inmates currently face a substantial risk of serious harm inside Adirondack, in the face of data suggesting that the rate of deaths and hospitalizations may be lower inside the facility than outside of it.  *See Farmer*, 511 U.S. at 837 (deliberate indifference requires that a prison official have drawn the inference that a substantial risk of serious harm exists).

### iii. Plaintiffs Have Not Established Deliberate Indifference Based on the Failure to Implement Additional Measures Not Called for Under CDC Guidelines

Plaintiffs also contend that Defendants and Adirondack officials are being deliberately indifferent because they have failed to adopt several steps recommended by Plaintiffs' experts, but not called for by the CDC's guidance.  Plaintffs fall far short of establishing deliberate indifference on those grounds.  With respect to at least one of the measures that Plaintiffs seek— testing of all inmates preferably every two weeks but no less than once a month (Dkt. No. 8, Attach. 15 at 11)—Plaintiffs have failed to demonstrate that such an approach was practicable in the initial months of the pandemic, given shortages in supplies.  *See Hernandez v. Keane*, 341 F.3d 137, 146 (2d Cir. 2003) (finding no deliberate indifference from delays in treatment when they were mostly "caused by factors outside defendants' control"); *Williams v. Vincent*, 508 F.2d 541, 544 (2d Cir. 1974) (indicating that deliberate indifference will not be found if treatment requested was "impossible under the circumstances" or not "practicable").  Since December 21, 2020, Defendants have randomly tested ten inmates per week from different housing units, for COVID-19.  (Dkt. No. 19, Attach. 1 at 5.)  This random testing policy was "made in consultation" with the New York State Department of Health.  (*Id*.)

Petitioners also take aim at Adirondack's failure to take additional steps that go beyond CDC guidelines, such as (1) inmates who are being transferred have been tested and quarantined

pending results and have been determined to be negative for COVID-19 prior to transfer (Dkt.
No. 8 at 2) (this recommendation was added to the CDC guidelines based on a revision dated
July 14, 2020),[10] (2) staff who are conducting transfers have been tested and quarantined pending
results and have been determined to be negative for COVID-19 prior to conducting transfers
(Dkt. No. 8 at 2), (3) inmates are transferred only from one facility at a time and are not exposed
to inmates from other facilities during the transport (*id*.), (4) post-transfer testing (Dkt. No. 8,
Attach. 1 at 28), and (5) "regular" facility-wide testing (*id*.).

    As discussed above, the CDC guidelines have not called for those practices, and Plaintiffs
have not demonstrated that Defendants' failure to adopt those specific approaches falls below
any standard of care.  I cannot conclude on this record that Defendants' or Adirondack officials'
failure to adopt those measures exposes inmates to a substantial risk of serious harm or that any
Defendants or Adirondack officials have drawn the inference that their failure to take such
measures creates any such risk.  *Cf. Valentine*, 956 F.3d at 802 (finding that plaintiffs were
unlikely to establish deliberate indifference when the evidence showed that prison officials were
taking measures "informed by guidance from the CDC and medical professionals").

### 2.    Plaintiffs' ADA and RA Claims

    On the record before me at the preliminary injunction stage, I find that Plaintiffs have not
demonstrated a clear likelihood of success on their ADA and RA claims.

    Title II of the ADA "proscribes discrimination against the disabled in access to public
services."  *Harris v. Mills*, 572 F.3d 66, 73 (2d Cir. 2009) (citation omitted).  The statute

---

[10]    *See* Centers for Disease Control and Prevention, Interim Guidance on Management of
Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities,
https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-
correctional-detention.html (last visited March 1, 2021).

provides that "no qualified individual with a disability shall, by reason of such disability, be

excluded from participation in or be denied the benefits of the services, programs, or activities of

a public entity, or be subjected to discrimination by any such entity." *Harris*, 572 F.3d at 73.

(citing 42 U.S.C. § 12132).[11]

Similarly, Section 504 of the Rehabilitation Act requires that "[n]o otherwise qualified

individual with a disability . . . shall, solely by reason of her or his disability, be excluded from

the participation in, be denied the benefits of, or be subjected to discrimination under any

program or activity receiving Federal financial assistance. . . ." 29 U.S.C. § 794(a).

The Second Circuit has noted that "the standards under both statutes are generally the

same[.]" *Wright v. New York State Dep't of Corr.*, 831 F.3d 64, 72 (2d Cir. 2016).  Moreover,

where, as here, the subtle distinctions between the statutes are not implicated, courts "'treat

claims under the two statutes identically.'" *Wright*, 831 F.3d at 72 (quoting *Henrietta D. v.

Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003)).

"In order to establish a prima facie violation under these acts, [an inmate] must show that

1) he is a qualified individual with a disability; 2) DOCCS is an entity subject to the acts; and 3)

he was denied the opportunity to participate in or benefit from DOCCS's services, programs, or

activities or DOCCS otherwise discriminated against him by reason of his disability." *Id.* (citing

*Henrietta D.*, 331 F.3d at 272).  It is well-settled that "neither Title II of the ADA nor § 504 of

---

[11]    A state prison is a "public entity" for purposes of the ADA. *See Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998) ("State prisons fall squarely within the statutory definition of 'public entity,' which includes 'any department, agency, special purpose district, or other instrumentality of a State or States or local government.'"); *Wright,* 831 F.3d at 72 ("Both the ADA and the RA undoubtedly apply to state prisons and their prisoners."); *Allah v. Goord*, 405 F. Supp. 2d 265, 279 (S.D.N.Y. 2005) ("Courts within this Circuit have consistently held that prisons fall within the ADA and the [RA] definition of the term 'public entity.'").

the Rehabilitation Act provides for individual capacity suits against state officials." *Garcia v. S.U.N.Y. Health Scis. Ctr. of Brooklyn*, 280 F.3d 98, 107 (2d Cir. 2001).

Defendants appear to concede, for purposes of Plaintiffs' motion for a preliminary injunction, elements one and two.  (Dkt. No. 19 at 18-19.)  However, Defendants dispute that Plaintiffs have established a likelihood of success with respect to element three.

There are "three available theories" of discrimination that can be used to establish the third prong of an ADA and RA claim: "(1) intentional discrimination (disparate treatment); (2) disparate impact; and (3) failure to make a reasonable accommodation."  *Fulton v. Goord*, 591 F.3d 37, 43 (2d Cir. 2009).

Plaintiffs allege the first and third bases for their ADA and RA claims, that: (1) Defendants have failed to provide them with reasonable modifications that would allow them to access programs and services at Adirondack safely, and (2) Defendants intentionally discriminated against them.  (Dkt. No. 8, Attach. 1 at 23.)

### a. Failure to Provide Reasonable Modifications

With respect to Plaintiffs' failure to provide reasonable modifications claim, I find that Defendants have taken reasonable measures to "prevent the unnecessary spread of COVID-19 within Adirondack."  *See Wright v. New York State Dep't of Corr.*, 831 F.3d 64, 73 (2d Cir. 2016) (internal quotation marks omitted) (quoting *Dean v. Univ. at Buffalo Sch. of Med. & Biomedical Scis.*, 804 F.3d 178, 189 (2d Cir. 2015)) ("[A] reasonable accommodation need not be perfect or the one most strongly preferred by the plaintiff, but it still must be effective.").

Here, inmates at Adirondack were provided with the following reasonable modifications to help prevent the unnecessary spread of COVID-19: (1) two bars of soap every two weeks, (2) hand sanitizer dispensers throughout the facility (Dkt. No. 37, Attach. 1 at 25-26), (3) cloth and

disposable masks, (4) random COVID-19 testing of asymptomatic inmates, (5) policies that

ensure adequate social distancing in the dining hall (*id.* at 1), (6) permission to use electric

trimmers for shaving in personal rooms, (7) allowing access to shaving razors for approximately

thirty-minute increments each day at 6:00 a.m. and 5:40 p.m. (*id.* at 40-41), (8) cleaning supplies

to each housing unit every day, and (9) several alternative recreational opportunities for inmates

so that inmates may remain socially distanced from one another including use of personal

computer tablets, reading materials, access to a gym, basketball, ping-pong, and going to the

yard. *See Norfleet v. Gaetz*, 820 F. App'x 464, 469-70 (7th Cir. 2020) (finding that the inmate

plaintiff failed to "introduce[] sufficient evidence to call into question whether" a sports

wheelchair was a necessary and reasonable accommodation).

Although Plaintiffs introduced evidence at the preliminary injunction hearing that, at

various times, social distancing in the day rooms to watch television or bathrooms to shave, was

difficult, if not impossible, there was also evidence that social distancing in other facilities,

where not all inmates are disabled as defined by the ADA and RA, was similarly difficult, if not

impossible. *See Malcolm v. Starr*, 2021 WL 190870, at *9, n.6 (D. Minn. Jan. 15, 2021)

(recommending that the plaintiffs' motion for a temporary restraining order be denied where,

with respect to their RA claims, the plaintiffs alleged that they were subject to the same

circumstances as all other inmates, some of whom were non-disabled inmates).  For example,

Francisco Salinas testified that before being transferred to Adirondack, he was incarcerated at

Fishkill, where he was housed in a dorm-style living arrangement, where each inmate had their

own cube to sleep in, but were not socially distanced from one another.  In addition, Plaintiff

Harper testified that before being transferred to Adirondack, he was incarcerated at Woodbourne,

where he was also housed in a cube separated by dividers with fifty-seven other inmates.

Moreover, Plaintiffs presented testimony at the preliminary injunction hearing that other inmates, who were not necessarily disabled as defined by the RA and ADA, were transferred among DOCCS facilities subject to the same circumstances that Plaintiffs and other Adirondack inmates experienced.  For example, Plaintiff Harper testified that during his transfer from Woodbourne to Adirondack, the transport vehicle that he was in stopped at Washington Correctional Facility and Clinton Correctional Facility, where other inmates were unloaded.

In addition, the Court notes that there was testimony at the preliminary injunction hearing that other DOCCS facilities do not have day rooms in each housing unit.  For example, Eastern Correctional Facility only has a television available for inmates on the yard.  Thus, Plaintiffs have not established that they have been unable to access programs, services, and activities that other inmates routinely access.  *See Wright v. New York State Dep't of Corr.*, 831 F.3d 64, 73 (2d Cir. 2016) (remanding on a motion for summary judgment where the plaintiff "testified that while at the Marcy and Franklin facilities he has been unable to access programs, services, and activities that other inmates routinely access.").

As a result, I find that Plaintiffs have not demonstrated a clear likelihood of success on their claim that Defendants failed to provide reasonable modifications to them.  *See Kearney v. Adams*, 15-CV-824, 2018 WL 3121618, at *9-10 (N.D.N.Y. Feb. 8, 2018) (Hummel, M.J.) (recommending that the plaintiff's ADA claim be dismissed at summary judgment stage where the plaintiff "fail[ed] to identify any programs or services that he was excluded from because of DOCCS'" failure to provide him with bilateral knee braces and crutches, where the denial of those accommodations was based on a doctor's medical determination that they were not medically necessary, and where DOCCS provided the plaintiff with reasonable accommodations such as a walker), *report and recommendation adopted* 2018 WL 1470579, (N.D.N.Y. Mar. 26,

2018) (Sharpe, J.); *Hall v. N.Y. State Dep't of Corr. & Cmty. Supervision*, 12-CV-0377, 2015 WL 901010, at *3-6 (N.D.N.Y. Mar. 3, 2015) (Suddaby, J.) (dismissing ADA and RA claims alleging disparate treatment and failure to reasonably accommodate the plaintiff's mental illness, where the plaintiff's denial of access to programs and services was based largely on his conviction of disciplinary offenses, the complaint failed to allege that "non-mentally-ill inmates convicted of a disciplinary offense and serving a sentence in SHU" received access to those programs); *Roberts v. City of New York,* 14-CV-5198, 2016 WL 4146135, at *9 (S.D.N.Y. Aug. 2, 2016) (dismissing ADA and RA claims where the plaintiff failed to allege that he "was excluded from participation in any program or activity, or otherwise treated differently, because of" his diabetes); *Rosado v. Herard*, 12-CV-8943, 2014 WL 1303513, at *4-6 (S.D.N.Y. Mar. 25, 2014) (dismissing ADA and RA claims where the plaintiff's allegations suggested that he was denied access to therapeutic group sessions because of his ethnicity, not because of his mental illness).

### b.    Intentional Discrimination

With respect to Plaintiffs' intentional discrimination claim, I find that Defendants have not acted with deliberate indifference.  As Plaintiffs set forth in their reply, the definition of deliberate indifference with respect to ADA and RA claims differs from the definition of deliberate indifference with respect to Eighth Amendment claims.  (Dkt. No. 29 at 8-9.) However, even under this "less onerous" standard, I find that Plaintiffs failed to establish a clear likelihood of success on the merits.

"Intentional discrimination does not require a showing of animosity or ill will; it may be inferred when a qualifying 'official,' or 'policymaker,' 'acted with at least deliberate indifference to the strong likelihood that a violation of federally protected rights will result.'"  *Biondo v.*

*Kaledia Health*, 935 F.3d 68, 73 (2d Cir. 2019) (quoting *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 275 (2d Cir. 2009)).  "The standard for deliberate indifference is set out in *Loeffler*," which requires "'an official who at a minimum [1] has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf [2] has actual knowledge of discrimination in the recipient's programs and [3] fails to adequately respond.'" *Biondo*, 935 F.3d at 73 (quoting *Loeffler.*, 582 F.3d at 276).  "*Loeffler* explained that such indifference must reflect a 'deliberate choice among various alternatives' and may not be inferred from mere 'negligence of bureaucratic inaction.'"  *Id*. at 73-74 (citing *Loeffler*, 582 F.3d at 276).

 As set forth more fully above, I find that Defendants have provided reasonable modifications to allow Plaintiffs to safely access Adirondack's programs and services.  While Defendants acknowledge that Adirondack "has been functioning as a facility for older inmates, who in general are more susceptible to serious harm from COVID-19 than younger inmates," Plaintiffs were "specifically transferred to [Adirondack] to minimize any contact and potential to get COVID-19" because there are fewer than one hundred inmates at Adirondack and the facility has over one hundred and seventy-five beds, which "more easily enables social distancing." (Dkt. No. 19, Attach. 4 at 2.)  Defendants moved Plaintiffs to a facility that is currently at approximately half of its capacity, where they would be housed in single cells—most with doors on them—and instituted significant measures to safeguard Plaintiffs from COVID-19.  It is hard to fathom, under these circumstances, how Defendants could arguably be acting in a fashion that is deliberately indifferent.

 As a result, I find that this factor weighs against granting Plaintiffs' motion for a preliminary injunction.

### B.      Irreparable Harm

"Irreparable harm is injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages." *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 660 (2d Cir. 2015).  The showing of irreparable harm "is the single most important prerequisite for the issuance of a preliminary injunction." *Rodriguez ex rel. Rodriguez v. DeBuono*, 175 F.3d 227, 233-34 (2d Cir. 1999).

The Court can presume irreparable injury where it is alleged that a constitutional right has been violated.  *See Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996) (finding that the district court's presumption of irreparable harm based on a showing of substantial likelihood of success on the merits on an Eighth Amendment claim was appropriate because "it is the *alleged* violation of a constitutional right that triggers a finding of irreparable harm").  However, "if a court finds it unlikely that a plaintiff will succeed on the merits of a constitutional claim, the argument that he is entitled to a presumption of irreparable harm based on the alleged constitutional violation is without merit." *Van Diver v. Nagy*, 20-CV-11340, 2020 WL 4696598, at *5 (W.D. Mich. Aug. 13, 2020).

Here, it appears unlikely that Plaintiffs will face an immediate and irreparable injury absent a preliminary injunction in light of the significant preventative measures taken by Defendants and Adirondack officials to prevent the spread of COVID-19.  Even without a global pandemic, "there is always an unfortunate risk that detainees will be exposed to certain communicable diseases" while incarcerated "due in obvious part to limited space, overpopulation, and lack of resources" in the prison system.  *Matos v. Lopez Vega*, 20-CV-60784, 2020 WL 2298775, at *10 (S.D. Fla. May 6, 2020).  These shortcomings, however, "do not automatically translate into a constitutional violation." *Matos*, 2020 WL 2298775, at *10.

Here, I find that Plaintiffs have failed to establish that they will suffer an irreparable injury—one that is actual and imminent—absent the requested injunctive relief.

As a result, I find that the irreparable-injury factor weighs against granting Plaintiffs' motion for a preliminary injunction.

### C.      Balance of Equities and Public Interest

"Given that Plaintiff has failed to show either a substantial likelihood of success on the merits or a threat of irreparable injury, the last two factors of the four factor balancing test do not alter the outcome of this case." *White v. Corr. Medical Services*, 08-CV-277, 2009 WL 529082, at *4 (W.D. Mich. Mar. 2, 2009) (citing *Gonzalez v. National Bd. of Med. Exam'rs*, 225 F.3d 620, 625 (6th Cir. 2000) ("Although no one factor is controlling, a finding that there is simply no likelihood of success on the merits is usually fatal.")); *see also In re DeLorean Co.*, 755 F.2d 1223, 1228 (6th Cir. 1985) (noting that the district court may decline to analyze all four factors where fewer factors are dispositive of the issue).

Further, regarding the public interest at stake, "the Court's intervention in internal prison operations without an urgently compelling and extraordinary reason is viewed as against the public interest." *Miles v. Kentucky Dep't of Corr.*, 16-CV-P73, 2016 WL 3636070, at *4 (W.D. Ky. June 29, 2016) (citing *Lang v. Thompson*, 10-CV-379, 2010 WL 4962933, at *7 (E.D. Ky. Nov. 30, 2010)); *see Matheis v. CDCR*, 20-CV-2100, 2021 WL 718603, at *4 (S.D. Cal. Feb. 24, 2021) ("The Court cannot substitute CDCR's own judgment on what would best serve the public interest, such as calculating whether transferring an inmate during times of COVID-19 would be net beneficial."); *Scofield v. Butler*, 20-CV-0652, 2020 WL 8513820, at *2 (M.D. Ala. Dec. 30, 2020) (holding that the plaintiff failed to establish that his requested injunction would not be adverse to the interests of the Government and public because "[t]he Government has a significant public interest in the administration of its prisons."); *Criswell v. Boudreaux*, 2020 WL

37

7646405, at *19 (E.D. Cal. Dec. 23, 2020) (citing *Roman v. Wolf*, 977 F.3d 935, 945-46 (9th Cir. 2020)) ("The Ninth Circuit also reiterated that 'the district court possesses broad equitable authority to remedy a likely constitutional violation,' but cautioned against 'micromanag[ing]' and 'wad[ing] into facility administration at a granular level beyond what is required to remedy the constitutional violation identified.'").

As a result, I find that this factor weighs against granting Plaintiffs' motion for a preliminary injunction.

**ACCORDINGLY**, it is

**RECOMMENDED** that Plaintiffs' motion for a preliminary injunction (Dkt. No. 8) be **DENIED**; and it is further

**ORDERED** that Defendants shall answer or otherwise respond to Plaintiffs' Complaint (Dkt. No. 1) within ten days of the date of this Order and Report-Recommendation; and it is further

**ORDERED** that the Clerk of the Court shall provide the parties with a copy of this Order and Report-Recommendation.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.**  *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec. of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

Dated: March  1 , 2021
    Binghamton, New York

Miroslav Lovric
U.S. Magistrate Judge